# EXHIBIT E

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE DISTRICT OF DELAWARE
2
           CHAPTER 11 CASE NO. 00-2425 (PJW)
3         Jointly Administered Adv. No. 00-3495 (PJW)
              Dist. Adv. No. 01-579 (BMS)
4
   In Re:
5
   INACOM CORP., et al.,
6
                              Debtors,
7  _____
8  INACOM CORP., on behalf of all
   affiliated Debtors,
9                        Plaintiff,
   v.
10
   TECH DATA CORPORATION,
11                       Defendant.
   _____
12
   TECH DATA CORPORATION,
13
                Third-Party Plaintiff,
14 v.
15 COMPAQ COMPUTER CORPORATION, et al.,
16              Third-Party Defendant.
   _____
17
18
19              DEPOSITION
20                  OF
21            MICHAEL ZAVA
22
          350 East Las Olas Boulevard
23              Suite 1700
          Fort Lauderdale, Florida
24
          Wednesday, January 26, 2005
25            9:14 a.m. - 4:14 p.m.

DOWNTOWN REPORTING (954) 522-3376

Inacom vs. Tech Data                          1/26/2005                          MICHAEL ZAVA

Page 38

1    If there was correspondence that came in
2    with a check in the 1999 time frame, what would
3    happen to that correspondence as far as internally
4    at Tech Data?
5        A.  What was supposed to happen would be that
6    the correspondence would be separated from the check
7    at the lock box and the correspondence would be sent
8    to Tech Data from the lock box.
9        Q.  Who at Tech Data would receive the
10   correspondence?
11       A.  Normally the accounting or the cash
12   application people because the correspondence would
13   normally be remittance advices.
14       Q.  In the 1999-2000 time frame, those folks
15   were in the accounting department?
16       A.  The cash application people, yes, work in
17   the accounting department.
18       Q.  At or around the time that you became
19   aware that, I think your words, you said Compaq was
20   purchasing a majority of Inacom, do you have a
21   recollection of ever becoming aware of any
22   correspondence that came with a check --
23       A.  Correspondence?
24       Q.  Correspondence, yes, that came with a
25   check sent to Tech Data?

Page 39

1        A.  No.
2        Q.  Just so I make sure you understand the
3    question, do you have any recollection as you sit
4    here today in the 1999-2000 time frame that
5    correspondence was being sent from Inacom with
6    respect to checks being mailed to Tech Data?
7        A.  No.
8        Q.  Same question but I am just going to
9    change it a little bit. In the 1999-2000 time
10   frame, as you sit here today, do you have any
11   recollection of correspondence ever being received
12   by Tech Data with a check from Compaq?
13       A.  No.
14       Q.  In the 1999-2000 time frame, are you aware
15   of any correspondence that may have been forwarded
16   from a company by the name of Custom Edge with
17   checks as forwarded to Tech Data?
18       A.  Could you repeat that? Let me make sure
19   I've got that clear.
20       Q.  In the 1999-2000 time frame, do you have
21   an independent recollection of checks being
22   forwarded to Tech Data from a company by the name of
23   Custom Edge that included correspondence with the
24   check?
25       A.  No.

Page 40

1        Q.  I believe I may have asked you this
2    question, but did you have any individual who you
3    contacted in the 1999 or 2000 time frame from
4    Inacom?
5        A.  Did I have --
6        Q.  That you contacted or corresponded with at
7    Inacom.
8        A.  No.
9        Q.  So your communications with Inacom would
10   have been conducted in 1999 or 2000 by one of your
11   directors or somebody below them?
12       A.  Yes.
13       Q.  In 1999, do you have any recollection of
14   Inacom falling behind as far as payments owed to
15   Tech Data?
16       A.  No.
17       Q.  In 2000, do you have any recollection of
18   Inacom falling behind in payments made to Tech Data?
19       A.  In 2000?
20       Q.  Yes, in the year 2000.
21       A.  I don't recall ever having that as a
22   consideration after the purchase, okay, so I would
23   not -- no, the answer to your question is no. The
24   situation was different.
25       Q.  So prior to the purchase by Compaq of a

Page 41

1    majority of Inacom, you don't have any recollection
2    of Inacom ever falling behind in payments owed to
3    Tech Data?
4        A.  Let me specify that. No more than would
5    be normal for any account that size. You know, life
6    is not perfect when you are asking these accounts to
7    pay within, our terms are net 30 days. Nobody pays
8    in net 30 days.
9            Accounts of this stature generally paid in
10   those days in the 40-some day range and I have no
11   recollection of them paying worse than the norm.
12       Q.  I am going to show you a document.
13           MR. NOLAN: Let's mark this as
14       Exhibit 1 to this deposition.
15       (Thereupon, defendant's answer and
16       affirmative defenses was marked as
17       Deposition Exhibit 1 for Identification.)
18   BY MR. NOLAN:
19       Q.  Why don't you take your time and look at
20   Exhibit 1.
21           MR. HUNT: Is there a particular
22       portion you would like him to review?
23       Q.  The first question after you have looked
24   over the page is, is that your signature. I want to
25   represent to you that this was a proof of claim that

11 (Pages 38 to 41)

Inacom vs. Tech Data                    1/26/2005                    MICHAEL ZAVA

Page 42

1  was filed in the Inacom bankruptcy. Just scan it,
2  you don't have to study it.
3       (Pause.)
4       Q. Was that your title in 2000, vice
5  president of US credit services?
6       A. Yes.
7       Q. Do you have a recollection as you sit here
8  today of filing this proof of claim?
9       A. I have a recollection, well, specifically
10 no, but I recall the amount of the claim and signing
11 it, yes.
12      Q. Have you filed proofs of claim in other
13 bankruptcies besides the Inacom case?
14      A. Yes.
15      Q. Can I have you look at page 1 which is a
16 couple pages in the document. There is a column
17 underneath the heading of type. What does DM stand
18 for?
19      A. Debit memo.
20      Q. What's a debit memo?
21      A. Deduction by the customer.
22      Q. Was that an ordinary entry?
23      A. Yes.
24      Q. Can you tell me -- strike that.
25          What could a deduction by the customer be

Page 43

1  in that time frame, what could be the possible
2  source or explanation?
3       A. It could be a pricing discrepancy where
4  the customer believes they got X price and the
5  supplier charged them Y. It could be a shortage
6  issue where the customer ordered ten and only
7  received eight or claim they only received eight.
8           It could be the wrong product. There's
9  probably about 50 different categorizations.
10 Generally where the customer is disagreeing with
11 what you are billing them and then deducting it from
12 a subsequent payment to you.
13      Q. A debit memo, is there a form of some type
14 that was typically forwarded by Tech Data in this
15 time frame to the customer indicating that there was
16 going to be a debit on the account?
17      A. No, the customer would actually debit, for
18 instance, on their remittance to Tech Data, they
19 would list out the amount of the check, there would
20 be the total amount of the invoices that they were
21 going to be paying, they would actually put minus
22 debit memo blah blah blah, blah blah blah and we
23 would then take that debit memo with hopefully
24 enough explanation to figure out what it's all about
25 and refer it to whichever department should handle

Page 44

1  the issuance of a credit and if it had been a
2  deduction we would reinstate it under the customer's
3  account normally under their numbering scheme, that
4  is credits would come if they came and we would
5  match the credits against the debits.
6       Q. Would there be any type of a report that
7  would be generated by Tech Data when the customers
8  would go ahead and send an amount that was less than
9  the full amount of the invoice by Tech Data?
10      A. Any kind of report generated?
11      Q. Like a reconciliation report.
12      A. Generally speaking the statement which you
13 are looking at, a printed customer statement would
14 be the record of that item.
15      Q. There wouldn't be another document that
16 would be generated for each particular invoice or
17 check that had more detail on it?
18      A. No, we have certain data bases that we use
19 to track this because obviously customers of this
20 stature deduct often and within the scope of those
21 access data bases will categorize the kinds of
22 deductions and shoot them off to the various
23 departments and indeed we do share those
24 spreadsheets with the customers when we are trying
25 to reconcile accounts.

Page 45

1       Q. And the column next to type appears to be
2  doc number. Can you tell me what that refers to?
3       A. Likely that is the customer's debit memo
4  number. In other words, they likely numbered their
5  deduction when they sent it to us. Now, there is
6  another, we could also use debits to correct pricing
7  when we make an error too, so it could be that type
8  of thing as well.
9       Q. There is a DM 64422, would that also refer
10 to debit memo?
11      A. Yes.
12      Q. Underneath the type heading there is IN,
13 can you tell me what that refers to?
14      A. Invoice.
15      Q. Can you just tell me generally what would
16 that refer to, that being invoice as far as of this
17 reconciliation report?
18      A. It should be, an invoice would be the
19 billing for a specific item that's shipped, a copy
20 of that obviously would have detail as to what the
21 item was and what the pricing was.
22      Q. So that's actually an invoice for product
23 that wasn't paid --
24      A. Unpaid invoice, yes.
25      Q. According to the records at Tech Data?

12 (Pages 42 to 45)

Inacom vs. Tech Data  1/26/2005  MICHAEL ZAVA

Page 66

1  With respect to the sale of the
2  distribution business or asset purchase sale between
3  Inacom and Compaq, do you have knowledge concerning
4  that particular category?
5      A. Yes.
6      Q. Do you have personal knowledge concerning
7  category 1, meaning, did you have any communications
8  with anyone at Inacom concerning the sale of the
9  distribution business or asset purchase division to
10 Compaq?
11      MR. HUNT: I am going to object to
12  the form only to ask that the term
13  communications be explained.
14      Q. Did you ever talk with anyone at Inacom or
15 send any correspondence to anyone at Inacom
16 concerning the sale of the distribution business of
17 Inacom to Compaq or some other entity?
18      A. I'm just trying to think of the timing on
19 how this stuff works so I answer this correctly.
20 Did I have personal communication with someone with
21 regard to this, no. After the fact, later, yes,
22 after knowledge was known, I guess, is the way to
23 put it.
24      Q. Would that be with somebody at Inacom?
25      A. I participated in a conference call, okay.

Page 67

1      Q. After the sale of the asset division to
2  Compaq, I am going to call it Compaq. I know there
3  will be a reference later on about Custom Edge. Do
4  you know if Tech Data had any business relations
5  with Inacom, the service division?
6      A. I believe we did to some small degree for
7  education.
8      Q. I am going to skip -- actually, category
9  2, do you have knowledge concerning the terms of the
10 asset sale between Inacom and Compaq prior to
11 February 15, 2000?
12     A. Yes.
13     Q. As your duties and responsibilities at
14 Tech Data, have you -- strike that.
15         Do you know with category 3, are you the
16 person most knowledgeable concerning the issuance of
17 invoices between Tech Data and Inacom?
18     A. Am I the person most knowledgeable on
19 Number 3?
20     Q. Correct.
21     A. No.
22     Q. Do you know who that would be?
23     A. I would believe that to be the director or
24 someone under the director responsible for that
25 account.

Page 68

1      Q. And the director for the Inacom account
2  was Mr. Ward?
3      A. Yes.
4      Q. As far as category 4 and the facts and
5  documents with respect to the handling of payments
6  from Inacom, would the person most knowledgeable
7  also be Mr. Ward?
8      A. Yes.
9      Q. Category 6, would you be the person most
10 knowledgeable concerning accounts receivable and
11 collections?
12     A. Yes.
13     Q. At any time when you were at Tech Data,
14 did you ever become familiar with the phrase, held
15 checks with respect to Inacom?
16     A. With respect to Inacom?
17     Q. Correct.
18     A. Held checks like what? I mean, whether we
19 were asked to hold checks?
20     Q. No. Let me state the question a little
21 differently. Did you ever become aware in 1999 or
22 2000 that Inacom was holding checks that were actual
23 checks that paid invoices issued by Tech Data?
24     A. My knowledge on that would be extremely
25 limited. I do recall seeing something in some

Page 69

1  correspondence but I was not familiar or aware of
2  what that meant.
3      Q. So you are not, as you sit here today, you
4  don't have any personal recollection of a practice
5  at Inacom of holding checks that were payable to
6  Tech Data?
7      A. No.
8      Q. Do you ever recall in 1999 or 2000, there
9  being an issue with Inacom being unable to pay
10 certain amounts owed to Tech Data?
11     A. Being unable to pay?
12     Q. Yes, unable to pay on amounts that were
13 invoiced for a product that was shipped by Tech Data
14 to Inacom.
15     A. No.
16     Q. In 1999 or early 2000, did you ever become
17 aware of an issue concerning Inacom having
18 difficulties or problems with their cash flow?
19     A. Problems with their cash flow as far as
20 related to payments or just knowledgeable of cash
21 flow issues?
22     Q. With respect to making payments to
23 customers of theirs such as Tech Data?
24     A. With respect to making payments, no. I
25 mean, I obviously reviewed the Qs and the Ks and the

18 (Pages 66 to 69)

Case 1:04-cv-00148-GMS   Document 34-6   Filed 04/25/2005   Page 6 of 10

Inacom vs. Tech Data                                   1/26/2005                                    MICHAEL ZAVA

Page 154

```
 1    would the guarantee be in the file or the
 2    request? He is literally listening to
 3    your question, would the request be in
 4    the file.
 5      Q. Would a copy of the guarantee be in the
 6    file?
 7      A. Yes, it would.
 8      Q. Did you in preparation for your deposition
 9    review any materials in the H-P customer file?
10      A. No.
11      Q. So earlier in answering Mr. Nolan's
12    questions about the customer file you reviewed, it
13    was the Inacom customer file, is that right?
14      A. Yes.
15      Q. Do you know if Tech Data maintained a
16    separate Inacom and Custom Edge file as two
17    accounts?
18      A. I believe we created a new file for Custom
19    Edge, yes.
20      Q. Why was a new file created?
21      A. New company, new customer.
22      Q. So it wasn't to distinguish the amount
23    owing by each entity?
24      A. It was to support the credit line issued
25    to Custom Edge.
```

Page 155

```
 1      Q. Was a balance transferred over from the
 2    Inacom account to the Custom Edge account when it
 3    was opened?
 4      A. I don't recall.
 5      Q. Do you recall, do you have any
 6    recollection of communications by Mr. Ward with
 7    Custom Edge of roughly $2.2 million owing to Tech
 8    Data from Compaq because that was the amount of the
 9    liability assumed?
10      A. No.
11      Q. Do you have any knowledge of
12    communications between Mr. Ward and Inacom to try to
13    collect or try to get released, three checks in the
14    aggregate amount of 4.5 million because that was the
15    amount that Inacom was holding in its treasury
16    department?
17      A. Do I have any what?
18      Q. Knowledge of that.
19      A. I have knowledge of Mike making calls to
20    the appropriate people, we thought, to clear out the
21    balance of Inacom, yes.
22      Q. But my question is, did you know at the
23    time that Mr. Ward was calling Inacom to try to get
24    4.5 million in held checks released and he was
25    calling Custom Edge to try to get 2.2 million in
```

Page 156

```
 1    assumed liabilities paid?
 2      A. That's not the picture I see, no.
 3      Q. That's not the picture you saw at the
 4    time?
 5      A. Right.
 6      Q. So if Tech Data's customer profile
 7    revealed otherwise, you would be surprised?
 8      A. It might indicate calls were made to
 9    someone at Inacom or Custom Edge, whatever. In our
10    minds we were talking Custom Edge or Compaq.
11      Q. In your mind or Mr. Ward's mind or Tech
12    Data's mind?
13      A. Possibly all.
14      Q. But you can only refer to what was in your
15    mind.
16      A. Correct.
17      Q. Had Mr. Francis not delivered the letter
18    that you understood to indicate that Custom Edge was
19    assuming all the payables owing to Tech Data, what
20    would you have done as the credit manager?
21         MR. TATELBAUM: Objection, if you
22      speculate. But don't speculate; if you
23      know.
24      A. We would have reacted differently. As to
25    what exactly we would have done, I can not say, but
```

Page 157

```
 1    we would have reacted quite differently to the
 2    entire situation.
 3      Q. I may have asked you this and if I did, I
 4    apologize: Do you know what the outstanding
 5    receivable was from Inacom as of this closing,
 6    February 16, 2000?
 7      A. I don't.
 8      Q. Do you know if it was less than a million
 9    dollars or more than $10 million?
10      A. It was several million, I know that much.
11      Q. Was it less than 10 million?
12      A. I can't say without going back and
13    looking.
14      Q. Did whatever the number was, the several
15    million, did everything eventually get paid?
16      A. No.
17      Q. Do you recall how much didn't get paid?
18      A. Eight or 900,000, something of that
19    nature.
20      Q. So all but eight or 900,000 got paid?
21      A. Yes.
22      Q. Have you attempted to collect that eight
23    or 900,000 from H-P?
24      A. No.
25      Q. Why not?
```

Inacom vs. Tech Data                          1/26/2005                          MICHAEL ZAVA

Page 158

1   A. That was more or less the disputed kind of
2   things we were talking about before.
3   Q. In what sense?
4   A. Some very, very old.
5   Q. In what sense?
6   A. Deductions, disputes, accumulations over
7   years.
8   Q. I see. I wasn't tracking. The emphasis
9   in my question was, did you try to collect it from
10  Compaq or H-P after the Compaq/H-P merger as opposed
11  to collecting it from Inacom?
12       MR. TATELBAUM: Asked and answered.
13       THE WITNESS: What?
14       MR. TATELBAUM: You already answered
15  it. You didn't.
16  A. No.
17  Q. But you didn't try to collect it, you
18  answered that you didn't try to collect it from H-P
19  and I think that's correct, you didn't try to
20  collect it from H-P at all.
21  A. Right.
22  Q. But Tech Data did try to collect it from
23  Inacom.
24  A. I'm not sure about that either. I can't
25  give you an accurate answer on that. I'm not sure

Page 159

1   we did.
2   Q. Do you have Exhibit 1 in front of you?
3   A. I know what you are referring to.
4   Q. So that's a proof of claim that Tech Data
5   filed in Inacom's bankruptcy case.
6   A. Right.
7   Q. Seeking payment of that eight or 900,000.
8   A. I don't know what transpired between the
9   collection of the other dollars and the bad debt of
10  these dollars, as to whether H-P said, that's
11  disputed items, we're not going to pay it or that's
12  Inacom's because of such-and-such. I don't know
13  what transpired on that so I can't give you an
14  accurate answer.
15  Q. Do you know if demand was ever made on H-P
16  with respect to those amounts?
17  A. I don't know.
18  Q. Do you know if Tech Data ever accepted
19  payments from Inacom, not Custom Edge, after
20  February 16, 2000?
21  A. I would assume that we did with regard to
22  the entity, the service entity which did get a
23  credit line, a small credit line. I would have to
24  assume that indeed they paid against that credit
25  line for some period of time.

Page 160

1   Q. Do you know whether Tech Data accepted
2   payment from Inacom after February 16, 2000 with
3   respect to invoices delivered in connection with the
4   distribution and the hardware side of the business?
5   A. I'm sorry, say that again, please.
6   Q. Do you know whether Tech Data accepted
7   payment from Inacom, not Custom Edge, after February
8   16, 2000 with respect to invoices submitted to
9   Inacom's distribution and configuration business?
10  A. So what you are saying is did Inacom, the
11  new entity of services, make payment against the
12  other distribution piece assumed by Compaq?
13  Q. Right.
14  A. I don't know the answer to that. I would
15  assume not but I don't know the answer to that.
16  Q. Do you know if Tech Data accepted payments
17  from Inacom with respect to invoices that had been
18  submitted to Inacom before the acquisition by
19  Compaq?
20       MR. HUNT: Objection, for what
21  period?
22  A. No, I don't.
23  Q. So you are unaware of the fact that Tech
24  Data accepted payments of almost $5 million from
25  Inacom after the merger, a month after the merger?

Page 161

1   A. We were paid X amount of dollars after
2   such time as Compaq/Custom Edge told us that they
3   were responsible for that debt. Now, how Compaq
4   arranged the payment through any arrangement or
5   agreement with Inacom or checks or whatever was not
6   important to us at that juncture as long as we got
7   paid per their agreement to pay those liabilities.
8   Q. Again, you have no knowledge whatsoever
9   regarding whether or not Compaq knew about Inacom's
10  held checks?
11  A. I actually don't understand that question
12  quite, you know.
13  Q. I can restate it.
14  A. I understand what you are saying but I
15  guess I'm not getting the point.
16  Q. I can explain it.
17       MR. TATELBAUM: I am going to object
18  again because the question presupposes he
19  knows what's in the mind of somebody at
20  Compaq and he has not been qualified as a
21  soothsayer.
22  Q. You keep saying in a half a dozen answers
23  to my questions that Compaq must have directed
24  Inacom to do something and all I'm trying to
25  ascertain is what's the basis for your having made

41 (Pages 158 to 161)

Case 1:04-cv-00148-GMS    Document 34-6    Filed 04/25/2005    Page 8 of 10

Inacom vs. Tech Data                          1/26/2005                         MICHAEL ZAVA

Page 178

1  perform any type of an analysis to determine the
2  financial abilities of -- strike that. Poor
3  question.
4        Just prior to, which is in the year 2000
5  but prior to February 15, 2000, did you do any
6  analysis at all to identify whether or not Inacom
7  was meeting its debts?
8     A. **Inacom was reviewed every quarter by the**
9  **ECC.**
10    Q. That's at an executive committee?
11    A. **Right.**
12    Q. Do you sit on the executive committee?
13    A. **Yes.**
14    Q. If January 1st is the beginning of a year
15 even though it might not be the fiscal year, when
16 would the first executive committee meeting be?
17    A. **There is a meeting every month but the**
18 **customers are reviewed every 90 days and there's no**
19 **specific 90-day cycle per se.**
20    Q. So it wouldn't be March 31st of every
21 year?
22    A. **No, whenever the particular day fell, Qs**
23 **are pulled, Ks are pulled, they are analyzed, the**
24 **whole "shmere".**
25    Q. As you sit here today, do you have any

Page 179

1  recollection of whether or not subsequent to January
2  1, 2000 but prior to the February 15, 2000 sale,
3  whether or not the executive committee reviewed the
4  financial ability of Inacom in that time frame?
5     A. **I don't have any recollection as to the**
6  **last date reviewed but they would be current within**
7  **their 90-day cycle.**
8     Q. In any of those executive committee
9  meetings that you have attended and based upon your
10 pulling a position with Tech Data, do you have any
11 recollection of a discussion with regard to a
12 particular customer holding checks?
13    A. **No.**
14       MR. NOLAN: I don't have any other
15    questions, thank you.
16       MS. DUMAS: No more, thank you.
17       MR. TATELBAUM: We will read and
18    sign.
19       (Thereupon, the deposition was concluded)
20
21       MICHAEL ZAVA
22 Sworn to and subscribed before
   me this   day of   ,
23
24 Notary Public in and for
   the State of Florida at Large.
25

Page 180

1       CERTIFICATE OF NOTARY
2  STATE OF FLORIDA:
           SS.
3  COUNTY OF DADE:
4       I, MAXYNE BURSKY a Shorthand Reporter and
5  Notary Public in and for the State of Florida at
6  Large, do hereby certify that I reported in
7  shorthand the deposition of MICHAEL ZAVA, a witness
8  called by the debtors in the above-styled cause;
9  that the witness was first duly sworn by me; that
10 the reading and signing of the deposition were not
11 waived by the witness; that the foregoing pages,
12 numbered from 1 to 180, inclusive, constitute a true
13 record.
14      I further certify that I am not an
15 attorney or counsel of any of the parties, nor
16 related to any of the parties, nor financially
17 interested in the action.
18      WITNESS my Hand and Official Seal this
19 3rd day of February 2005.
20
21
22      MAXYNE BURSKY, RPR
23      Notary Public - State of Florida
        My Commission No. DD 125128
24      Expires: July 17, 2006
25

FILED
U.S.B.C. - DISTRICT OF DELAWARE
INACOM CORP., ET AL
00-2426 THROUGH 00-2452 (PJW)
00356

**PROOF OF CLAIM**
**District of Deleware**

Case Number: 00-2426
Chapter 11

Customer #1147688
Inacom Corporation
10810 Farnham Dr. Ste.200
Omaha, NE. 68154

1. The undersigned, who resides at <u>5301 Tech Data Drive, Clearwater, FL 33760</u> is the <u>Vice President of U.S. Credit Services</u> of <u>Tech Data Corporation</u>, a corporation organized under the laws of <u>Florida</u> and doing business at <u>5301 Tech Data Drive, Clearwater, FL 33760</u> and is authorized to make this proof of claim on behalf of the corporation.

2. The Debtor was at the time of the filing of the petition initiating this case, and still is indebted (or liable) to this claimant in the sum of **$929,187.11.**

3. The consideration for this debt(*or ground of liability*) is as follows:
    MISC. COMPUTER PRODUCT

4. (*If the claim is founded on writing*) The writing on which this claim is founded(*or a duplicate thereof*) is attached hereto(*or cannot be attached for the reason set forth in the statement attached hereto*):

5. (*If appropriate*) This claim is founded on an open account, which became(*or will become*) due on:

6. No judgment has been rendered on the claim except:

7. The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. This claim is not subject to any setoff or counter-claim except:

9. No security interest is held for this claim except:

(*If security interest in property of the debtor is claimed*) The undersigned claims the security interest under the writing referred to in paragraph 4 hereof (or under a separate writing which, or a duplicate of which is attached hereto, or under a separate writing which cannot be attached hereto for the reason set forth in the statement attached hereto). Evidence of perfection of such security interest is also attached hereto.

10. This claim is a general unsecured claim, except to the extent that the security interest, if any described in paragraph 9 is sufficient to satisfy the claim. (*If priority is claimed state the amount and basis thereof*)

Dated: June 27, 2000       Signed: _____
                                   Mike Zava, Vice President of U.S. Credit Services

EXHIBIT
Zava 1
1-26-05 MB



# PROOF OF CLAIM
## District of Deleware

Case Number: 00-2426
Chapter 11

Customer #1147688
Inacom Corporation
10810 Farnham Dr. Ste.200
Omaha, NE. 68154

1. The undersigned, who resides at <u>5301 Tech Data Drive, Clearwater, FL 33760</u> is the <u>Vice President of U.S. Credit Services</u> of <u>Tech Data Corporation</u>, a corporation organized under the laws of <u>Florida</u> and doing business at <u>5301 Tech Data Drive, Clearwater, FL 33760</u> and is authorized to make this proof of claim on behalf of the corporation.

2. The Debtor was at the time of the filing of the petition initiating this case, and still is indebted(*or liable*) to this claimant in the sum of **$929,187.11.**

3. The consideration for this debt(*or ground of liability*) is as follows:
   MISC. COMPUTER PRODUCT

4. (*If the claim is founded on writing*) The writing on which this claim is founded(*or a duplicate thereof*) is attached hereto(*or cannot be attached for the reason set forth in the statement attached hereto*):

5. (*If appropriate*) This claim is founded on an open account, which became(*or will become*) due on:

6. No judgment has been rendered on the claim except:

7. The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

8. This claim is not subject to any setoff or counter-claim except:

9. No security interest is held for this claim except:

   (*If security interest in property of the debtor is claimed*) The undersigned claims the security interest under the writing referred to in paragraph 4 hereof (or under a separate writing which, or a duplicate of which is attached hereto, or under a separate writing which cannot be attached hereto for the reason set forth in the statement attached hereto). Evidence of perfection of such security interest is also attached hereto.

10. This claim is a general unsecured claim, except to the extent that the security interest, if any described in paragraph 9 is sufficient to satisfy the claim. (*If priority is claimed state the amount and basis thereof*)

Dated: June 27, 2000    Signed: _____
                        Mike Zava - Vice President of U.S. Credit Services