## SCHEDULE (b)(2)

### Third-Party Defendant Hewlett-Packard Company's
### Statement of Contested Issues of Fact and Law

I.   **Tech Data's Claims For Breach of Contract and Indemnity Under the Asset Purchase Agreement**

1.   Whether, as a matter of law under the express terms of the APA, Tech Data has standing to assert claims under the Asset Purchase Agreement as a third-party beneficiary.

2.   Whether Compaq assumed specific open accounts payable of Inacom under the Asset Purchase Agreement, excluding obligations represented by checks that were held by Inacom at the time of the closing of the Asset Purchase Agreement and subsequently released and paid to Tech Data.

HP contends, and Tech Data disputes, the following specific facts:

1.   The Asset Purchase Agreement is solely between Inacom and its affiliates, and Compaq and its subsidiary.

2.   Section 13.05 of the Asset Purchase Agreement provides that the agreement shall be construed according to New York law without regard to the conflicts of law rules.

3.   Section 13.08 of the Asset Purchase Agreement provides that no other party is an intended beneficiary of the agreement.

4.   The terms of the Asset Purchase Agreement do not require Compaq to guarantee payments made by Inacom to Tech Data, and do not otherwise obligate Compaq to indemnify Tech Data for any recovery obtained by Inacom for preferential payments.

5.   On Friday, February 11, 2000, Inacom closed the books on its account payable records in anticipation of closing the asset purchase transaction the following Monday. On or about the same date, Inacom emailed to ITY Corp./Compaq an Accounts Payable Aging Report ("AP Report") that describes the Inacom accounts payable assumed by ITY Corp. pursuant to the

25

Asset Purchase Agreement, including account payable #102598 relating to Tech Data.

6.  Compaq paid all of the Tech Data accounts payable listed on the AP Report.

7.  Prior to the close of the asset sale, Inacom wrote numerous checks in payment of outstanding Tech Data invoices that were not immediately mailed to Tech Data, and were held in the office of Inacom's treasurer, Richard Oshlo, (the "Held Checks").

8.  The Held Checks include three checks made payable to Tech Data in the aggregate amount of $4,555,370.21 as follows: check no. 708391 in the amount of $1,026,316.45 payable from Inacom to Tech Data was issued on February 3, 2000 and cleared on March 22, 2000; check no. 709697 in the amount of $1,334,959.01 payable from Inacom to Tech Data was issued on February 8, 2000 and cleared on March 24, 2000; and check no. 710575 in the amount of $2,194,094 payable from Inacom to Tech Data was issued on February 10, 2000 and cleared on March 30, 2000.

9.  The AP Report does not reflect invoices paid by Held Checks because, consistent with Inacom's accounting systems, once Inacom wrote a check the invoice was no longer shown on Inacom's account payable report.

10. Inacom and Compaq did not intend that Compaq would assume liability for Held Check amounts under the Asset Purchase Agreement.

11. At the time of the Asset Purchase Agreement, Compaq was unaware that Inacom had written checks in payment of Tech Data invoices, which were held in the office of Inacom's treasurer.

12. Tech Data was aware that Inacom was holding checks that would be paid after the closing of the Asset Purchase Agreement.

13. On February 3, 2000, Michael Ward of Tech Data sent an email to Inacom's Treasurer, Dick Oshlo, and others at Inacom, listing the check number and amount of certain

checks payable to Tech Data "that have been reported as being in Inacom's Treasury." Mr. Ward requested a schedule of releasing the checks to Tech Data's lockbox in order for Tech Data to determine when it would resume shipping to Inacom.

14.    On February 8, 2000, Michael Ward of Tech Data sent an internal email to his supervisor, Mike Zava, summarizing a conference call with certain Inacom managers. The email describes the pending asset purchase by Compaq and states, "In the meantime, all checks payable to all Inacom vendors at this time are being held in Inacom's treasury department. This includes 5 checks totaling $4.9 million today payable to Tech Data. No checks will be released by Inacom until at least a week after the closing per Dick Oshlo." "Additionally, per the Inacom managers, Compaq will assume all vendor liabilities on account at closing unless Inacom is holding a check in Treasury to pay such liabilities."

15.    On February 9, 2000, Michael Ward sent a letter to David Guenthner, Vice President of Inacom, summarizing the conference call with Inacom managers that took place on February 8, 2000. Michael Ward again stated that "all checks payable to all Inacom vendors at this time are being held in Inacom's Treasury Department." Further, "An important item of note, as discussed is that Compaq will assume all vendor liabilities on account at closing unless Inacom is holding a check in its Treasury to pay such liabilities. Such checks from Inacom will then be released over several days to its vendors though no sooner than a least a week after the closing." The letter requests that Mr. Guenther immediately update or correct Mr. Ward if any information contained in the letter is incorrect.

16.    Tech Data was aware, and did not dispute, that Held Checks would be paid by Inacom after the closing of the Asset Purchase Agreement. Tech Data was also aware that Compaq only assumed open payables in connection with the Asset Purchase Agreement.

17.    After the closing of the Asset Purchase Agreement, Tech Data maintained

27

separate trade account receivable numbers for Compaq/Custom Edge (#953001) and Inacom (#1147688).

18. The Francis Letter dated February 16, 2000 stated that as part of the asset purchase transaction between Compaq and Inacom, Compaq "assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of such account." The referenced account is "Account Payable #102598 of InaCom Corporation."

19. The Francis Letter was sent in connection with the closing of the Asset Purchase Agreement and arises from the terms of the agreement.

20. The Francis Letter was sent from Texas, where Compaq was principally located.

21. The Francis Letter does not state that Compaq will guarantee payments made by Inacom to Tech Data, and does not otherwise obligate Compaq to indemnify Tech Data for any recovery obtained by Inacom for preferential payments.

22. Between February 18, 2000 and March 21, 2000, Michael Ward and other Tech Data employees exchanged emails regarding the status of checks received from Inacom and Compaq. On March 7, 2000, Mr. Ward stated that Tech Data had received $3.9 million in checks from Inacom, leaving $4.5 million still being held in Inacom's Treasury Department; and Tech Data had received $4.5 million from Compaq, with a balance due of $2.2 million.

23. Internal Tech Data emails exchanged between February 18, 2000 and March 21, 2000 reflect that Tech Data continued to pursue the release of Held Checks from Inacom by contacting Inacom's Treasury Department.

24. An Account Receivable Note Management Report maintained by Tech Data contains notes dated between February 18, 2000 and June 1, 2000 that reflect Tech Data's communications with Inacom regarding the release of Held Checks and payment of past due invoices.

{210346.0002/N0560727_1}

25. On March 22, 2000, March 24, 2000, and March 30, 2000, Tech Data negotiated three Held Checks that it received from Inacom in the aggregate amount of $4,555,370.21, which are the subject of Inacom's preference action. Tech Data did not return the Held Checks received from Inacom; nor did it question or dispute its receipt of the checks.

26. Consistent with the Bill Francis Letter, Compaq paid all of the Tech Data invoices submitted to Inacom that were reflected on the AP Report as Account Payable #102598.

27. Account Payable #102598 on the AP Report did not include the invoices of Tech Data which were paid by the Held Checks.

28. Bill Francis did not intend, and was not authorized, to commit Compaq to any obligations that were not contained in the Asset Purchase Agreement.

29. There was no mutual assent or meeting of the minds between Compaq and Tech Data with respect to the terms of the Francis Letter, including the meaning of the "outstanding amount" on the referenced account, Account Payable #102598 of Inacom Corporation.

30. Neither Tech Data nor Compaq intended that Compaq would assume the obligation for Held Check amounts, or that the "outstanding amount" referenced in the Francis Letter included Held Check amounts.

II. **Tech Data's Claims For Breach of Contract and Indemnity Under the Francis Letter dated February 16, 2000**

1. Whether the February 16, 2000 letter from Bill Francis to Tech Data ("Francis Letter") constitutes a legally enforceable contract in the absence of mutual assent between Compaq and Tech Data and consideration for the alleged promise.

2. Whether, by the terms of the Francis Letter, Compaq agreed to guarantee and otherwise assume liability for amounts that were paid by Inacom to Tech Data, which are now the subject of

29

Inacom's preference action.

3. Whether the Francis Letter is supported by consideration.

4. If New York law does not govern Tech Data's claims under the Francis Letter, whether the claims are barred by the applicable statute of limitations of Texas or another state.

### III. Defenses Applicable to All Claims

1. Whether Tech Data waived the right to seek reimbursement from Compaq/HP of the transfer amounts at issue because it accepted payments from Inacom and failed to assert any right to payment from Compaq upon receipt of the payments.

2. Whether Tech Data is barred by the doctrine of laches from seeking reimbursement from Compaq/HP of the transfer amounts at issue because it accepted payment from Inacom and unreasonably delayed asserting any right to payment from Compaq.

{210346.0002/N0560727_1}