UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

In re:

INACOM CORPORATION, *et al.,*

    Debtors.
_____/

INACOM CORPORATION, etc.,

    Plaintiff,

v.

TECH DATA CORPORATION,

    Defendant and
    Third-Party Plaintiff,

v.

HEWLETT-PACKARD COMPANY,
COMPAQ COMPUTER CORP., ITY
CORP., and CUSTOM EDGE, INC.,

    Third-Party Defendants.
_____/

Civil Action No. 1:04-cv-00148-GMS

Bankr. Case No. 00-02426 (PJW)
Adv. Pro. No. 02-03496 (PJW)

## TECH DATA CORPORATION'S TRIAL BRIEF

HERLIHY, HARKER & KAVANAUGH
James F. Harker (Bar No. 255)
1300 North Market Street, Suite 400
Wilmington, Delaware 19899
Telephone: (302) 654-3111

-and-

ADORNO & YOSS, LLP
Charles M. Tatelbaum (Admitted Pro Hac Vice)
Stephen C. Hunt (Admitted Pro Hac Vice)
Nicole Testa
350 E. Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954) 763-1200
Facsimile: (954) 766-7800

*Attorneys for Tech Data Corporation*

{210346.0002/N0560596_1}

Pursuant to the Court's Scheduling Order, Third-Party Plaintiff Tech Data Corporation ("Tech Data") files this trial brief.

## I. NATURE OF THE CASE

Tech Data's third party action is contingent upon a finding of liability by Tech Data to Inacom Corp. ("Inacom") on account of alleged preferential transfers. Accordingly, the facts and circumstances underlying Inacom's complaint against Tech Data are integral to the statement of Tech Data's third party action against Hewlett-Packard Company ("HP") and constitute *res gestae* to be considered by the Court in conjunction with this statement of proposed findings of fact and conclusions of law.

Plaintiff Inacom Corp. and its related debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date").

This action was commenced as an adversary proceeding by Inacom against Tech Data pursuant to Sections 547 and 550 of the Bankruptcy Code for the recovery of alleged preferential transfers. Inacom filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on June 5, 2002, against Tech Data alleging that it had received certain transfers from Inacom by separate checks totaling $4,608,313.97. Inacom and Tech Data have since stipulated that the true amount in controversy is the lesser sum of $4,606,313.97.

Tech Data sought and obtained leave to file its Third-Party Complaint against HP alleging that it is liable to Tech Data for any amount it may be adjudged liable to Inacom. Tech Data alleges several theories of liability including breach of contract and indemnity

against HP. The amount of the damages for which HP will be liable to Tech Data will be equal to the amount of the damages for which Tech Data may be found liable to Inacom.

## II. CONTESTED FACTS TECH DATA WILL ESTABLISH AT TRIAL

At trial, Tech Data expects the evidence to establish the following:

1. Tech Data is a corporation formed under the laws of the State of Florida, with its principal place of business located at 5350 Tech Data Drive, Clearwater, Florida. Tech Data sells computer products and peripherals, as well as a variety of other electronic products.

2. The Debtors were originally in two basic lines of business: computer hardware and peripherals distribution (the "Distribution Business") and a technology service and configuration business (the "Service Business"). Through these businesses, the Debtors delivered personal computer and related information technology products to businesses and provided various technology-related services managing the entire technology lifecycle, including technology planning, technology procurement, technology integration, technology support, and technology management.

3. In late 1999, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for the sale of their Distribution Business to Compaq. Upon the sale of the Distribution Business to Compaq, Inacom intended to continue operating the Service Business, which historically enjoyed higher margins than the Distribution Business.

4. As a result of these negotiations, on January 4, 2000, the Debtors signed an Asset Purchase Agreement (the "APA"), and certain related operational agreements with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (referred to collectively as "Compaq").

5. Under the APA, Compaq agreed to purchase substantially all of the assets of Inacom's' Distribution Business (the "Compaq Sale").

6. In connection with the Compaq Sale, Compaq also entered into certain additional agreements with Inacom. Among these related agreements were: (i) a $55.5 million credit facility in which Compaq agreed to extend to Inacom a $55.5 million loan; (ii) a three year, $420 million Services, Supply and Sales Agreement (and a related Service Level Agreement) in which Compaq agreed to utilize Inacom's services and "assist Inacom in a generation of incremental revenues for Inacom service business" in the aggregate amount of $85 million for year 2000, $140 million for year 2001, and $195 million for year 2002; (iii) a three-year outsourcing/agency agreement in which Compaq agreed to pay Inacom a 3.5% distribution fee for the sale of Compaq computer products; and (iv) a Separation and Sharing Agreement, in which Inacom and Compaq would share certain assets and personnel for up to twelve (12) months following the close of the Compaq Sale.

7. In connection with the APA and at the request of Inacom, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared a solvency opinion, dated February 16, 2000 ("Houlihan Lokey Solvency Opinion"). Under the Houlihan Lokey Solvency Opinion, Houlihan Lokey stated that: (i) the fair value and present saleable value of Inacom's assets exceeded the company's stated and identified contingent liabilities; (ii) Inacom would be able to pay its debts as they matured; and (iii) the capital remaining in Inacom after the sale of the Distribution Business to Compaq would not be unreasonably small for the continued operation of the Service Business.

8. Based on the APA, the related agreements discussed above, the Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement with Deutsche Bank, to

provide for the restructuring of Inacom's debt (as discussed below) and the Houlihan Lokey Solvency Opinion, the Compaq Sale closed on February 16, 2000. Compaq paid approximately $369.5 million for Inacom's Distribution Business and also assumed some of Inacom's accounts receivable and debt obligations, including, but not limited to, all of Inacom's previous obligations owed to Deutsche Financial Services in connection with Inacom's floor planning facility for Compaq product.

9. In connection with the APA, Inacom amended its $450 million revolving credit and amortizing term facility with Deutsche Bank ("Credit Agreement") to modify it to a $225 million revolving credit facility ("Deutsche Bank Credit Facility"). The sale of the Distribution Business to Compaq reduced Inacom's total indebtedness to Deutsche Bank.

10. The Deutsche Bank Credit Facility contained certain financial covenants, including minimum net worth covenants, covenants requiring certain minimum levels of working capital and minimum EBITDA (earnings before interest, taxes, depreciation and amortization) covenants.

11. In addition, a borrowing base requirement was put into place to govern future advances under the Deutsche Bank Credit Facility. The borrowing base was comprised of 60% of eligible inventory, plus 85% of eligible receivables plus 50% of the amount of the Nesbitt Burns Residual Note (a pre-existing debt).

12. After the Compaq Sale, Inacom submitted monthly Borrowing Base Certificates to Deutsche Bank, providing information concerning the eligible inventory, receivables, and outstanding principal of the Nesbitt Burns Residual Note, in order to arrive at the funds available to Inacom under the Deutsche Bank Credit Facility.

13.   In the February 26, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $79,322,298.40. In the March 25, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $54,656,000. In the April 22, 2000 Borrowing Base Certificate, Inacom had unused availability under the Deutsche Bank Credit Facility of $89,681,203.

14.   On April 17, 2000, Thomas Fitzpatrick, Inacom's Chief Financial Officer, learned, by telephone, while on vacation in Cancun, Mexico, that certain accounts receivable allegedly belonging to Compaq, had been mistakenly received in the Inacom lock box and automatically swept as payments upon the Deutsche Bank Credit Facility. Upon learning this information, Mr. Fitzpatrick, nevertheless, chose to continue with his vacation in Mexico and did not return to the United States until the following week.

15.   On April 27, 2000, Compaq notified Deutsche Bank that Compaq claimed that certain receivables owned by Compaq were paid into Inacom's lockbox. Deutsche Bank notified Compaq that it would investigate the matter. Subsequently, Deutsche Bank refused to return the swept funds and refused to advance further funds to Inacom, giving as a reason an alleged material adverse change under the Deutsche Bank Credit Facility.

16.   Regarding the sale from Inacom to Compaq, certain representations of fact were reportedly made to Tech Data by Compaq as to the treatment of pre-closing accounts payable by Inacom to Tech Data.

17.   On January 7, 2000, Inacom filed its Form 8-K with the Securities and Exchange Commission which addressed, in pertinent part, the proposed sale of assets to Compaq, which by virtue of mergers and consolidation is now Hewlett-Packard Company.

18. On February 3, 2000, John Frasca, then an employee of Inacom, directed electronic mail to Mike Ward, of Tech Data, attaching Inacom's Form 8-K, referencing a section of the 8-K as to accounts payable to be assumed by Compaq, and stating that "100% of the payables for Tech Data will be assumed by Compaq" and requesting a credit line increase "based upon this contract."

19. On February 16, 2000, William Francis, Director of Corporate Finance of Compaq, faxed a letter to Michael Zafa [Zava], of Tech Data, regarding "Account Payable # 102598 of Inacom Corporation" (the "Francis Letter"). The Francis Letter stated, in part, that certain assets of Inacom had been purchased by Compaq and would be operated as Custom Edge, with accounts payable to be funded by Compaq. The letter also stated, in part, that Custom Edge "also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of the account."

20. The Francis Letter was sent to Tech Data in order to induce Tech Data to continue fulfilling orders for the purchase of goods by Compaq after the Compaq Sale on credit terms, to maintain and transfer Inacom's existing customer accounts to Compaq for the sake of continued efficiency for the ordering of goods from Tech Data. Until receipt of the Francis Letter, Tech Data intended to treat the new Compaq entity as a new customer, and was unwilling to allow for the use of Inacom's customer accounts by the new Compaq entity. However, in reasonable and actual reliance upon the terms of the Francis Letter, Tech Data ultimately agreed to allow for the requested use of the pre-existing accounts by Compaq, thereby conveying valuable and sufficient consideration to Compaq.

21. A letter similar to the Francis Letter was also sent to Lexmark by Mr. Francis.

22. On June 16, 2000 (the "Petition Date"), the Debtors filed a Petition under Chapter 11 of the Bankruptcy Code.

23. On June 27, 2000, Tech Data filed a proof of claim against Inacom in the amount of $929,187.11, this sum representing an unpaid balance of Inacom's account payables to Tech Data that was in the process of being reconciled at the time of the Petition Date. Tech Data has represented that this proof of claim was filed as a contingent claim against Inacom, and has since sought to recover these sums directly from HP.

24. On June 30, 2000, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). Thereafter, the Bankruptcy Court approved the Creditors' Committee's retention of Blank Rome LLP, as its general bankruptcy counsel and Executive Sounding Board ("ESB") as its financial consultants.

25. Inacom filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Tech Data. Tech Data filed its Motion to Dismiss on May 28, 2002, whereupon Inacom filed a First Amended Complaint ("First Amended Complaint") and Opposition to the Motion to Dismiss on June 5, 2002. Tech Data filed its Motion to Dismiss the First Amended Complaint on July 10, 2003, to which Inacom filed its Opposition on July 29, 2003. On March 1, 2004 the Court issued a letter ruling denying Tech Data's Motions to Dismiss the Complaint and First Amended Complaint. On April 9, 2004 Tech Data filed its Answer and Affirmative Defenses to the First Amended Complaint, denying certain material

allegations, asserting various affirmative defenses, and contesting liability, as well as its Third Party Complaint against Compaq Computer Corp. and Custom Edge, Inc., now known as HP, for recovery of any damages resulting from Inacom's First Amended Complaint. An Amended Third Party Complaint was filed with the Court on June 4, 2004, to which HP filed an Answer and Affirmative Defenses.

26. On March 6, 2003 the Court granted Inacom's Motion for an Order barring the depositions of witnesses in preference actions, which was vacated by the Court upon Inacom's application on January 23, 2004.

27. The bankruptcy court confirmed the Debtors' Chapter 11 Plan on May 23, 2003.

28. On March 23, 2004, Tech Data filed its Motion to Withdraw the Reference and Motion to Determine Core/Non-Core Status, to which Inacom filed Opposition on March 8, 2004.

29. On June 25, 2004, the Court entered an Order withdrawing the reference of the adversary proceeding to the United States District Court for the District of Delaware.

30. For some time prior to the Petition Date, the Debtors purchased computer equipment and peripherals (the "Goods") from Tech Data. This relationship continuously existed for several years prior to the Petition Date, and Inacom had purchased Goods from Tech Data generally under standard net-thirty (30) day terms.

31. After the February 16, 2000 closing of Compaq Sale, Tech Data provided Goods to HP under the same terms as it had prior to the Compaq Sale.

32. Within the ninety (90) day period prior to the Petition Date, the transferor debtor made payments to Tech Data in the amount of $4,606,313.97 (the "Transfers").

33. All of the Transfers were accepted by Tech Data, albeit without regard to any account stated or open, as the assumption of Inacom's account payable obligation through the APA and the Francis Letter had terminated Tech Data's debtor-creditor relationship with Inacom.

34. The Transfers were not made to or for the benefit of a "creditor," within the meaning of Section 547(b)(1) of the Bankruptcy Code, due to Compaq's assumption of the indebtedness.

35. The Transfers were not made for or on account of an "antecedent debt" owed by the transferor debtor before such transfers were made, within the meaning of Section 547(b)(2) of the Bankruptcy Code, again due to Compaq's assumption of the indebtedness.

36. The Transfers were not made while the transferor debtor was insolvent, within the meaning of Section 547(b)(3) of the Bankruptcy Code, as Tech Data has demonstrated through the testimony of fact and expert witnesses and other competent evidence that Inacom was not insolvent when it made the Transfers to Tech Data.

37. The Transfers did not enable Tech Data to receive more than it would have received if the case were a chapter 7 case, if the Transfers had not been made, and if Tech Data received payment of such debt to the extent provided by the Bankruptcy Code. Due to Compaq's assumption of Inacom's account payable indebtedness to Tech Data, Tech Data was entitled to payment by Compaq irrespective of any distribution under a hypothetical liquidation of Inacom's estate. In fact, Tech Data was not a creditor of Inacom's estate given the novation of the debtor-creditor relationship by and between Inacom and Tech Data by virtue of Compaq's assumption of the debt.

38.     Inacom is not entitled to the recovery of any alleged Transfers pursuant to Section 550 of the Bankruptcy Code. As Inacom cannot prove a prima facie case under Section 547 of the Bankruptcy Code and has not timely plead any other theory of recovery for the Transfers, it has no basis for recovery pursuant to Section 550 of the Bankruptcy Code.

39.     Tech Data was a direct, intended third party beneficiary of the APA.

40.     If Tech Data was not an intended third party beneficiary of the APA, it was an implied third party beneficiary of the APA.

41.     The APA was a contract for the sale of goods, within the meaning of Article 2 of the Uniform Commercial Code.

42.     The APA selected New York law as the applicable law for the APA.

43.     The APA satisfies the requirements of the statute of frauds under applicable law, including New York law.

44.     The APA satisfies the requirements of the parol evidence rule under applicable law, including New York law, to bar the use of external evidence in interpretation of the contract.

45.     The Francis Letter relates back to the APA and confirms that HP had assumed Inacom's account payable obligations to Tech Data.

46.     The Francis Letter also operates as an independent simple contract between HP and Tech Data, upon which Tech Data reasonably relied and through which Compaq induced Tech Data to provide good and valuable consideration.

47.     Through its fact and expert witness testimony and other competent evidence, Tech Data satisfied its burden of rebutting the presumption of insolvency, and shifted the burden of proof on insolvency to Inacom.

## III. TECH DATA'S CLAIMS AGAINST HP

A. <u>Tech Data's Claims For Breach of Contract Based on the Asset Purchase Agreement</u>

   1. *<u>The Asset Purchase Agreement Is Governed By Article 2 Of The Uniform Commercial Code</u>*

The New York Uniform Commercial Code governs contracts for the sale of goods. N.Y. CLS UCC § 2-102. A contract for the sale of goods may be made in any manner sufficient to show agreement. In this regard, though, the Statute of Frauds requires that a contract for the sale of goods for $500 or more is not enforceable unless there is some writing sufficient to indicate that a contract for the sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. N.Y. CLS UCC § 2-204; N.Y. CLS UCC § 2-201. The APA was a contract for the sale of goods, within the meaning of Article 2 of the Uniform Commercial Code. The APA also satisfies the requirements of the statute of frauds under applicable law, as it was signed by the parties who are to be bound by its terms. The APA satisfies the requirements of the parol evidence rule under applicable law to bar the use of external evidence in interpretation of the contract.

   2. *<u>The Asset Purchase Agreement Is A Simple Contract Under Common Law</u>*

Alternatively, the APA is governed by common law and constitutes a valid and binding contract. Under New York law, the required elements of contract formation are offer, acceptance, and consideration. <u>Deutsche Asset Management, Inc. v. Callaghan</u>, 2004 WL 758303, *15 (S.D.N.Y. 2004); Restatement (Second) of Contracts §§ 24, 50, 71 (1981). When determining whether the parties intended a writing to be a final expression of their agreement, you should determine the intention of the parties from all

circumstances, including their language and other conduct. Amer Indus. Technologies v. Aero Tec Lab., 1994 U.S. Dist. LEXIS 6233, *59 (D. Del., 1994).

The payment obligations to Tech Data were expressly assumed by Custom Edge in the APA. Custom Edge and Compaq represented in the APA that Custom Edge had assumed the payment obligations, and that Compaq would provide the funds to pay these obligations. It is well-settled that a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. Martin-Senour Paints v. Delmarva Venture Corp., 1988 Del. Super. LEXIS 93, *4 (Del. Super. 1988) (citing to Restatement (Second) of Contracts § 90(1)). A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made. Id. at *7 (citing to Restatement (Second) of Contracts § 2(1)).

    3.    *Under Either Common Law Or The Uniform Commercial Code, The Asset Purchase Agreement Was A Valid Contract Enforceable By Tech Data As A Third-Party Beneficiary Against The Signatories*

New York law has adopted the Restatement (Second) of Contracts § 302 (1979) in recognizing a third party's right to enforce a contract if that third party is an intended beneficiary of the contract. In re Miner, 229 B.R. 561, 566 (2nd Cir. BAP 1999). An intended third party beneficiary is established under New York law by, "showing that the parties to the contract intended at the time of contracting to grant the benefit claimed." Id. at 566. New York only requires that the contracting parties intended to benefit a third party on the face of the agreement or through the surrounding circumstances. Id. "While a third-party beneficiary is not required to be named in the contract, the contract must demonstrate an intent by the parties to provide the third party with a sufficiently

immediate benefit to justify recognition of a cause of action." Houbigant, Inc. v. Dev. Specialists, Inc., 229 F. Supp. 2d 208, 217-18 (S.D.N.Y. 2002).

To establish that it is entitled to enforce the contract as a beneficiary, the plaintiff has the burden to prove by a preponderance of the evidence that the original parties to the contract intended the plaintiff to be a direct beneficiary and not just an incidental beneficiary. Robert E. Kehoe, Jr., Jury Instructions for Contract Cases, Vol. 1, Ch. 5.02 (1995). Although you may consider all of the circumstances surrounding the original parties at the time they entered into the contract, the plaintiff must prove that the contract terms themselves contain some clear indication that the original parties intended the plaintiff to be a direct beneficiary. Id.

Tech Data acted in actual and reasonable reliance of the contractual obligations of Custom Edge and Compaq. Tech Data was a direct, intended third party beneficiary of the APA. In re Miner, 229 B.R. at 566. Tech Data qualifies as an intended third party beneficiary under New York Law, because the APA between Compaq and Inacom and the surrounding circumstances show that both Compaq and Inacom intentionally conferred a benefit to Tech Data. To wit, the Frasca Email shows that Inacom intended Tech Data to rely upon the APA for the proposition that Compaq was assuming complete responsibility for the payment of Inacom's accounts payable to Tech Data. The Francis Letter, which related back to the APA, proves that Compaq intended for Tech Data to rely upon the APA for the same proposition, that Compaq was assuming complete responsibility for the payment of Inacom's accounts payable to Tech Data.

By failing to pay and satisfy the payment obligations to Tech Data, Custom Edge (which merged into Compaq, was acquired by and merged into HP), has breached its obligations to Tech Data. HP, in assuming all liabilities of ITY, Custom Edge and

Compaq, is liable for Tech Data equal to the amount of any damages for which Tech Data may be found liable to Inacom. Alternatively, if Tech Data was not an intended third party beneficiary of the APA, it was an implied third party beneficiary of the APA.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Tech Data as to Counts I and II.

### B. Tech Data's Claims For Breach of Contract Based on the Francis Letter Dated February 16, 2000

To determine whether the parties entered into a contractual agreement, it is necessary to look to the objective manifestations of the intent of the parties as gathered by their express words and deeds. Flores v. Lower East Side Service Center, Inc., 795 N.Y.S.2d 494 (N.Y. 2005). Under New York law, the required elements of contract formation are offer, acceptance, and consideration. Deutsche, 2004 WL 758303 at *15; Restatement (Second) of Contracts §§ 24, 50, 71 (1981). The Bill Francis Letter constitutes a valid and binding contractual agreement by and between Custom Edge and Tech Data, pursuant to which Custom Edge agreed to pay Tech Data the payment obligations. "Consideration is, of course, an essential element of a contract, but so long as 'something of 'real value in the eye of the law' was exchanged' the adequacy of the consideration is not a proper subject of judicial inquiry." Wood Realty Trust v. N. Storonske Cooperage Co., Inc., 229 A.D.2d 821, 822-823 (N.Y.A.D. 3 Dept. 1996). There was adequate and legally sufficient consideration tendered in exchange for the promise of payment to Tech Data. Additionally, the Statute of Frauds requires that promises guaranteeing the payment of a corporation's liability be in writing and signed by the promisor.

The Bill Francis Letter is in writing and satisfies the Statute of Frauds. Tech Data actually and reasonably relied upon the Francis Letter, pursuant to which Compaq intended to induce Tech Data into providing good and valuable consideration, the sufficiency and delivery of which has been proven to the satisfaction of the Court. Compaq failed to comply with the terms of the Bill Francis Letter. By failing and refusing to pay and satisfy the payment obligations, Custom Edge (which merged into Compaq, was acquired by and merged into HP), has breached its obligations to Tech Data under the Bill Francis Letter. HP in assuming all liabilities of ITY, Custom Edge and Compaq, is liable for Tech Data equal to the amount of the damages for which Tech Data may be found liable to Inacom.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Tech Data as to Counts III and IV.

### C. Tech Data's Claims For Indemnity Based on the Asset Purchase Agreement and the Francis Letter Dated February 16, 2000

The payment obligations were expressly assumed by Custom Edge in the APA and in the Bill Francis Letter. As the primary obligor for the payment obligations, Custom Edge is the indemnitor of any payments on those obligations that Inacom seeks to recover from Tech Data and an indemnitor of any obligations of Inacom that are not ultimately satisfied.

The Bill Francis Letter created a valid and binding contractual agreement by and between Tech Data and Custom Edge, pursuant to which Custom Edge agreed to pay to Tech Data the payment obligations.

The APA created a valid and binding contractual agreement by and between Tech Data and Custom Edge, pursuant to which Custom Edge agreed to pay Tech Data the payment obligations.

By suffering or permitting Inacom to pay the payment obligations to Tech Data, notwithstanding the obligations of Custom Edge to do so, Custom Edge placed itself in a surety position owing direct indemnity to Tech Data for any failure by Inacom to fully satisfy the payment obligations. To the extent that Inacom satisfied the obligations of Custom Edge, Custom Edge received a concurrent benefit.

Where a party to a contract agrees to make payment to an entity not a party to that contract and subsequently mails a letter to the non-party agreeing to make payment to it, the party to the contract has assumed the obligation to make payment to the non-party. RCA Corp. v. Columbia Pictures Industries, Inc., 425 N.Y.S.2d 250, 251-252 (1980).

By virtue of its various agreements and actions, Custom Edge is obligated to indemnify Tech Data in the event of any recovery obtained by Inacom in the within adversary proceeding or otherwise, and all cost of defense incurred by Tech Data in opposing the Inacom claims and asserting this third party action.

Accordingly, judgment is granted against Compaq, Custom Edge, and HP in favor of Tech Data as to Count VI.

## IV. TECH DATA'S THEORY OF DAMAGES

The amount of the damages for which HP will be liable to Tech Data will be equal to the amount of the damages for which Tech Data may be found liable to Inacom.

## V. TECH DATA'S THEORY OF ANY ANTICIPATED MOTION FOR DIRECTED VERDICT

Tech Data reserves the right to assert a Motion for Directed Verdict as circumstances warrant at trial.

## VI. TECH DATA'S PROPOSED JURY INSTRUCTIONS

Tech Data is filing three sets of jury instructions herewith.

Dated: August 15, 2005

HERLIHY, HARKER & KAVANAUGH

/s/ James F. Harker
James F. Harker (Bar No. 255)
Local Counsel for Defendant
1300 North Market Street, Suite 400
Wilmington, Delaware 19899
Telephone: (302) 654-3111

-and-

ADORNO & YOSS, LLP
Charles M. Tatelbaum
(Admitted Pro Hac Vice)
Stephen C. Hunt
(Admitted Pro Hac Vice)
350 E. Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL 33301
Telephone: (954) 763-1200
Facsimile: (954) 766-7800
*Attorneys for Third-Party Plaintiff,*
*Tech Data Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that, on August 15, 2005, a true and correct copy of *Tech Data Corporation's Trial Brief* was served upon the following counsel of record, each via regular United States first class mail:

William H. Sudell, Jr. Esq.
Derek C. Abbott, Esq.
Morris, Nichols Arsht & Tunnell
1201 North Market Street
Wilmington, Delaware 19899-1347

and

Cecily Dumas, Esq.
Friedman Dumas & Springwater, LLP
One Maritime Plaza, Suite 2475
San Francisco, California 94111

*Counsel for Third-Party Defendant
Hewlett-Packard Caompany*

Laura Davis Jones, Esq.
Sandra McLamb, Esq.
Pachulski, Stang, Ziehl, Young,
   Jones & Weintraub, P.C.
919 North Market St., 16th Floor
Wilmington, Delaware 19899

and

Andrew W. Caine, Esq.
Jeffrey P. Nolan, Esq.
Pachulski, Stang, Ziehl, Young,
   Jones & Weintraub, P.C.
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067

*Counsel for Plaintiff, Inacom Corporation*

_____
James F. Harker