**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

In re:

INACOM CORPORATION, *et al.,*

      Debtors.

_____/

INACOM CORPORATION, etc.,

      Plaintiff,

v.

TECH DATA CORPORATION,
      Defendant and
      Third Party Plaintiff,

v.

HEWLETT-PACKARD COMPANY,
COMPAQ COMPUTER CORP.,
ITY CORP., and CUSTOM EDGE, INC.,

      Third-Party Defendants.

_____/

Civil Action No. 1:04-cv-00148-GMS

Bankr. Case No. 00-02426 (PJW)
Adv. Pro. No. 02-03496 (PJW)

**DEFENDANT TECH DATA CORPORATION'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

      Tech Data Corporation, the defendant herein ("Tech Data"), respectfully submits the following proposed findings of fact and conclusions of law in support of its Answer and Affirmative Defenses to the First Amended Complaint filed by Inacom Corporation, on behalf of affiliated debtors, the plaintiff herein ("Inacom"), in accordance with the Court's Scheduling Order entered October 4, 2004 and Rule 16.4 of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware.

**I.**      **FINDINGS OF FACT**

      **A.**      **The Parties and Procedural History**

1.    Tech Data is a corporation formed under the laws of the State of Florida, with its principal place of business located at 5350 Tech Data Drive, Clearwater, Florida. Tech Data sells computer products and peripherals, as well as a variety of other electronic products.

2.    On June 16, 2000 (the "Petition Date") Inacom Corp. and its affiliated Debtors (collectively the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.    On June 16, 2000, the United States Bankruptcy Court for the District of Delaware entered an order consolidating the Debtors' Chapter 11 cases for administrative purposes only (joint administration). Following the Petition Date, the Debtors operated their businesses and managed their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

4.    On June 27, 2000, Tech Data filed a proof of claim against Inacom in the amount of $929,187.11, this sum representing an unpaid balance of Inacom's account payables to Tech Data that was in the process of being reconciled at the time of the Petition Date. Tech Data has represented that this proof of claim was filed as a contingent claim against Inacom, and has since sought to recover these sums directly from HP.

5.    On June 30, 2000, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). Thereafter, the Bankruptcy Court approved the Creditors' Committee's retention of Blank Rome LLP, as its general bankruptcy counsel and Executive Sounding Board ("ESB") as its financial consultants.

6.    Inacom filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 16, 2002 against Tech Data.

7.    Tech Data filed its Motion to Dismiss on May 28, 2002, whereupon Inacom filed a First Amended Complaint and Opposition to the Motion to Dismiss on June 5, 2002.

8.    On March 6, 2003 the Bankruptcy Court granted Inacom's Motion for an Order barring the depositions of witnesses in preference actions. This effectively prevented Tech Data, and any other similarly situated preference defendants, from engaging in discovery with Inacom. The discovery bar order was vacated by the Bankruptcy Court upon Inacom's application on January 23, 2004.

9.    The Bankruptcy Court confirmed the Debtor's Plan on May 23, 2003.

10.   Tech Data filed its Motion to Dismiss the First Amended Complaint on July 10, 2003, to which Inacom filed Opposition on July 29, 2003.

11.   Tech Data's Motions to Dismiss the Complaint and First Amended Complaint resulted in a Letter Opinion by Bankruptcy Judge Peter J. Walsh dated April 1, 2004. Judicial notice of Judge Walsh's Letter Opinion is hereby taken pursuant to Rule 201 of the Federal Rules of Evidence. Importantly, Judge Walsh digested the disputes between Tech Data and Inacom, and Tech Data and HP, as follows:

> As I understand Tech Data's position, it is that pursuant to a pre-petition asset purchase agreement between Compaq Computer Corporation ("Compaq") and Inacom, Compaq assumed Inacom's obligations to Tech Data and those obligations are the antecedent debts to which the alleged transfer payments were made. Nowhere in the documents can I find any information which would tell me whether in fact Compaq assumed and paid those Inacom obligations to Tech Data. If, in fact, Compaq did not assume those obligations or if it did not pay them, then there is no basis to accept Tech Data's argument that it did not receive more than it would have received had Inacom filed a chapter 7 case. On the other hand, if in fact Compaq assumed the obligations and paid the obligations, then it would appear that Inacom may have made the payments to Tech Data without an obligation to do so. If so, Inacom may have a cause of action other than a preference.

Inacom Corp. v. Tech Data Corp., Adv.Pro.No. 02-3496 (PJW), slip op. at 2 (Bankr.D.Del. Apr. 1, 2004) (emphasis not in original).

12.    As Bankruptcy Judge Walsh implied, if Compaq assumed the account payable obligation to Inacom, Inacom cannot maintain a preference action against Tech Data, as Inacom will be unable to satisfy the statutory requirements of proving a preference as set forth in Bankruptcy Code Section 547(b).  Notwithstanding this warning by Judge Walsh to Inacom's counsel, Inacom never sought to further amend its complaint to include any additional theories of recovery other than that of preferential transfer, under Section 547 of the Bankruptcy Code.

13.    On April 9, 2004 Tech Data filed its Answer and Affirmative Defenses to the First Amended Complaint, denying certain material allegations, asserting various affirmative defenses, and contesting liability.  Tech Data also filed therewith its Third Party Complaint against Compaq Computer Corp., ITY Corp. and Custom Edge, Inc., now collectively known as HP, for recovery of any damages to Tech Data resulting from Inacom's First Amended Complaint.  An Amended Third Party Complaint was filed with the Court on June 4, 2004, to which HP filed an Answer and Affirmative Defenses.

14.    On March 23, 2004 Tech Data filed its Motion to Withdraw the Reference and Motion to Determine Core/Non-Core Status, to which Inacom filed Opposition on March 8, 2004.

15.    On June 25, 2004, over the objection of Inacom, this Court entered an Order withdrawing the reference of this adversary proceeding to the bankruptcy court.

**B.    Debtors' Financial Condition At the Time of the Alleged Preferential Transfers**

16.    The Debtors were originally in two basic lines of business: computer hardware and peripherals distribution (the "Distribution Business") and a technology service business (the "Service Business").  Through these businesses the Debtors delivered personal computer and related information technology products to businesses and provided various technology-related

services, managing the entire technology lifecycle, including technology planning, technology procurement, technology integration, technology support, and technology management.

17.    On April 9, 1999, Inacom entered into a Credit Agreement with various lending institutions, with Deutsche Bank AG New York Branch ("Deutsche Bank") as the administrative agent ("Credit Agreement"). The Credit Agreement provided a $450,000,000 loan to Inacom, with such loan being comprised of both a Term Loan Facility and a Revolving Loan Facility.

18.    In late 1999, the Debtors entered into negotiations with Compaq Computer Corporation ("Compaq"), one of their largest distribution vendors, for the sale of the Distribution Business to Compaq. At that time, Compaq was the largest seller of computer products in the United States. Upon the sale of the Distribution Business to Compaq, Inacom fully intended to continue operating the Service Business, which historically enjoyed higher margins than the Distribution Business, and Compaq had promised to be a major Inacom customer. Specifically, for the first nine months of 1999, the Service Business had a Gross Margin of approximately 37%; whereas, for that same time period, the Distribution Business had a Gross Margin of approximately only 7%. Therefore, the sale to Compaq permitted Inacom to focus its business on the high-margin Service Business as opposed to the low-margin Distribution Business.

19.    As a result of these negotiations, on January 4, 2000, Inacom signed an Asset Purchase Agreement (the "APA") and certain related operational agreements with Compaq and its acquisition subsidiary ITY Corp., subsequently known as Custom Edge, Inc. (referred to collectively as "Compaq").

20.    Under the APA, Compaq agreed to purchase substantially all of the assets of Inacom's Distribution Business (the "Compaq Sale").

21.    On January 7, 2000 Inacom filed its Form 8-K with the Securities and Exchange Commission which addressed, in pertinent part, the proposed sale of assets to Compaq, which by virtue of mergers and consolidation is now Hewlett-Packard Company.

22.    Inacom, prior to the beginning of the Preference Period, engaged in a pattern or practice of "cutting" checks and holding such checks prior to sending them.    Inacom acknowledges that it regularly held checks in the three and a half month period prior to the beginning of the Preference Period.  In fact, by the admission of Inacom's Accounts Payable Manager, on many occasions, every check in a check run would be held.

23.    In addition, Inacom consistently held checks for the entire one year period prior to the beginning of the Preference Period, and, in fact, Inacom regularly held checks between 1993 and 1997.  In short, Inacom's practice of holding checks was usual and ordinary for many years prior to the beginning of the Preference Period.

24.    On February 3, 2000, John Frasca, then an employee of Inacom, directed electronic mail to Mike Ward, of Tech Data, attaching Inacom's Form 8-K, referencing a section of the 8-K as to accounts payable to be assumed by Compaq, and stating that "100% of the payables for Tech Data will be assumed by Compaq" and requesting a credit line increase "based upon this contract."

25.    On February 16, 2000, William Francis, Director of Corporate Finance of Compaq, faxed a letter to Michael Zafa [Zava], of Tech Data, regarding "Account Payable # 102598 of Inacom Corporation" (the "Francis Letter").  The Francis Letter stated, in part, that certain assets of Inacom had been purchased by Compaq and would be operated as Custom Edge, with accounts payable to be funded by Compaq.  The letter also stated, in part, that Custom Edge "also assumed the obligation to pay all of the outstanding amount on the referenced account, subject to the terms and conditions of the account."

26.    The Francis Letter was sent to Tech Data in order to induce Tech Data to continue fulfilling orders for the purchase of goods by Compaq after the Compaq Sale on credit terms, to maintain and transfer Inacom's existing customer accounts to Compaq for the sake of continued efficiency for the ordering of goods from Tech Data.  Until receipt of the Francis Letter, Tech Data intended to treat the new Compaq entity as a new customer, and was unwilling to allow for the use of Inacom's customer accounts by the new Compaq entity.   However, in reasonable and actual reliance upon the terms of the Francis Letter, Tech Data ultimately agreed to allow for the requested use of the pre-existing accounts by Compaq, thereby conveying valuable and sufficient consideration to Compaq.

27.    A letter similar to the Francis Letter was also sent to Lexmark by Mr. Francis.

28.    In connection with the Compaq Sale, Compaq, in addition to the APA, also entered into substantial long-term operational agreements with Inacom worth hundreds of millions of dollars.  Among these related agreements were: (i) a $55.5M credit facility in which Compaq agreed to extend to Inacom a $55.5M loan; (ii) a three year, $420M Services, Supply and Sales Agreement (and a related Service Level Agreement) in which Compaq agreed to utilize Inacom's services and "assist Inacom in a generation of incremental revenues for Inacom service business" in the aggregate amount of $85M for year 2000, $140M for year 2001, and $195M for year 2002; (iii) a three-year outsourcing/agency agreement in which Compaq agreed to pay Inacom a 3.5% distribution fee for the sale of Compaq computer products; and (iv) a Separation and Sharing Agreement, in which Inacom and Compaq would share certain assets and personnel for up to twelve (12) months following the close of the Compaq Sale.

29.    In connection with the APA, Inacom also executed a Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement, amending the Credit Agreement to modify it to a

$225M revolving credit facility ("Deutsche Bank Credit Facility"). The proceeds of the sale of the Distribution Business to Compaq significantly reduced Inacom's total indebtedness.

30.    The Deutsche Bank Credit Facility contained certain financial covenants, including minimum net worth covenants, covenants requiring certain minimum levels of working capital, and minimum EBITDA covenants, among others. Under the Deutsche Bank Credit Facility, as stated under the February 15, 2000 Fourth Amendment and Waiver, the minimum EBITDA covenant required Inacom to have EBITDA of $7,000,000 by December 31, 2000 and $15,000,000 by March 31, 2001. In addition, the Deutsche Bank Credit Facility set a net worth covenant, which required Inacom to maintain a minimum net worth of $185,000,000, plus 75% of net income, plus 100% of capital stock net issuance proceeds, plus 100% of any indebtedness converted into equity. Deutsche Bank's own analysis showed that Inacom would be able to comply with the minimum EBITDA and net worth covenants set forth in the Deutsche Bank Credit Facility.

31.    The Third Amendment and Waiver to the Credit Agreement, dated January 4, 2000 established a borrowing base requirement to govern advances under the Deutsche Bank Credit Facility. The borrowing base was comprised of 60% of eligible inventory plus 85% of eligible receivables plus 50% of the amount of the Nesbitt Burns Residual Note (a pre-existing debt). This borrowing base requirement continued under the Fourth Amendment and Waiver.

32.    In connection with the APA, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") prepared a solvency opinion, dated February 16, 2000 ("Houlihan Lokey Solvency Opinion"). After an extensive review and analysis of Inacom's financial records and the Service Business and after interviews with Inacom's top management, including but not limited to Thomas Fitzpatrick (Inacom's CFO) and Richard Oshlo (Inacom's Treasurer), Houlihan Lokey stated in the Houlihan Lokey Solvency Opinion that: (i) the fair value and present saleable value

of Inacom's assets exceeded the company's stated and identified contingent liabilities; (ii) Inacom would be able to pay its debts as they matured; and (iii) the capital remaining in Inacom after the sale of the Distribution Business to Compaq would not be unreasonably small for the continued operation of the Service Business. The Houlihan Lokey Solvency Opinion was a condition precedent to finalization and consummation of the APA. The Houlihan Lokey Solvency Opinion was based on an extensive financial and business analysis, and Houlihan Lokey was paid $400,000 for the Houlihan Lokey Solvency Opinion.

33.    Accordingly, Compaq, Inacom, and Deutsche Bank relied upon the Houlihan Lokey Solvency Opinion and believed that it was an accurate of assessment of Inacom's financial condition.

34.    Prior to the APA, Goldman Sachs & Co. ("Goldman Sachs") utilized market data and other information in preparing a January 4, 2000 presentation to Inacom's Board of Directors. Goldman Sachs provided investment and financial advice and services to Inacom for approximately two years prior to the APA. During the over two-year relationship between Goldman Sachs and Inacom, Goldman Sachs performed business analysis for Inacom on a variety of topics, including valuation analysis and capital structure analysis.

35.    In preparing the January 4, 2000 presentation to Inacom's Board of Directors, Goldman Sachs undertook an extensive analysis concerning Inacom, including utilizing the information previously known and made available to it over the course of the various projects performed by Goldman Sachs over the two-year prior relationship. In addition, Goldman Sachs analyzed information from various sources including IBIS estimates[1] (for earnings projections) and information from Wall Street analysts in preparing the January 4, 2000 presentation to Inacom's Board of Directors.

---

[1] IBIS is a public market source for forecast information.

{210346.0002/N0560555_1}

9

36.    Based on Goldman Sachs knowledge of Inacom and its extensive analysis, Goldman Sachs prepared projections showing that Inacom would have increasing EBITDA throughout 2000 with a positive EBITDA by the second quarter of 2001. In preparing this analysis, Goldman Sachs was projecting future increases in EBITDA and revenues for Inacom, and Goldman Sachs specifically believed that the Service Business of Inacom was viable and would survive as a going concern.

37.    In addition, Deutsche Bank performed a specific analysis concerning Inacom in connection with the Deutsche Bank Credit Facility. Deutsche Bank, like Goldman Sachs & Co., concluded that Inacom would achieve positive EBITDA in 2001 and that its revenue and EBITDA levels would continue to strengthen throughout 2000.

38.    Deutsche Bank believed that Inacom's management had a sound plan and direction for the company and believed that Inacom would continue as a going concern after the Compaq Sale in the future.

39.    Following the Compaq Sale, Deutsche Bank, Goldman Sachs, Compaq, and Inacom all believed based on their independent analysis and experience, that Inacom would continue as a going concern into the future.

40.    Based on the APA, the related operational agreements discussed above, the Fourth Amendment and Waiver to the April 9, 2000 Credit Agreement, and the Houlihan Lokey Solvency Opinion, the Compaq Sale closed on February 16, 2000. Compaq paid approximately $369,500,000 for Inacom's Distribution Business and also assumed some of Inacom's accounts receivable and debt obligations, including but not limited to all of Inacom's previous obligations owed to Deutsche Financial Services in connection with Inacom's floor planning facility for Compaq product.

41.    Inacom's management received bonuses, approved by Inacom's Board of Directors, following the Compaq Sale, including a $625,000 which in part was a bonus and other additional compensation to the CEO, Gerald Gagliardi, and a $100,000 bonus to the CFO, Thomas Fitzpatrick.[2]

42.    After the Compaq Sale, Inacom through its treasurer, Richard Oshlo, submitted monthly Borrowing Base Certificates to Deutsche Bank in accordance with the Deutsche Bank Credit Facility, providing information concerning the eligible inventory, receivables, and outstanding principal of the Nesbitt Burns Residual Note (an existing note), in order to calculate the funds available to Inacom.

43.    In the February 26, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $79,322,298.40.  In the March 25, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $54,656,000.  In the April 22, 2000 Borrowing Base Certificate, Inacom had availability under the Deutsche Bank Credit Facility of $89,681,203.

44.    In the February 26, 2000 Borrowing Base Certificate and the March 25, 2000 Borrowing Base Certificate, Richard Oshlo, Inacom's Treasurer, specifically represented, among other things, that "no default or event of default or potential default exists."  Accordingly, Inacom, itself, was representing that as of the dates of the Borrowing Base Certificates, it was in compliance with the Deutsche Bank Credit Facility, including but not limited to compliance with its minimum net worth covenants.

---

[2] Notwithstanding the fact that these persons constituted "insiders" within the meaning of Section 101(31) of the Bankruptcy Code, the Court observes that Inacom's counsel did not, nor did any other fiduciary of the bankruptcy estates, commence any actions for the avoidance of allegedly preferential transfers pursuant to Sections 547 and 550 of the Bankruptcy Code.  The Court has taken these factors into account in adjudging the credibility of Inacom's witnesses who were so situated as "insiders."

{210346.0002/N0560555_1}

45.    At all times, from March 17, 2000 through April 17, 2000 Inacom continued to sell services and products, retain employees and pay wages, advertise, pay its obligations, and generally continue to operate its business and perform its business functions.

46.    In addition, from February 16, 2000 through the Petition Date, Inacom continued to pay its indebtedness and reduce the loan balance it owed to Deutsche Bank. The outstanding balance owed by Inacom to Deutsche Bank under the Credit Agreement was $164,672,000 on February 16, 2000. By April 22, 2000 that amount had been reduced to $112,672,000, and by the Petition Date, the amount had been further reduced to $66,872,000. Indeed, as of April 24, 2000, the amounts owed to Deutsche Bank by Inacom were "lower than projected" by Deutsche Bank, thus showing that Inacom was operating in such a manner so as to be able to reduce its indebtedness even more than was expected. Inacom was even able to pay off its current debts earlier than expected, including paying an extra $15,000,000 to IBM in late March 2000 to pay off a $78,000,000 loan over a month and a half early.

47.    On March 31, 2000, Inacom contacted Deutsche Bank concerning the regularly-scheduled meeting between Inacom and Deutsche Bank scheduled for April 27, 2000. In the March 31, 2000 correspondence concerning the meeting, Inacom made no mention of or reference to any problems or issues concerning the operation of its business or any defaults (existing or potential) or difficulties in meeting its covenants or obligations under the Deutsche Bank Credit Facility.

48.    On April 17, 2000, Thomas Fitzpatrick, Inacom's Chief Financial Officer, learned, by telephone, while on vacation in Cancun, Mexico, that certain accounts receivables allegedly belonging to Compaq had been mistakenly received in Inacom's lockboxes and automatically swept as payments upon the Deutsche Bank Credit Facility. Upon learning this

information, Mr. Fitzpatrick, nevertheless, chose to continue his vacation in Mexico and did not return to the United States until the following week.

49.     On April 27, 2000, Compaq, for the first time, notified Deutsche Bank that Compaq claimed that certain receivables owned by Compaq were mistakenly paid into Inacom's lockboxes. Deutsche Bank notified Compaq that it would investigate the matter. Subsequently, Deutsche Bank refused to return the swept funds and, refused to advance further funds to Inacom, giving as the reason an alleged material adverse change under the Deutsche Bank Credit Facility.

50.     Deutsche Bank funded the draw requests of Inacom under the Deutsche Bank Credit Facility on each occasion as requested up through April 28, 2000.

51.     Indeed, it was not until April 28, 2000 that Deutsche Bank provided any indication to Inacom that Deutsche Bank was considering declaring a material adverse change and advancing no further funds to Inacom under the Deutsche Bank Credit Facility. However, Deutsche Bank did not actually declare a material adverse change at that time; instead it continued to investigate Compaq's allegations concerning the commingling of funds paid into Inacom's lockboxes.

52.     In April 2000, Inacom still had numerous employees, and revenues based upon income statements for the four the weeks ending April 22 of $63 million.

53.     In fact, on May 1, 2000 and again on May 26, 2000, Deutsche Bank informed Compaq that it was still investigating the matter of the misapplied funds that Compaq had misdirected to Inacom's bank account.

54.     Throughout February, March, and April, 2000, there was no indication to Inacom, its customers, its lenders, its investment advisors, or the general public that Inacom would cease operations, and during that time, Inacom continued to operate its business and bankruptcy was

not clearly imminent. Throughout February, March, and April, 2000, Inacom was a going concern actively engaged in business.

55.     The aggregate equity of Inacom Corp. on April 22, 2000 was between $44,000,000 and $144,000,000.

56.     Therefore, at least through April 22, 2000 Inacom was solvent.

57.     Inacom's solvency on this date means that Inacom has failed to meet its burden of proof that any monies it paid to Tech Data that are the subject of this action were "made while the debtor was insolvent," within the meaning of 11 U.S.C. § 547(b)(3).

C.      **Additional Facts Concerning Tech Data's Status With Inacom After The Compaq Sale And The Legal Consequences Which Bar Any Preference Liability By Tech Data Under Bankruptcy Code Section 547(b)**

58.     After the Compaq Sale, Tech Data was no longer a creditor of Inacom's.

59.     By virtue of the Compaq Sale, the APA, the Form 8-K and the Frasca Email, as well as the Francis Letter, Compaq had agreed to assume all accounts payable outstanding to Tech Data. This created a novation of the debtor-creditor relationship between Inacom and Tech Data, and severed that debtor-creditor relationship. New contractual obligations between Compaq and Tech Data were created instead, whereby Tech Data became Compaq's account creditor based upon the outstanding Inacom accounts payable.

60.     Accordingly, as a result of these events, there was no longer any indebtedness oweing by Inacom to Tech Data after the Compaq Sale. The assumption by Compaq of the accounts payable owed by Inacom to Tech Data prior to the Compaq Sale meant that Inacom was no longer Tech Data's account debtor.

61.     The termination of the debtor-creditor relationship and the cancellation of any indebtedness by and between Inacom and Tech Data had several practical and legal

consequences to the pending dispute, and ensures that Inacom has failed to meet its burdens of proof and persuasion under 11 U.S.C. §§ 547(b), et seq.

62.    First, Inacom has failed to meet its burden of proof that any monies paid by Inacom to Tech Data that are the subject of this dispute were "to or for the benefit of a creditor," within the meaning of 11 U.S.C. § 547(b)(1).  If Tech Data was no longer a creditor at the time of any transfers by Inacom to Tech Data, Inacom cannot prove preference liability on the part of Tech Data.

63.    Second, Inacom has failed to meet its burden of proof that any monies paid by Inacom to Tech Data that are the subject of this dispute were "for or on account of an antecedent debt owed by the debtor before such transfer was made," within the meaning of 11 U.S.C. § 547(b)(2).  Upon the assumption of the Inacom accounts payable to Tech Data by Compaq, the indebtedness by Inacom was canceled.  Accordingly, any monies paid to Tech Data by Inacom after the Compaq Sale were not on account of a legal obligation by Inacom to Tech Data.

64.    The inability of Inacom to have satisfied each and every subsection of 11 U.S.C. §§ 547(b), et seq., means Inacom has failed to prove any liability on the part of Tech Data.

**D.    Facts Concerning the Amounts Tech Data Would Have Received As A Hypothetical Creditor Under A Hypothetical Chapter 7 Liquidation**

65.    The provisions of 11 U.S.C. § 547(b)(5) are inapposite in this case because Tech Data was not a creditor of the bankruptcy estates or, to the extent that it was a creditor, it was a creditor only on account of a contingent proof of claim.

66.    Assuming for the sake of argument that Tech Data was a hypothetical creditor of the bankruptcy estates and would have been entitled to a distribution pursuant to a hypothetical chapter 7 liquidation, Inacom has still failed to meet its burden of proof under 11 U.S.C. § 547(b)(5).

67.     Specifically, Inacom has failed to show that it can meet the Chapter 7 liquidation test, i.e that payments to Tech Data allowed Tech Data to receive more than Tech Data would have received if (i) the case were a case under Chapter 7; (ii) the payments had not been made; and (iii) Tech Data received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

68.     The reason that Inacom cannot meet this statutory burden, as it hypothetically pertains to Tech Data, is that the costs in this case are so excessive, and the results from the sale of the business would appear to be far less than what would have been obtained by a Chapter 7 Trustee, who would only be paid a small statutory percentage of the amounts recovered and would not have employed the many extra layers of bankruptcy estate compensated professionals..

69.     For the period of June 30, 2000 through June 8, 2003, Blank Rome, L.L.P. ("Blank Rome"), counsel for the Creditors' Committee and then the Administrative Agent, received compensation of $1,794,178.00.

70.     For the period of June 26, 2000 through June 9, 2003, Inacom's counsel, Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C. ("Pachulski Stang") received compensation for attorneys' fees in the amount of $9,160,035.69, with an additional $2,428,569.20 being paid to Pachulski Stang as expenses.

71.     For the period of June 22, 2000 through June 8, 2003, Bridge Associates, L.L.C., previously known as Restoration Management Company, L.L.C. ("Bridge Associates"), was paid by Inacom's bankruptcy estate the following: (i) fees in the amount of $4,333,720.00, (ii) expenses in the amount of $565,652.14, and (iii) a $4,463,520.00 contingent fee.  Accordingly, from June 22, 2000 through June 8, 2003, Inacom paid Bridge Associates $9,362,892.14.

72.    Executive Sounding Board Associates, Inc. ("ESB") financial advisors to the Official Committee of Unsecured Creditors for the period of August 28, 2000 through June 8, 2003, received $1,192,074 in fees and $83,466 in expenses from Inacom's bankruptcy estate.

73.    In addition, Inacom's Plan provided a $6,000,000 fund for post-confirmation, professional compensation and reimbursement claims.

74.    Since Plan Confirmation, Blank Rome, Pachulski Stang, and Bridge Associates have been paid undisclosed amounts by Inacom out of the $6,000,000 fund.

75.    As set forth above, the compensation paid to Blank Rome, Pachulski Stang, Bridge Associates, and ESB through June 9, 2003, in connection with the Chapter 11 bankruptcy proceeding of Inacom was $24,021,215.03.    In addition to this $24,021,215.03, another $6,000,000 was made available from the estate to pay further compensation to Blank Rome, Pachulski Stang, Bridge Associates, and others.    Therefore, total expenses for the compensation of Blank Rome, Pachulski Stang, ESB and Bridge Associates may total more than $30 million dollars.

76.    Additionally, no statutory quarterly fees to the United States Trustee would have been required in a chapter 7 liquidation, as is required by operation of 28 U.S.C. §§ 1930(a)(6) for all chapter 11 cases. These statutory fees are required until a chapter 11 case is "converted or dismissed."

77.    Because Inacom's chapter 11 case has not been converted or dismissed, it is still incurring chapter 11 fees and has accrued the obligation for more than twenty-two (22) quarters of statutory fees through the trial date of this matter.

78.    The total quarterly fees, which are calculated on a sliding scale based upon the amount of disbursements from the bankruptcy estate, comprise a sum which is not insubstantial

and would have otherwise directly redounded to the benefit of chapter 7 creditors in the form of dividends on claims.

### E.    Facts Regarding the Parties' Business Relationship

79.    For some time prior to the Petition Date, the Debtors purchased computer equipment and peripherals (the "Goods") from Tech Data. This relationship continuously existed for several years prior to the Petition Date, and Inacom had purchased Goods from Tech Data generally under standard net-thirty (30) day terms.

80.    After the February 16, 2000 closing of the Compaq Sale, Tech Data continued to provide Goods to the Debtors under the same terms as it had prior to the Compaq Sale.

81.    Within the ninety (90) day period prior to the Petition Date, the transferor debtor made payments to Tech Data in the total amount of $4,606,313.97 (the "Transfers").

82.    All of the Transfers were accepted by Tech Data, albeit without regard to any account stated or open, as the assumption of Inacom's account payable obligation through the APA and the Francis Letter had terminated Tech Data's debtor creditor relationship with Inacom.

83.    The Transfers were not made to or for the benefit of a "creditor," within the meaning of Section 547(b)(1) of the Bankruptcy Code, due to Compaq's assumption of the indebtedness.

84.    The Transfers were not made for or on account of an "antecedent debt" owed by the transferor debtor before such transfers were made, within the meaning of Section 547(b)(2) of the Bankruptcy Code, again due to Compaq's assumption of the indebtedness.

85.    The Transfers were not made while the transferor debtor was insolvent, within the meaning of Section 547(b)(3) of the Bankruptcy Code, as Tech Data has demonstrated through the testimony of fact and expert witnesses and other competent evidence that Inacom was not insolvent when it made the Transfers to Tech Data.

{210346.0002/N0560555_1}

86.    The Transfers did not enable Tech Data to receive more than it would have received if the case were a chapter 7 case, if the Transfers had not been made, and if Tech Data received payment of such debt to the extent provided by the Bankruptcy Code.  Due to Compaq's assumption of Inacom's account payable indebtedness to Tech Data, Tech Data was entitled to payment by Compaq irrespective of any distribution under a hypothetical liquidation of Inacom's estate.  In fact, Tech Data was not a creditor of Inacom's estate given the novation of the debtor-creditor relationship by and between Inacom and Tech Data by virtue of Compaq's assumption of the debt.

87.    Inacom is not entitled to the recovery of any alleged Transfers pursuant to Section 550 of the Bankruptcy Code.  As Inacom cannot prove a prima facie case under Section 547 of the Bankruptcy Code and has not timely plead any other theory of recovery for the Transfers, it has no basis for recovery pursuant to Section 550 of the Bankruptcy Code.


## II.    CONCLUSIONS OF LAW:

### A.    Jurisdiction and Venue

88.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 547 and 550.

89.    Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

90.    This is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (F), and (O).

### B.    Inacom's Preference Claim—11 U.S.C. § 547(b)

91.    Inacom brought this adversary proceeding against Tech Data pursuant to 11 U.S.C. §§ 547 and 550 to avoid transfers of the Debtors property to wit: the payments to Tech Data for products previously sold to and accepted by Inacom.  Inacom has failed to meet its

burden of proof under 11 U.S.C. § 547(b). Under Section 547(b) of the Bankruptcy Code, Inacom has the burden of proof to establish that such transfers were:

    (1)    to or for the benefit of a creditor;

    (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)    made while the debtor was insolvent;

    (4)    made—

        (a)    on or within ninety (90) days before the date of filing of the petition; or

        (b)    between ninety (90) days and one year before date of the filing of the petition, if such creditor at the time of the transfer was an insider; <u>and</u>

    (5)    enabled the creditor to receive more than such creditor would receive if—

        (a)    the case were a case under chapter 7 of this title [title 11];

        (b)    the transfer had not been made; and

        (c)    such creditor received payment of such debt to the extent provided by the provisions of this title [title 11].

Proof of each of these five (5) elements is required in order for Inacom to sustain its burden of proof under 11 U.S.C. § 547(b).

    92.    As a matter of law, Tech Data has proven that it was no longer a creditor of Inacom at the time that Tech Data received the transfers from Inacom. Inacom has therefore failed to carry its burden of proof under 11 U.S.C. § 547(b)(1).

93.    As a matter of law, Tech Data has proven that there was no longer indebtedness between itself and Inacom at the time that Tech Data received the transfers from Inacom. Inacom has therefore failed to carry its burden of proof under 11 U.S.C. § 547(b)(2).

94.    As a matter of law, Tech Data has rebutted the presumption of insolvency and as set forth in more detail below, Inacom has failed to establish that it was insolvent from the beginning of the preference period to April 22, 2000.  Inacom has therefore failed to carry its burden of proof under 11 U.S.C. § 547(b)(3).

95.    As a matter of law, Tech Data was entitled to receive payments from Compaq and would have been entitled to such payments irrespective of a hypothetical liquidation of Inacom under chapter 7 of the Bankruptcy Code.  Inacom has therefore failed carry its burden of proof under 11 U.S.C. §547(b)(5).

96.    Section 550 of the Bankruptcy Code does not apply if the payments cannot be avoided, and Inacom has failed to prove that the payments to Tech Data are avoidable under Section 547 of the Bankruptcy Code.

**C.    Inacom Was Not Insolvent at the Time the Payments Were Made**

97.    The factual evidence established that Tech Data has rebutted the presumption of insolvency and, therefore, Inacom has the burden of proof to establish insolvency at the time of the payments made by Inacom to Tech Data by a preponderance of the evidence. *See In re Trans World Airlines, Inc.,* 180 B.R. 389, 404 (Bankr. D. Del. 1994), *affirmed in part, reversed in part on other grounds,* 203 B.R. 890 (D. Del. 1996), *reversed,* 134 F.3d 188 (3rd Cir. 1998) (Third Circuit affirmed the bankruptcy court and reversed the district court's reversal);  *see also In re Lids Corp.,* 281 B.R. 535, 540 (Bankr. D. Del. 2002); 11 U.S.C. § 547(g); FED. R. EVID. 301.

98.    "Insolvency" is defined as a "financial condition such that the sum of . . . [the debtor's] debts is greater than all of . . . [the debtor's] property, at a fair valuation, exclusive of"

exempt and fraudulently transferred property. 11 U.S.C. § 101(32)(A); *see also In re Lids Corp.*, 281 B.R. at 540. This test is commonly referred to as the Balance Sheet Test. *See id.* There is no statutory guidance as to the manner of assessing the "fair valuation" of assets so the determination of "[i]nsolvency requires the court to use some practical business judgment about asset valuation." DANIEL R. COWANS, 2 BANKRUPTCY LAW AND PRACTICE 467 (7th ed. 1998).

99.    The Third Circuit, contemplating the proper manner to determine fair valuation, has stated that where "liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer . . . assets [are] valued on a going concern basis," not a liquidation basis. *In re Trans World Airlines, Inc.*, 134 F.3d at 193; *see also Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992); *In re Lids Corp.*, 281 B.R. at 541 (going concern where company planned to continue operations as usual on valuation date). Contrarily, "going concern value is not the proper standard if the business is 'on its deathbed'" at the time of the transfer. *Matter of Taxman Clothing Co., Inc.* 905 F.2d 166, 170 (7th Cir. 1990). A company is on its deathbed only when it is "wholly inoperative, defunct, or dead on its feet." *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D. Pa. 1988). Therefore, a company need not be thriving to receive going concern valuation. *Id.*

100.    Inacom, as of April 22, 2000, employed thousands of people, continued to carry on its business, and was actively engaged in pursuing the Service Business. Inacom was a going concern, through at least April 22, 2000. Therefore, in valuing Inacom for purposes of determining whether Inacom was solvent on the date of the Payments, Inacom as a matter of law should be valued on a going concern basis, not as a company in liquidation.

101.    The Third Circuit has defined the fair valuation of assets, in the going concern context, as "'market value' rather than 'distress value,' but . . . the valuation must be analyzed 'in a realistic framework' considering amounts that can be realized 'in a reasonable time' assuming

a 'willing seller' and a 'willing buyer.'" *In re Trans World Airlines, Inc.*, 134 F.3d at 193-94; *see also In re Lids Corp.*, 281 B.R. at 541.

102.    A "reasonable time" is defined as an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claims, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. *In re Trans World Airlines, Inc.*, 134 F.3d at 195 (in that case a reasonable time was twelve (12) to eighteen (18) months); *see also In re Lids Corp.*, 281 B.R. at 541.

103.    In this context, the fair valuation/market value is "the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can reasonably evaluated by . . ." an expert. *In re Lids Corp.*, 281 B.R. at 541.

104.    Furthermore, the debtor's "assets must be valued at what they are reasonably worth at the time of the allegedly preferential transfers and not what they turned out to be worth at some time after the bankruptcy intervened." *In re Davis*, 120 B.R. 823, 825 (Bankr. W.D. Pa. 1990) (emphasis added); *see also Total Tech. Servs., Inc. v. Whitworth*, 150 B.R. 893, 900 (Bankr. D. Del. 1993). Consistent with this rule, the Third Circuit has stated that "the use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's 'insolvency' element has been criticized by courts and commentators alike." *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996). Indeed, "[t]here is overwhelming authority to the effect that . . . subsequent dismemberment [of the debtor] . . . should not enter into the picture." *In re Trans World Airlines, Inc.*, 134 F.3d 188, 197-98 (3d Cir. 1998) (quoting Lawrence P. King, 2 Collier on Bankruptcy ¶ 101.32[4], p. 101-16 (15th ed. 1997)), *cert. denied*, 523 U.S. 1138 (1998).

105.    Once the fair value of Debtor is determined, "it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if "the debtor was insolvent. *In re Lids Corp.*, 281 B.R. at 545.  Unlike assets, debts are measured at their face value and not at market value.  *In re Trans World Airlines, Inc.*, 134 F.3d 188, 190, 196 (3rd Cir. 1998); *In re Lids Corp.*, 281 B.R. at 545.  Contingent liabilities, however, are "limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *In re Trans World Airlines, Inc.*, 134 F.3d at 196-98; *see also In re Lids Corp.*, 281 B.R. at 546.  Therefore, "[c]ontingent liabilities do not include costs associated with liquidation or dissolution of the debtor" as this would inherently contradict the going concern status of the debtor.  *In re Lids Corp.*, 281 B.R. at 546; *see also In re Trans World Airlines, Inc.*, 134 F.3d at 197-98.

106.    Further, hindsight is forbidden when a court is assessing whether an entity was on its financial deathbed at the time of the transfer(s).  *In re Payless Cashways, Inc.*, 290 B.R. 689, 705 (Bankr. W.D. Mo. 2003); *In re DAK Indus., Inc.*, 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996).   Therefore, evidence after April 22 time period, is irrelevant to the inquiry.

107.    Under the foregoing valuation standards, Tech Data has provided sufficient evidence to rebut the presumption of insolvency, thus shifting the burden of persuasion to Inacom to establish by a preponderance of the evidence that Inacom was insolvent during the period of the alleged preferential payments at issue in this action.

108.    Inacom was solvent at least through April 22, 2000.  As of April 22, 2000, Inacom had an aggregate equity value of between $44,000,000 and $144,000,000.  The legal conclusion is based upon on the April 2000 income statement prepared by Inacom, the collective opinions of third parties with substantial expertise in valuing business, including but not limited to Goldman Sachs and  Houlihan Lokey, Compaq Computer's determination that it would enter into a $55 million dollar subordinated loan with Inacom and a three year, $420 million dollar

service agreement, a separate service and support agreement whereby Inacom's employees were to work with Compaq's in the future, the revolving credit facility with Deutsche Bank with availability in the range of $89,681,203 in April and Borrowing Base Reports prepared by Inacom.

109.     Because Inacom was solvent through April 22, 2000, Inacom is not entitled to any recovery as to any of the payments made prior to that date, having failed to satisfy the requirement of 11 U.S.C. § 547 (b)(3).  Therefore, the maximum amount Inacom may even be entitled to recover, subject to Tech Data's affirmative defenses discussed below, is $40,625.17.

**D.     Conclusion**

110.     For the foregoing reasons, the Court finds that Tech Data is not liable to Inacom for any of the Payments and that Inacom is entitled to no relief or recovery whatsoever against Tech Data.

Dated:  August 15, 2005

Respectfully submitted,

HERLIHY, HARKER & KAVANAUGH

/s/ James F. Harker
James F. Harker (Bar No. 255)
1300 North Market Street, Suite 400
Wilmington, Delaware 19899
Telephone:  (302) 654-3111

-and-

ADORNO & YOSS, LLP
Charles M. Tatelbaum (*Admitted Pro Hac Vice*)
Stephen C. Hunt (*Admitted Pro Hac Vice*)
350 E. Las Olas Boulevard, Suite 1700
Fort Lauderdale, FL  33301
Telephone: (954) 763-1200
Facsimile:  (954) 766-7800
*Attorneys for Defendant,*
*Tech Data Corporation*