IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: INACOM CORP., et al., Debtors. | Bankruptcy Case No. 00-2426 (PJW) |
| INACOM CORP., on behalf of all affiliated Debtors,<br>　　　　　　　　　　Plaintiff,<br>　v.<br>TECH DATA CORPORATION,<br>　　　　　　　　　　Defendant. | Civil Action No. 04-148 (GMS)<br><br>[Adversary Proc. No. 03-50501 (PJW)] |

## PLAINTIFF'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.　FINDINGS OF FACT

#### Procedural Posture

1.　Plaintiff InaCom Corp. and its related debtors each filed a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") on June 16, 2000 (the "Petition Date").

2.　Plaintiff filed a Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on May 20, 2002 against Defendant. Plaintiff filed a First Amended Complaint for Avoidance and Recovery of Preferential Transfers (the "Complaint") on June 5, 2002 against Defendant. Defendant, after motion practice, filed its Answer And Affirmative Defenses on April 9, 2004. No counter-claims have been asserted, although Defendant did file a proof of claim in the Debtor's bankruptcy estate.

## General Background

3.      Historically, Inacom was in two basic lines of business; computer hardware and peripherals distribution (the "Distribution Business") and a related technology service and configuration business (the "Service Business"). Through these businesses, Inacom delivered personal computer and related information technology products to businesses together with related support services. Following its merger with Vanstar Corporation on February 17, 1999, Inacom was a Fortune 500 public company, a leading single-source provider of information technology products and technology management services to primarily Fortune 1000 clients. Inacom distributed its products and services through a marketing network of approximately ninety (90) business centers throughout the United States. In 1999, the Distribution Business generated annual revenues of approximately $5.1 billion in annual revenues, while the Service Business generated approximately $800 million.

4.      In late 1999, due to changes in the market that had made the Distribution Business less profitable, Inacom began to explore the sale of the Distribution Business, and to develop a business strategy that would focus on the remaining Service Business. To shepherd the service-oriented entity, Inacom hired a new CEO (Gerald Gagliardi) in early November, 1999, and a new CFO (Thomas Fitzpatrick) in late November.

5.      In early December, 1999, Inacom reached an agreement in principle for sale of the assets of the Distribution Business to Compaq Computer Corporation ("Compaq"), one of Inacom's largest distribution vendors. Inacom's new CEO and CFO spent the balance of December responding to Compaq's due diligence requests and negotiating aspects and details of the transaction. On January 4, 2000, Inacom signed an Asset Purchase Agreement (the "APA"),

and certain related operational agreements, with Compaq and its acquisition subsidiary, ITY Corp., subsequently known as Custom Edge, Inc. (also referred to collectively, as "Compaq").

6. Inacom faced a liquidity crisis beginning in late December, 1999. Richard Oshlo, Inacom's Treasurer, began to hold checks made payable to many of Inacom's vendors. Inacom's accounts payable department continued the practice of cutting checks when the underlying obligation became due, but Mr. Oshlo physically picked up the checks from the payables department starting in January, 2000 and held them in boxes in his office until funds were available to release them. Mr. Oshlo maintained a ledger of checks held. This process continued until the Petition Date. The checks constituting the Transfers were among those held by Richard Oshlo in his office in Inacom's Treasury department. Inacom had no prior history of holding checks.

7. The liquidity crisis became intractable in January. In mid-January, Inacom defaulted under its accounts receivable securitization facility. Inacom came within hours of missing payroll for a company of over 10,000 employees, and had to pay a substantial fee in exchange for the lender's waiver to fund the payroll. The lender, Nesbitt Burns, began sweeping Inacom's accounts of all funds in order to pay down the outstanding obligation under the facility.

8. In addition, Inacom's new management, including a new Controller hired in late January, 2000, discovered that Inacom's books and records contained many inaccuracies, including what proved to be over $100 million in uncollectible accounts receivable attributed to Inacom's lenders. Management concluded that the books maintained by and projections prepared by the prior CFO were highly unreliable. Inacom's financial condition continued to

deteriorate as sales continued to under perform projected levels, a trend that began in the third quarter of 1999.

9.  Against this backdrop, Inacom's new CFO, Fitzpatrick, concluded that a chapter 11 filing would be necessary if the Compaq transaction did not close. In addition, Fitzpatrick became convinced that Inacom had no chance of survival without additional concessions from Compaq and Inacom's lenders. Fitzpatrick went back to Compaq and Inacom's lenders and succeeded in obtaining approximately $100 million in cash, additional borrowing capacity and relaxed lending covenants.

10. After extensive negotiations among Inacom, Compaq and Inacom's secured lenders over the next several weeks, the very complex transaction closed on February 16, 2000. In sum, in exchange for $369.5 million, Compaq purchased the inventory, supply agreements, customer contracts, leases, furniture, fixtures and equipment of the Distribution Business, and assumed certain related outstanding liabilities. Compaq hired essentially all of Inacom's employees and management personnel associated with the Distribution Business, and maintained operations from the same business premises. Compaq also agreed to provide subordinated financing up to $55 million and committed to order over $400 million services over 3 years.

11. On the date of the Compaq closing, Inacom used $313,836,629 of the Compaq proceeds to pay its secured creditors, DeustcheBank, Nesbitt Burns and IBM Credit. In addition, Inacom paid $78,173,988 to IBM Credit through March 29, 2000, and Nesbitt Burns seized $147,875,991 (from lock box collections) through March 6, 2000. All told, from

February 16 through June 16, 2000, Inacom paid $583,291,056 to DeutscheBank, IBM Credit and Nesbitt Burns, net of any new borrowings during this time period.

12. Through the APA, Compaq agreed to assume only those of Inacom's accounts payable specifically identified in the Asset Purchase Schedules (Accounts Payable) to the APA. This Schedule was reconciled by the parties as of February 12, 2000, and included a detailed computer run of specifically identified invoices to be assumed. These invoices represented outstanding invoices for which Inacom had not already cut checks as of February 12, 2000.

13. The liquidity crisis continued even after the Compaq closing. Nesbitt Burns continued to sweep Inacom's receivables lock boxes until its facility was satisfied in early March 2000. Thus, there were few funds available to pay outstanding trade debt until mid-March, 2000, following the closing of the Compaq purchase and subsequent satisfaction of Inacom's secured indebtedness, particularly the accounts receivable securitization facility. Nonetheless, Inacom was pressured by the industry leaders, such as Defendant, to be paid.

14. The Compaq $55 million subordinated financing facility never materialized based on disputes that arose between Inacom and Compaq in April, 2000. Moreover, Compaq never delivered the additional promised service business, despite complaint to that effect from Inacom's CEO beginning in late March, 2000.

15. Inacom encountered numerous other difficulties following the Compaq closing, resulting in Management's decision, in late April, 2000, to liquidate the remaining businesses. These included: (1) the discovery of further inaccuracies in Inacom's books and records, (2) oft-changing positions by KPMG, Inacom's auditors, which eventually led to much

larger and more extensive restatements, for 1998 and 1999, than represented by the auditors on February 15, 2000, (3) the inability of Inacom's auditors to complete the restatement of the financial statements, which precluded Inacom from qualifying for new business with its traditional customer base, publicly-held Fortune 1000 customers, (4) unexpectedly poor performance of the Service Business, resulting in $20 million in monthly losses from operations, and (5) a claim asserted by Compaq on April 18, 2000, to over approximately $100 million in disputed receivables collections and overpayments arising out of Compaq's purchase of the distribution business.

16.     As a result of the Compaq claims voiced on April 18, and as discussed in an April 27 meeting between Inacom and its lenders, led by DeutscheBank, it became clear that Inacom could not certify that it was in compliance with all applicable lending covenants. As a result, DeutscheBank was unwilling to lend further amounts, and acted to seize Inacom's lock boxes and accounts. From late April through the June 16 bankruptcy filing, Inacom operated on budgeted cash releases negotiated with DeustcheBank.

17.     In late April, Inacom hired investment bankers (The Blackstone Group) and endeavored to sell the Service Business. One potential buyer, Compucom, proceeded with negotiations toward a sale that, if successfully negotiated, was to be consummated through an Inacom chapter 11 proceeding. Under the deal, Compucom was to pay $100 million for all of the operating assets of the Service Business, including its accounts receivable and furniture, fixtures and equipment, and to assume Inacom's operating liabilities and employees. Although Inacom would not receive any effective premium from the transaction over and above the value of the assets sold, Inacom pursued the transaction primarily to find continued employment for its

remaining 5000 employees. The deal fell through a day or two before the Debtors filed their chapter 11 petitions on June 16, 2000.

18. Inacom closed virtually all business operations as of the Petition Date, June 16, 2000, and began to liquidate its remaining assets.

19. On May 23, 2003, the Bankruptcy Court entered the Order Confirming Debtors' Joint Plan of Liquidation (the "Plan") as Amended Pursuant to Chapter 11 of the United States Bankruptcy Code. Implementation of the Plan accomplished the liquidation of all of the Debtors' remaining assets.

20. Nonpriority unsecured creditors with allowed claims against the Debtors' estates will recover between 27 and 37 cents on the dollar for their claims, depending on the Estate's litigation recoveries. Under no circumstances will nonpriority unsecured claims be paid in full.

### The Parties' Relationship and the Challenged Transfers

21. Tech Data is a corporation formed under the laws of the State of Florida, with its principal place of business located at 5350 Tech Data Drive, Clearwater, Florida. Tech Data sells computer products and peripherals, as well as a variety of other electronic products.

22. Primarily in the operation of the Hardware Business, the Debtors purchased computer equipment and peripherals (the "product") from Defendant. This relationship existed for many years before the Petition Date.

23. In the years prior to the Petition Date, the Debtors purchased tens of millions of dollars of product from Defendant. The Debtors purchased relatively little product, if any, from Defendant after the sale of the Distribution Business to Compaq.

24. As of the Petition Date, the Debtors owed nothing to Defendant for any invoices for product purchased. Defendant's proof of claim in the Debtors' bankruptcy cases was on account of contingent liabilities, as conceded by Defendant.

25. Within the 90 days prior to the Petition Date (March 17-June 16, 2000), the Debtors made payments of their funds to the Defendant in the amount of $4,608,313.97 (the "Transfers"), which are more specifically described in Exhibit A attached hereto.

26. The Transfers were made to or for the benefit of the Defendant, as a creditor of the Debtors.

27. The Transfers were payments made on account of an antecedent debt, reflected by invoices for product previously shipped by Defendant to the Debtors.

28. The Transfers enabled the Defendant to receive more than it would have received if the Debtors' case was one under chapter 7, the Transfers had not been made, and Defendant received payment on the debt to the extent provided by the Bankruptcy Code.

29. Defendant was the initial transferee for whose benefit all of the Transfers were made.

30. As part of the Asset Purchase Agreement, Compaq agreed to assume responsibility for payment of certain accounts payable of InaCom, including responsibility for certain accounts payable of Inacom owed to Defendant.

31. On Friday, February 11, 2000, Inacom closed the books on its account payable records in anticipation of closing the asset purchase transaction the following Monday. On or about the same date, Inacom delivered to Compaq an Accounts Payable Aging Report

("AP Report") that describes the Inacom accounts payable assumed by ITY Corp. pursuant to the Asset Purchase Agreement, including the account payable relating to Defendant.

32. Prior to the February 11 delivery of the AP Report, Inacom wrote several checks in payment of certain of Defendant's outstanding invoices. These checks were not immediately mailed to Defendant, but were held in the office of Inacom's treasurer, Richard Oshlo (the "Held Checks"). The Transfers were among the Held Checks.

33. The AP Report does not reflect invoices paid by Held Checks because, consistent with Inacom's accounting systems, once Inacom wrote a check the invoice was no longer shown on Inacom's account payable report.

34. All of Defendant's invoices paid by the preferential payments were not among those on the list of invoices in the AP Report, and thus, were not assumed by Compaq under the Schedule to the APA.

35. Inacom and Compaq did not intend that Compaq would assume liability for Held Check amounts under the Asset Purchase Agreement.

36. There is no contract or other form of agreement between Defendant, Inacom and Compaq with respect to liability for invoices for goods delivered by Defendant to Inacom.

37. At least as of February 15, 2000, Defendant understood, as expressed in writing, that Compaq would not be assuming through the APA any obligation to satisfy invoices for which Inacom had cut checks prior to the February 16, 2000.

38. Defendant did not at any time agree to release Inacom of its obligation to satisfy invoices unpaid as of February 16, 2000.

39. Section 13.05 of the Asset Purchase Agreement provides that the agreement shall be construed according to New York law without regard to the conflicts of law rules.

40. In section 13.08, the APA provides that "No provision of this Agreement is intended to confer upon any person other than the parties hereto any rights or remedies hereunder."

41. In section 11.02, the APA provides that "Buyer hereby indemnifies Seller...against and agrees to hold [Seller] harmless from any and all Damages incurred...arising out of (i) any breach of covenant of agreement made or to be performed by Buyer pursuant to this Agreement; or (ii) and Assumed Liability."

42. Allowed nonpriority unsecured claims against the Debtors' estate will likely receive distributions of approximately $.30 on the dollar, and will surely not receive 100% payment. Payment on nonpriority unsecured claims in a chapter 7 case of the Debtors would result in an even smaller distribution.

43. If Defendant had not received the Transfers, it would hold a prepetition nonpriority unsecured claim against the Debtors' estate arising out of the invoices satisfied by the Transfers. If the Debtors' case were one under chapter 7, the estate would not have sufficient assets to pay in full any prepetition nonpriority claims of Defendant.

44. Any finding of fact that may qualify as a conclusion of law shall be equally considered as such.

II.     **CONCLUSIONS OF LAW**

**Avoidance of the Transfers Under Bankruptcy Code Section 547**

1.      Section 547(b) of the Bankruptcy Code states:

The trustee may avoid any transfer of an interest of the debtor in property—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made -
        (A) on or within 90 days before the date of the filing of the petition; or
        (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

    (5) that enables such creditor to receive more than such creditor would receive if –
        (A) the case were a case under chapter 7 of this title;
        (B) the transfer had not been made; and
        (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

2.      Section 547 "aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor." *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3d Cir. 1994). The preference provisions are designed "not to disturb normal debtor-creditor relationships, but

to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors." *Id.* at 224.

3. The purpose of the Preference statute is to discourage creditors from racing to the courthouse to dismember the debtor during his slide into bankruptcy. *Report of the Committee on the Judiciary, Bankruptcy Law* Revision R.H. Rep. No. 595, 95th Congress 1st sess. 177 (1977). The preference provisions facilitate the prime bankruptcy policy of a equality of distribution among creditors of the debtor. *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355 5th Cir. 1986) (quoting *Report of the Committee on the Judiciary, Bankruptcy Law Revision*, R.H. Rep. No. 595, 95th Congress 1st sess. 177 (1977).

4. Plaintiff has sufficiently established all of the elements of its *prima facie* case under Section 547(b) with respect to all of the Transfers. The parties have stipulated to proof of 547(b)(4). As described below, Plaintiff's evidence clearly satisfied the requirements of Section 547(b)(1), (2), (3) and (5) as well.

### Transfers of the Debtors' Funds to a Creditor, on Account of Antecedent Debt (547(b)(1), (2))

5. The evidence left no doubt that the Transfers were of the Debtors' funds, made on account of invoices for product delivered by Defendant to the Debtors prior to the Transfers, and thus, on account of antecedent debt. Defendant was clearly a creditor of the Debtors based on the outstanding invoices paid by the Transfers, as well, Defendant filed a proof of claim against the Debtors' estates based on other alleged liabilities.

6.    Defendant's arguments that the APA relieved the Debtors' outstanding obligations to Defendant for the invoices fail as a matter of law. Under New York law[1], absent a novation, the original obligor remains liable for performance of any delegated duties. *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 498 (S.D.N.Y. 2002). The act of delegation…does not relieve the delegant of the ultimate responsibility to see that he obligation is performed. If the delegate fails to perform, the delegant remains liable." *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 924 (2d Cir. 1977).

7.    Under New York law, a novation requires four elements: (1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract." *Atlantic Mutual Ins. Co., v. Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82-83 (2d Cir. 1996). "New York courts have set a stringent standard for novation." *Holland v. Fahnestock & Co.*, 210 F.R.D. 487, 499 (S.D.N.Y. 2002), quoting *Citibank, N.A. v. Benedict*, 2000 U.S. Dist. LEXIS 3815, 97 Civ. 9541, 2000 WL 322785 at *8 (S.D.N.Y. Mar. 28, 2000).

8.    There was no contract or other form of agreement between Defendant, Inacom and Compaq with respect to liability for invoices for goods delivered by Defendant to Inacom. Thus, even if Defendant can prove that Compaq assumed such responsibility under the APA, Inacom's liability for the invoices remained, and the preference payments on these invoices were clearly made on account of "antecedent debt", and Defendant remained a creditor of the Debtors.

### Insolvency (547(b)(3))

9.    Inacom is presumed to have been insolvent during the Preference Period pursuant to Bankruptcy Code § 547(f). Each defendant bears the burden to put forward sufficient

---

[1] New York law applies to all issues arising out of the APA. (APA Section 13.05).

evidence of the Debtors' solvency to rebut the presumption. *See, e.g., In re Lids Corporation*, 281 B.R. 535, 540 (Bankr. D.Del. 2002)(Walrath, J.), citing Federal Rules of Evidence 301.

10. A determination of insolvency is a mixed question of law and fact. *See In re Transworld Airlines, Inc.*, 134 F.3d 188, 193 (3rd Cir. 1998); and *In re Roblin Indus*, 78 F.3d. 30 (2d Cir. 1996). Evidence amounting merely to speculation that a debtor may have been insolvent is insufficient to rebut the solvency presumption. *See In re Allegheny Health, Education and Research Foundation*, 292 B.R. 68 (Bankr. W.D. Pa. 2003) and *In re Molded Acoustical Products, Inc.*, 150 B.R. 608 (E.D. Pa. 1993).

11. The District of Delaware's leading case on the insolvency issue is *In re Transworld Airlines, Inc.*, 180 B.R. 389 (Bkrtcy D. Del. 1994)(Walsh, J.) ("TWA"), *affirmed*, 134 F.3d 188 (3rd Cir. 1998), which explains at length the adjusted balance sheet test appropriate to evaluate a debtor's insolvency for the purposes of Section 547(b)(4). *TWA* expressly rejects the notion that the debtor's schedules or financial statements prepared in accordance with Generally Accepted Accounting Principles (GAAP) are sufficient to rebut the presumption, because they fail to include any showing as to the fair value of the debtor's assets as required by Bankruptcy Code § 101(32). *TWA at* 410. As *TWA* describes, for the purposes of the adjusted balance sheet test, assets are presented at fair value, not book value as required by GAAP, while liabilities are presented at face (book) value.

12. The Plaintiff presented an adjusted balance sheet analysis in accordance with *TWA*, which conclusively demonstrates that the face value of Debtors' debts exceeded the fair value of their assets by $500 million at the time of the Transfers to Defendant.

| Assets (at fair value) | $400.2 million |
| Liabilities | $960.2 million |
| Net Financial Position | ($560 million) |

13.     The Bridge report notes: (1) After transitioning to a computer service business in February, 2000, the Debtors' primary asset was its accounts receivable. Its remaining inventory was quickly becoming obsolete. Its fixed assets were mainly software, office equipment, furniture and leasehold improvements (for over 100 leased locations), which have little recoverable value. (2) The Debtors' long term intangible assets (such as goodwill and deferred taxes) had no value because of large losses and consistent demonstrated lack of income and profit. (3) The Debtors' had large current and long term liabilities, and over $50 million in unrecorded liabilities, including real property leases, which substantially impact a balance sheet analysis. (4) Bridge's conclusions regarding assets and liabilities are consistent with the recoveries projected for creditors through the liquidation of the bankruptcy estates.

14.     The analyses presented by Defendant used methodologies not appropriate to the adjusted balance sheet approach, and in any event, did not result in a conclusion that the Debtors were solvent at the time of the preferential transfers. Defendant's expert report, prepared by Duff & Phelps/Sasco Hill Advisors ("Sasco Hill"), not only fails to follow the adjusted balance sheet approach required by *TWA* (*TWA* at 410), but also relies on unreliable data in performing its alternative analyses (e.g., future financial projections and "comparable" competitor data from companies very different from the Debtors). A complete explanation of the errors in the Sasco Hill report is set forth in the Bridge's May 27, 2005 Rebuttal Report.

15.  Defendant misplaced reliance on a "solvency opinion" of the Debtors given by Houlihan Lokey Howard & Zukin ("HLHZ") at the time of the Compaq Sale on February 16, 2000, over one month before the Preference Period.[2] As described at length in the Plaintiff's expert report of Murray Devine & Co., Inc. ("Murray Devine"), the HLHZ report cannot be relied upon to accurately reflect the Debtors' financial condition as of February 16, 2000, since among other problems, (1) HLHZ did not say how it became comfortable with the revenue growth projected by the Debtors' management when in fact the Debtors' revenues for the Services Business was declining; (2) HLHZ relied on inaccurate and incomplete financial information, particularly projections prepared using information from the Debtors' former chief financial officer, which were determined to be grossly inaccurate shortly after the closing of the Compaq Sale, and misleading representations by the Debtors' outside auditors, KPMG, made on the eve of the Compaq Sale, that restatements of the Debtors' prior publicly filed financial statements would be minimal when in fact those restatements were extensive; (3) HLHZ inaccurately calculated the total funded debt for covenant calculation purposes as required under the Debtors' senior credit agreement; (4) HLHZ performed inconsistent and inaccurate cash flow tests; (5) HLHZ did not take into consideration the possibility that cost savings could not be achieved; (6) HLHZ performed limited or no analyses of the assets and liabilities of the computer hardware business retained by the Debtors and the impact to the Debtors if such assets

---

[2] The function of the HLHZ analysis was not to perform a balance sheet analysis, but to review pro forma projections (*i.e.*, future forecasts) and determine whether the Debtors would have sufficient capital to execute, e.g., pay bills as they became due, and as a result, would not trip lending covenants or run afoul of fraudulent transfer laws. HLHZ did nothing to independently verify the data which its opinion was based and the opinion was not performed for the purpose of establishing solvency under § 547(b)(3)

could not be sold as quickly as projected; and (7) HLHZ does not provide evidence that it either received or reviewed any of the Debtors' quarterly or annual reporting documents.

16.     Over the 60 days following the February 16 Compaq close, the truth regarding the weakness of Inacom's financial position became known through a series of events, leading its new CFO, Fitzpatrick, to conclude that he could not "believe any number coming out of Inacom." Inacom's liquidation within four months after the Compaq closing corroborates the unreliability of the HLHZ opinion.

17.     In addition to the adjusted balance sheet evaluation of insolvency, *TWA* states that the debtors' financial performance in the months preceding the bankruptcy filing is highly relevant. In sum, as noted at length above, the uncontroverted testimony from the Debtors' Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO") and Treasurer established that the Debtors faced a worsening liquidity crisis beginning in December, 1999. The financial crisis became severe in mid-January 2000. At that time, the Debtors went into default of their accounts receivable securitization facility with Nesbitt Burns, which began sweeping the Debtors' accounts of cash in order to pay down that outstanding obligation. The Debtors' financial crisis was so acute that management concluded bankruptcy would be necessary if the Compaq Sale did not close. The Debtors' financial crisis continued amid a number of difficulties following the Compaq closing, resulting in Management's decision, in late April, 2000, to liquidate the remaining businesses.

18.     Applying the analysis required by *TWA*, it is clear that the Debtors were insolvent during the Preference Period. Thus, the Debtors were insolvent at the time that each of the Transfers was made.

## Liquidation Analysis (547(b)(5)

19. For purposes of the analysis required under Section 547(b)(5), only payment from the debtor's estate is considered. The right to or prospect of payment from other sources is not to be considered. 11 U.S.C. § 547(b)(5); *In re Powerine Oil Co.*, 59 F. 3d 969, 972-973 (9th Cir. 1995); *In re Virginia-Carolina Fin. Corp.*, 954 F.2d 193, 199 (4th Cir. 1992). *See, Union Bank v. Wolas*, 502 U.S. 151, 160-161, 112 S. Ct. 527, 116 L.Ed. 2d 514 (1991).

20. Thus, even if Defendant could prove a right to recover from Compaq as a third party beneficiary under the APA following avoidance of the preferential transfers[3], that right is irrelevant to the analysis under Section 547(b)(5). Since, as noted above, if Defendant had not received the Transfers, it would hold a prepetition nonpriority unsecured claim against the Debtors' estates arising out of the invoices satisfied by the Transfers, and if the Debtors' cases were under chapter 7, the estates would not have sufficient assets to pay in full any prepetition nonpriority unsecured claims. Plaintiff has clearly satisfied section 547(b)(5).

## Recovery of the Transfers Under Bankruptcy Code Section 550(a)

21. Defendant was in the initial transferee of each of the Transfers. As the Plaintiff has established its case for avoidance of the Transfers under Bankruptcy Code Section 547(b), it

---

[3] Defendant cannot demonstrate that it is a third party beneficiary under the APA under New York law, entitled to enforce any obligation of the APA against Compaq. A party asserting rights as a third-party beneficiary must establish "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit, and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *State of California Public Employees' Retirement System v. Shearman & Sterling*, 95 N.Y.2d 427, 718 N.Y.S. 256, 259 (2000). When determining whether a party is an intended beneficiary of an agreement, courts consider both "the intent of the parties – as revealed in their agreement – and the surrounding circumstances." *Owens v. Haas*, 601 F.2d 1242, 1250 (2d Cir. 1979). *See Nepco Forged Products, Inc. v. Consolidated Edison*, 470 N.Y.S.2d 680, 681 (N.Y. App. Div. 1984)(express provision [as in the APA] prevents any third party from bringing breach of contract claim). *Accord, Board of Managers v. Broadway/72nd Associates*, 729 N.Y.S.2d 16, 18 (N.Y. App. Div. 2001). Under Section 13.08 of the APA, the parties clearly stated that no third party beneficiaries were intended. Moreover, the benefit to vendors from assumption of certain accounts payable was clearly incidental to the contract.

is entitled to judgment in its favor and against Defendant in the total amount of the Transfers, $4,606,313.97. The Transfers are held to be avoidable under Section 547 and recoverable in full by the Debtors under Section 550 of the Bankruptcy Code.

22.  Any conclusion of law that may qualify as a finding of fact shall be equally considered as such.

Dated:  August 15, 2005

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

_____
Laura Davis Jones (Bar No. 2436)
Sandra McLamb (Bar No. 4283)
919 North Market Street, 16th Floor
Wilmington, DE  19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

Andrew W. Caine (CA Bar No. 110345)
Jeffrey P. Nolan (CA Bar No. 158923)
10100 Santa Monica Blvd., Suite 1100
Los Angeles, California 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

Counsel for Plaintiff, INACOM CORP.