```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
 2
                         - - -
 3
    In re:                        : CHAPTER 11
 4  INACOM CORP., et al.,         : BANKRUPTCY CASE
         Debtors                  : NO. 00-2426(PJW)
 5  _____
    INACOM CORP., et al.          : CIVIL ACTION
 6       -vs-                     :
    TECH DATA CORPORATION         : NO. 04-CV-148(GMS)
 7  _____
    INACOM CORP., et al.          : CIVIL ACTION
 8       -vs-                     :
    DELL COMPUTER CORP.           : NO. 04-CV-582(GMS)
 9  _____
    INACOM CORP., et al.          : CIVIL ACTION
10       -vs-                     :
    LEXMARK INTERNATIONAL, INC.   : NO. 04-CV-583(GMS)
11  _____
    INACOM CORP., et al.          : CIVIL ACTION
12       -vs-                     :
    RESILIEN, INC.                : NO. 04-CV-584(GMS)
13  _____
    INACOM CORP., et al.          : CIVIL ACTION
14       -vs-                     :
    INGRAM ENTERTAINMENT, INC.    : NO. 04-CV-593(GMS)
15
                         - - -
16
              Oral deposition of GERALD A. GAGLIARDI,
17  was taken pursuant to notice, held at BLANK ROME,
    LLP, One Logan Square, 18th & Cherry Streets,
18  Philadelphia, Pennsylvania, commencing at 9:33 a.m.
    on April 6, 2005, before April J. Foga, Certified
19  Shorthand Reporter and Notary Public, there being
    present:
20
                         - - -
21
              ZANARAS REPORTING AND VIDEO
22         REGISTERED PROFESSIONAL REPORTERS
      1616 Walnut St., Ste. 300     2112 Bay Avenue
23     Philadelphia, PA 19103    Ocean City, NJ 08226
           (215) 790-7857      1-877-GO-DEPOS
24
```

```
 1    A P P E A R A N C E S:

 2


 3         PACHULSKI, STANG, ZIEHL, YOUNG,
           JONES & WEINTRAUB
 4         BY:  ANDREW W. CAINE, ESQUIRE
           10100 Santa Monica Boulevard, 11th Floor
 5         Los Angeles, California 900067
           (310) 277-6910
 6         Counsel for Plaintiff, Inacom, Corp.

 7

           BLANK ROME, LLP
 8         BY:  EARL M. FORTE, ESQUIRE
           One Logan Square
 9         18th & Cherry Street
           Philadelphia, PA 19103
10         (215) 569-5618
           Counsel for Executive Sounding Board Associates,
11         Inc., liquidating agent for Inacom Corp. and
           affiliated debtors

12


13         ADORNO & YOSS, LLP
           BY:  STEPHEN C. HUNT, ESQUIRE
14         350 East Las Olas Boulevard, Suite 1700
           Fort Lauderdale, FL 33301
15         (954) 763-1200
           Counsel for Defendant Tech Data Corporation

16


17         HUGHES, LUCE, LLP
           BY:  SABRINA L. STREUSAND, ESQUIRE
18         111 Congress Avenue, Suite 900
           Austin, Texas 78701
19         (512) 482-6842
           Counsel for Defendant, Dell, Inc.

20


21
      (Appearance Page continued on Page 3.)
22


23


24
```

GERALD A. GAGLIARDI

Page 3

```
 1   A P P E A R A N C E S:

 2


 3       ZUCKERMAN, SPAEDER, LLP
         BY:  THOMAS G. MACAULEY, ESQUIRE
 4       919 Market Street, Suite 990
         Wilmington, DE 19899
 5       (302) 427-0400
         Counsel for Defendant, Ingram Entertainment,
 6       Inc.

 7
         MORRIS, NICHOLS, ARSHT & TUNNELL
 8       BY:  DEREK C. ABBOTT, ESQUIRE
         1201 North Market Street
 9       Wilmington, DE 19899
         (302) 575-7357
10       Counsel for Defendant, Hewlett-Packard Company

11

12

13

14

15
                              -  -  -
16

17

18

19

20

21

22

23

24
```

1   damaging. The fact that at the 99th hour when
2   we were trying to sell the assets to Compucom
3   and had a deal and Safeguard Scientific said
4   they couldn't allow the transaction to happen
5   because it was going to affect their tax
6   position. Compucom was happy with the
7   transaction and the fact that there were no
8   financials. Safeguard Scientific wouldn't let
9   us honor the contract or wouldn't let them do
10  the contract. Otherwise, we could have
11  packaged the thing and we could have saved the
12  5,000 jobs that got taken and none of us would
13  have ever met each other.
14          So I can give you a whole host -- I
15  called it a cesspool a while ago. It was the
16  worst situation I have ever seen in my 30 some
17  odd years of corporate experience. I've
18  worked in an environment at Unysis where we
19  actually had prepared for bankruptcy some
20  years ago. This was a completely different
21  situation. This was misinformation,
22  misrepresentation, people not carrying out
23  things they said they were going to do for us.
24  It was nothing -- the worst mess I've seen in

1  certain law facilities were actually paid off and
2  closed as a result of monies received from the Compaq
3  closing?
4       A.    I believe so.
5       Q.    Do you recall sitting here today which
6  ones would have been satisfied?
7       A.    I recall that there was one with IBM
8  and I don't recall the others. I know that bank one
9  was redone. Those are the ones -- I can remember the
10 IBM one because it was a sticky thing at the very end
11 of it. We couldn't find the person to sign the
12 document, so they had to agree before we could close
13 and then they would then get their money shot off to
14 them, so --
15      Q.    It sounds to me, Mr. Gagliardi, from
16 the way you described it that the Compucom sale had
17 proceeded fairly well along; is that correct?
18      A.    Yes.
19      Q.    Do you know what remained to be done in
20 order to close that?
21      A.    There was a list of -- as we went down
22 through the period, there was a list of things that
23 had to get done in terms of which employees, which
24 services, which this, which -- you know, commitments

1   amongst everyone, the banks, Compucom, ourselves.
2   And we had pretty much ticked our way through all of
3   them. I can't recall which ones in particular needed
4   to be finished, but we were on a path to close the
5   deal and were actively working to get it done by a
6   certain day in that week, the week that we ended up
7   closing the doors. And there had been an open issue
8   about this getting financial statements which we did
9   not believe -- it was listed, but it wasn't listed on
10  the critical path and all of a sudden it appeared out
11  of nowhere to be on the critical past. Safeguard
12  Scientific raised their head and then Tom -- the two
13  Toms dove into that one and we were unable to resolve
14  it.
15      Q.   Actually, I should jump in,
16  Mr. Gagliardi, because on a couple of occasions, you
17  referred to two Toms and I just want to make sure --
18      A.   Tom Molchen and Tom Fitzpatrick.
19      Q.   Thank you, sir. And your reference to
20  two Toms in the deposition would always be to those
21  gentlemen?
22      A.   Yes. That's what they were constantly
23  referred to.
24      Q.   Thank you. Mr. Gagliardi, do you

1  recall Mr. Fitzpatrick reporting to the board at the
2  May 1, 2000 meeting that the company was still
3  showing positive EBITDA?
4      A.   No. I don't recall that.
5      Q.   Did you have an expectation for the
6  revenue projections that would have been derived from
7  the cash generated through the Compucom closing if it
8  had actually taken place?
9          MR. CAINE: Can you read that back?
10         (The court reporter read back the
11    pertinent testimony.)
12         MR. CAINE: Two objections as to form
13    and no foundation.
14         THE WITNESS: I don't understand the
15    question.
16 BY MR. HUNT:
17     Q.   Mr. Gagliardi, I previously shared with
18 you a letter from the Houlihan, Lokey firm that was
19 marked as an exhibit. That was exhibit GAG-3. Do
20 you have any additional recollection regarding the
21 substance of this solvency opinion letter?
22     A.   No.
23     Q.   Do you believe that Inacom, at the time
24 of the actual closing with Compaq, had identified to

```
 1   BY MS. STREUSAND:
 2        Q.    Do you know what financial information
 3   was provided to Compucom?
 4        A.    I know financial data was provided to
 5   Compucom by Mr. Fitzpatrick --
 6        Q.    And --
 7        A.    -- and Laz.
 8        Q.    And do you know what type?  Was it --
 9        A.    No.  I didn't participate in those
10   meetings.  They had -- there were meetings I went to
11   and there were a set of meetings between just the
12   financial folks, Tom and a woman who was the CFO at
13   that time of Compucom.
14        Q.    Would balance sheets have been provided
15   to Compucom?
16        A.    I don't know.
17        Q.    Did you review the Houlihan, Lokey
18   solvency opinion of February 16, 2000 before the
19   close of the transaction with Compaq?
20              MR. CAINE:  Objection.  Asked and
21         answered.
22              THE WITNESS:  I did not.
23   BY MS. STREUSAND:
24        Q.    And did you work with anyone at
```

1      A.    In the spring.  Before that, I thought
we -- maybe we could get this thing -- maybe they
were actually going to do it, but when they began
bouncing us from Kansas City to the partners in New
York and we couldn't get straight answers, and we
actually had one come to the board meeting to tell us
what was going to happen and he wouldn't give the
board straight answers, I began to believe that there
was just no end to this thing.

         Q.    Do you recall when you first started talking to anyone about a potential sale of the service business?

         A.    Yes.

         Q.    When was that?

         A.    Right after the close -- right after the transaction with Compaq was announced, a guy named Pete Musser, who was with a company named Safeguard Scientific called me.  He was an acquaintance I had had before and he -- Safeguard Scientific was a principal owner in a thing call Compucom and so he called me and said, Gerry, how come you didn't give me a heads up you were thinking about selling anything.  If you guys are thinking of divesting yourself of any more of those assets, we

```
 1   month and week after week.  And the way we kept it
 2   going week after week was the seriousness of the
 3   negotiations with Compucom.
 4        Q.    At some point, was a deal in principal
 5   reach with Compucom?
 6        A.    Yes.
 7        Q.    What was the purpose for Inacom's
 8   perspective of entering into that deal?
 9        A.    Really to save the jobs of the 5,000
10   people that were going to get terminated.  There was
11   nothing in it for us.
12        Q.    When you say there was nothing in it
13   for Inacom, what do you mean?
14        A.    Well, Inacom would be in a position to
15   satisfy -- take care of its employees.  Clearly the
16   stockholders were going to be left high and dry and
17   there would have been more cash to pay creditors, so
18   from a fiduciary position, we thought that it was
19   best serving our constituency than just folding the
20   place up.
21        Q.    Was there cash coming to Inacom from
22   Compucom?
23        A.    Yes.  Yeah.  There was some cash.  I
24   don't recall the amount, but again, that would have
```