IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re INACOM CORP., *et al.*, | Bankruptcy Case No. 00-2426 (PJW) |
| INACOM CORP., on behalf of all affiliated Debtors, [1]<br><br>            Plaintiff,<br><br>    v.<br><br>TECH DATA CORPORATION,<br>            Defendant. | Civil Action No. 04-148 (GMS)<br><br>[Adversary Proc. No. 02-3496 (PJW)] |
| AND RELATED THIRD PARTY ACTION | |

**DECLARATION OF JEFFREY P. NOLAN IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT TECH DATA CORPORATION AND LEXMARK INTERNATIONAL, INC.'S JOINT MOTION IN AID OF LITIGANTS' RIGHTS SEEKING REMEDIES FOR PLAINTIFF INACOM CORPORATION'S LATE PRODUCTION OF CERTAIN DISCOVERY MATERIALS**

I, Jeffrey P. Nolan, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California. I am a lawyer at Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., counsel for Plaintiff, The Unsecured Creditors Committee ("Plaintiff" or, the "Committee"), in the above referenced matter. I make this declaration in opposition to the above-referenced Motion. I have personal knowledge of each of the matters set forth herein, and if called as a witness, I could and would testify correctly and competently as to the truth of all said matters.

---

[1]    The Debtors are the following entities: InaCom Corp.; InaCom Latin America; InaCom Solutions, Inc.; InaCom Communications, Inc.; InaComp Financial Services, Inc.; Perigee Communications, Inc.; Networks, Inc.; Gorham Clark, Inc.; InaCom International, Inc.; InaCom Tennessee, Inc.; InaCom Professional Services, Inc.; Kure Associates, Inc.; Office Products of Minnesota, Inc.; Boston Computer Exchange Corporation; PC Technical Services, Inc.; Vanstar Corporation; Computerland International Development, Inc.; Computerport World Trade, Inc.; Vanstar International Corporation; VST West, Inc.; VST Illinois, Inc.; VSTNC, Inc.; Cland Tex, Inc.; InaCom Government Systems, Inc.; Contract Data, Inc.; Computer Professionals, Inc.; Vanstar Professional Technical Resources, Inc.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the document attached to the e-mail from counsel for Inacom on July 13, 2005, which is the subject of the Motion as Defendants claim it was never produced previously in the litigation.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the Asset Purchase Schedule, Accounts Payable produced to the Defendants as evidenced by the bates-stamped number ICN 09129.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of Asset Purchase Schedules, Accounts Payable produced by Hewlett Packard as evidenced by the bates-stamped tab of HP/TD 0153 which this office received from counsel for Third Party Defendant, Hewlett Packard in the course of the litigation.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of portions of the Oral Deposition of Lazarus Krikorian, taken on January 7, 2005.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of portions of the Oral Deposition of Gerald A. Gagliardi, taken on April 6, 2005.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of portions of the Deposition of Richard Charles Oshlo, Jr., taken March 20, 2005.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of portions of the Deposition of Richard Whalen, taken on July 28, 2005.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:    August 24, 2005

By _____
JEFFREY P. NOLAN

# EXHIBIT A

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

| | Amount Per Detail |
|---|---|
| Distribution Operations -trade a/p | 108,901 |
| Distribution Operations -po accrual | 95,465 |
| Reseller Division | 34 |
| BCE Division | 3,314 |
| Total | 207,714 |
| | |
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947)   Supplier # 99999 - used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694)   HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) |
| Total Adustment | (83,523) |
| | |
| Net Accounts Payable | 124,191 |
| | |
| | |
| Deposits made to Compaq for inventory | (45,276) |
| Pre-payments made on Compaq | (980) |
| | - |
| Total | (46,256) |
| | |
| | - |
| | - |
| | - |
| | - |
| | - |
| | - |
| | - |
| | |
| Total accounts payable per asset schedule | 77,935 |

# **EXHIBIT B**

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

008820

| | Amount Per Detail |
|---|---|
| Distribution Operations -trade a/p | 108,901 |
| Distribution Operations -po accrual | 95,465 |
| Reseller Division | 34 |
| BCE Division | 3,314 |
| Total | 207,714 |

| | | |
|---|---|---|
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947) | Supplier # 99999 - used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694) | HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) | |
| Total Adustment | (83,523) | |

| | |
|---|---|
| Net Accounts Payable | 124,191 |

| | |
|---|---|
| Deposits made to Compaq for Inventory | (45,276) |
| Pre-payments made on Compaq | (980) |
| Total | (46,256) |

Total accounts payable per asset schedule    77,935

△ Bч HP #

Wбs scrubby

1 Dr Bocwco

1,671
1,671

81,277

ICN 09129

# **EXHIBIT C**

Inacom Corp
Asset Purchase Schedules
Accounts Payable
As of February 12, 2000

|  | Amount Per Detail |  |
|---|---|---|
| Distribution Operations -trade a/p | 108,901 | page 417-2157 |
| Distribution Operations -po accrual | 95,465 |  |
| Reseller Division | 34 | page 2174-2176 |
| BCE Division | 3,314 |  |
| Total | 207,714 |  |
|  |  |  |
| "Select/Delete" supplier on Dist/Ops Trade A/P | (947) | Supplier # 99999 - used to track fedwires already paid |
| Non-compaq major vendor a/p | (73,694) | HP, IBM, Dell, TOS |
| Lucent a/p | (8,882) |  |
| Total Adustment | (83,523) |  |
|  |  |  |
| Net Accounts Payable | 124,191 |  |
|  |  |  |
|  |  |  |
| Deposits made to Compaq for Inventory | (45,276) |  |
| Pre-payments made on Compaq | (980) |  |
|  | - |  |
| Total | (46,256) |  |
|  |  |  |
|  |  |  |
|  | - |  |
|  | - |  |
|  | - |  |
|  | - |  |
|  |  |  |
|  | - |  |
|  |  |  |
| Total accounts payable per asset schedule | 77,935 |  |

HP/TD 0153

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re INACOM CORP., et al. ) | Chapter 11 |
| Debtors ) | Bankruptcy Case No. |
| ) | 00-2426 (PJW) |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-148 (GMS) |
| TECH DATA CORPORATION ) | |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-580 (GMS) |
| INGRAM MICRO INC. ) | |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-582 (GMS) |
| DELL COMPUTER CORP. ) | |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-583 (GMS) |
| LEXMARK INTERNATIONAL, INC. ) | |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-584 (GMS) |
| RESILIEN, INC. ) | |
| ) | |
| INACOM CORP., et al. ) | |
| v. ) | Civil Action No. |
| ) | 04-CV-593 (GMS) |
| INGRAM ENTERTAINMENT INC. ) | |

ORAL DEPOSITION OF

**LAZARUS KRIKORIAN**

January 7, 2005



**FREDERICKS-CARROLL REPORTING & LITIGATION SERVICES, INC.**

| | | | | | | |
|---|---|---|---|---|---|---|
| 7719 Wood Hollow Drive ❖ | Suite 156 ❖ | Austin, Texas 78731 | ❖ | (800) 234-3376 | ❖ | (512) 477-9911 ❖ (512) 345-1417 Fax |
| 9 Greenway Plaza | ❖ Suite 1112 ❖ | Houston, TX 77046 | ❖ | (800) 234-3376 | ❖ | (713) 572-8897 ❖ (512) 345-1417 Fax |
| 909 N.E. Loop 410 | ❖ Suite 810 ❖ | San Antonio, TX 78209 | ❖ | (800) 767-9161 | ❖ | (210) 222-9161 ❖ (210) 225-1476 Fax |

```
1                UNITED STATES DISTRICT COURT
                      DISTRICT OF DELAWARE
2

3    _____  )
     In re INACOM CORP., et al.  ) Chapter 11
4          Debtors                ) Bankruptcy Case No.
     _____  ) 00-2426 (PJW)
5
     INACOM CORP., et al.        )
6          Plaintiffs            )
       v.                        ) Civil Action No.
7                                ) 04-CV-148 (GMS)
     TECH DATA CORPORATION       )
8          Defendant             )
     _____  )
9                                )
     INACOM CORP., et al.        )
10         Plaintiffs            )
       v.                        ) Civil Action No.
11                               ) 04-CV-580 (GMS)
     INGRAM MICRO INC.           )
12         Defendant             )
     _____  )
13                               )
     INACOM CORP., et al.        )
14         Plaintiffs            )
       v.                        ) Civil Action No.
15                               ) 04-CV-582 (GMS)
     DELL COMPUTER CORP.         )
16         Defendant             )
     _____  )
17                               )
     INACOM CORP., et al.        )
18         Plaintiffs            )
       v.                        ) Civil Action No.
19                               ) 04-CV-583 (GMS)
     LEXMARK INTERNATIONAL, INC. )
20         Defendant             )
     _____  )
21                               )
     INACOM CORP., et al.        )
22         Plaintiffs            )
       v.                        ) Civil Action No.
23                               ) 04-CV-584 (GMS)
     RESILIEN, INC.              )
24         Defendant             )
     _____  )
25
```

```
1   _____
                                       )
2   INACOM CORP., et al.               )
              Plaintiff                )
3        v.                            )  Civil Action No.
                                       )  04-CV-593 (GMS)
4   INGRAM ENTERTAINMENT INC.          )
              Defendant                )
5   _____)

6

7

8                         * - * - * - * - *

9

10           ORAL DEPOSITION OF LAZARUS KRIKORIAN

11

12

13                  On the 7th day of January, 2005, between

14   the hours of 9:05 a.m. and 12:40 p.m., at the Wyndham

15   Valley Forge Hotel, 888 Chesterbrook Boulevard, Wayne,

16   Pennsylvania, before me, CYNTHIA VOHLKEN, a Certified

17   Shorthand Reporter for the State of Texas, appeared

18   LAZARUS KRIKORIAN, who, being by me first duly sworn,

19   gave an oral deposition at the instance of the

20   Defendant Tech Data Corporation in said cause,

21   pursuant to the Federal Rules of Civil Procedure.

22

23

24

25
```

```
 1              A P P E A R A N C E S

 2   FOR THE PLAINTIFF INACOM CORP.:

 3              Mr. Andrew W. Caine
               Pachulski, Stang, Ziehl, Young,
 4                  Jones & Weintraub
               10100 Santa Monica Boulevard
 5             11th Floor
               Los Angeles, California  90067-4100
 6

 7   FOR THE EXECUTIVE SOUNDING BOARD ASSOCIATION, INC. AS
     PLAN ADMINISTRATOR:
 8
               Mr. Elio Battista, Jr.
 9             Blank Rome LLP
               Chase Manhattan Centre
10             1201 Market Street, Suite 800
               Wilmington, Delaware  19801
11
                    -and-
12
               Mr. Earl M. Forte
13             (By Telephonic Means)
               Blank Rome LLP
14             One Logan Square
               18th & Cherry Streets
15             Philadelphia, Pennsylvania 19103-6998

16
     FOR THE DEFENDANT TECH DATA CORPORATION:
17
               Mr. Stephen C. Hunt
18             Adorno & Yoss, LP
               350 East Las Olas Boulevard
19             17th Floor
               Fort Lauderdale, Florida  33301
20

21   FOR THE DEFENDANT DELL COMPUTER CORPORATION:

22             Ms. Sabrina L. Streusand
               Hughes & Luce, LLP
23             111 Congress Avenue
               Suite 900
24             Austin, Texas  78701

25
```

1    Q.    Did that ever change over the time that you

2  were working at InaCom?

3    A.    In the post-petition period, you know, Tom

4  Fitzpatrick left and I sort of reported up through

5  Bridge Associates in a -- in a -- in a manner, sure.          08:19

6    Q.    Would you identify which function Bridge

7  Associates had with respect to InaCom during the

8  post-petition period?

9    A.    The way I look at it is they administered the

10 whole -- the whole post-petition process of -- of the         08:20

11 estate of income, protecting -- you know, protecting

12 and trying to collect as much assets as possible for

13 the estate for the future use of creditors.

14   Q.    Were you involved with the advance planning

15 for the sale of the hardware business to Compaq?              08:20

16   A.    No.

17   Q.    At some point since you joined the company

18 prior to the closing did you have any involvement with

19 the sale?

20   A.    No.                                                   08:20

21   Q.    Isn't it true that at one point prior to the

22 bankruptcy proceeding there was some consideration

23 regarding the sale of the servicing business to

24 CompuCom?

25   A.    Yes.                                                  08:20

1    Q.    Were you involved in any way with the

2  discussions regarding that proposed sale?

3    A.    No, not directly.  I was involved in a manner

4  such that, you know, I was working with KPMG to

5  facilitate getting audited financials complete for the    08:21

6  1999 year, which obviously CompuCom would need in

7  the -- in the subsequent SEC filing.

8    Q.    Was it in connection with the CompuCom sale

9  that you discovered a substantial footing error with

10  some reporting?    08:21

11    A.    No.  It had nothing to do with the CompuCom

12  sale.

13    Q.    What did that have to do with?

14    A.    It's just, you know, I discovered footing and

15  other mechanical and accounting errors in rebate -- in    08:21

16  the rebate receivables area and I believe it was late

17  February/early March and it was just in the -- in the

18  course of trying to complete the audit.

19    Q.    In functioning as controller of InaCom did

20  you directly interact with any subordinates of the    08:22

21  company?

22    A.    My subordinates?

23    Q.    Yes.

24    A.    Sure.

25    Q.    Please explain for me the types of people    08:22

1  recall Chris' last name were involved with service

2  forecasts for the company in that -- during that time

3  period.

4      Q.   In your position as controller would you have

5  typically reviewed service revenue forecasts?                    11:02

6      A.   Not in the circumstances in which I was

7  operating under, no.

8      Q.   Were you aware that there had been a downward

9  revision to the service revenue forecasts for the

10  second quarter of 2000 from those which were            11:02

11  originally projected?

12          MR. ABBOTT:  I'm going to object to the

13  form.

14          MR. CAINE:  Object no foundation.

15      A.   No.                                             11:02

16      Q.   (BY MR. HUNT)  Mr. Krikorian, do you know how

17  far the proposed sale to CompuCom proceeded before it

18  was determined it would not happen?

19      A.   I believe it proceeded very far.  And at the

20  end it's my understanding that the deal didn't go        11:03

21  through because company management in KPMG could not

22  assure -- safeguard that the -- could not assure them

23  exactly when audited financials would be delivered.

24      Q.   Did that also have an impact in CompuCom

25  being unable to state an 8-K as required by the SEC      11:03

1  for that closing?

2      A.    I'm sorry, can you repeat the question?

3      Q.    Did that result in CompuCom not being able to

4  state an 8-K for that proposed closing as would have

5  been required by the SEC?                                    11:03

6              MR. CAINE:   Objection, vague and

7  ambiguous.

8      A.    Well, the deal was never consummated, so why

9  would an 8-K be filed?

10     Q.    (BY MR. HUNT)   Okay.  Would you agree that     11:04

11 the deal preceded far enough that it would have closed

12 but for the issues that you mentioned regarding KPMG?

13     A.    That's my understanding.

14     Q.    Would you agree that the reasons that the

15 CompuCom deal did not close were unrelated to the          11:04

16 financial conditions of InaCom?

17             MR. CAINE:   Objection, vague and

18 ambiguous.

19     A.    I don't know.

20     Q.    (BY MR. HUNT)   Do you recall how far into     11:04

21 calendar year 2000 the sale discussions continued with

22 CompuCom before the deal was -- before the deal was

23 settled?

24     A.    My understanding, discussions proceeded

25 either up to a couple days before the actual filing       11:05

1  such a report?

2      A.    I don't recall.

3      Q.    From the time that you joined InaCom in

4  January 2000 through the end of April of 2000 would

5  you agree that InaCom was conducting its remaining        11:10

6  business operations in the ordinary course?

7              MR. CAINE:   Objection, vague and

8  ambiguous.

9              MR. ABBOTT:   Object to the form of the

10  question.                                                 11:11

11      A.    To the best of my knowledge it was.

12  Obviously it was dealing with a lot of obstacles, but

13  yes.

14      Q.    (BY MR. HUNT)   Would you agree it was

15  operating as an entity that was a going concern as        11:11

16  opposed to one that was ready to close the doors in

17  the near future?

18              MR. CAINE:   Hang on a second.   I'll use

19  your object as to form.

20              MR. ABBOTT:   I will do that one.

21              MR. CAINE:   So many problems with it.

22      A.    I think everybody was doing their best --

23  doing their best from an operational standpoint.

24      Q.    (BY MR. HUNT)   Were you aware of any other

25  entities besides CompuCom that expressed an interest      11:12

1  the commingled funds.

2      Q.    Do you know what the liquidity or the

3  borrowing authority InaCom had in April 2001?

4      A.    No.

5      Q.    If it was in the range of 89,681,203, would

6  that have provided sufficiently liquidity for InaCom?

7              MR. ABBOTT:   I'll object to the form of

8  the question.

9      A.    I don't know.

10     Q.    (BY MS. STREUSAND)   Do you know the amount

11 that InaCom agreed in terms -- in terms of the muddied

12 receivables, do you know in April 2000 if that number

13 was quantified?

14     A.    I don't know that there was a -- I don't know

15 that there was any finalization on that number, no.

16 I'm not aware that there was.

17     Q.    Later in time do you know what that number

18 was finalized to?

19     A.    No, I don't.

20     Q.    Do you know the sales price that was agreed

21 to between CompuCom and InaCom?

22     A.    No, I don't.

23     Q.    Do you have any idea of the range?

24     A.    I don't.

25     Q.    Did you provide financial information to

12:11
12:11
12:12
12:12
12:13

1    CompuCom in order to help facilitate that sale?

2        A.    I'm sure I probably did.

3        Q.    Okay.  Can you identify what type of

4    documents you provided to help facilitate that sale?

5        A.    I don't recall what they would have been.    12:13

6        Q.    Were there forecasts of revenues from the

7    service business provided or prepared by Bank Group in

8    let's just say March or April of 2000?

9        A.    I believe so.

10       Q.    Do you have any memory of what those          12:14

11   forecasts showed?

12       A.    I do not.

13       Q.    Do you know where they would have been kept

14   in the files of InaCom?

15       A.    I do not.                                     12:14

16             MS. STREUSAND:  I also make the same

17   request of either Blank Rome or Pachulski, if those

18   documents can be identified or if you want to give us

19   the index we'll try and determine where those are.

20             MR. HUNT:  Join.                              12:14

21             MR. CAINE:  Okay.

22             MS. STREUSAND:  And to further clarify,

23   I do think it's part of our overall document request,

24   but I notice as the witness is going forward these

25   documents are getting more specific, but we do have     12:15

1    about KPMG as working with InaCom on the financials

2    for '99 and '98 and you also had stated previously

3    that Deloitte & Touche was also working with InaCom.

4    What relationship did Deloitte & Touche have with

5    InaCom versus KPMG's role?                                    12:18

6        A.    Immediately prior to the bankruptcy filing,

7    to the best of my recollection Deloitte & Touche had

8    two primary roles.  One was assisting me with

9    gathering the information that would be required for a

10   bankruptcy filing.  The other one was working with Tom      12:18

11   as it related to the -- I believe bank -- bank

12   related, treasury related issues and matters.

13       Q.    Do you know when Deloitte was retained by

14   InaCom?

15       A.    I believe it was in May 2000.                      12:19

16       Q.    Back to the CompuCom transaction.  The

17   business that was to be sold to CompuCom, was it

18   intended to be what I would call a continuing

19   business, a business that would remain intact or was

20   it going to be liquidated by CompuCom?                       12:19

21             MR. CAINE:  Objection, no foundation.

22       A.    To the best of my knowledge, it was a

23   business that would have continued.  CompuCom would

24   have continued to service the InaCom customers.

25       Q.    (BY MS. STREUSAND)  And the InaCom employees       12:20

1  would continue to have jobs, correct?

2      A.   I assume so.  Most of them, I assume, you

3  know, just like any other merger of two giants,

4  there's always sort of a re-sizing that takes place,

5  but yeah.                                              12:20

6      Q.   But InaCom's remaining business fundamentally

7  was a service business, correct?

8      A.   That's correct.

9      Q.   And so if CompuCom was interested in buying

10 it, it was to buy what I would call the brain power    12:20

11 from the InaCom business, correct?

12     A.   Right.

13     Q.   Would goodwill have been included as part of

14 the purchase price that InaCom was going to sell that

15 business to CompuCom?                                  12:21

16              MR. CAINE:  Objection, no foundation,

17 calls for speculation.

18              MR. ABBOTT:  I object to the form, but

19 you can answer.

20     A.   Uh-huh.  The answer to that question depends  12:21

21 on what the sales price was in comparison to what the

22 net assets acquired were.

23     Q.   (BY MS. STREUSAND)  And you don't know?

24     A.   (Shakes head negatively).  I don't have that

25 information.                                           12:21

# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


In re
INACOM CORP., et al.      Bankruptcy Case No. 00-2426 PJW

INACOM CORP., on behalf      :
of all affiliated Debtors,   : Civil Action No. 04-148 GMS
                             : (Original filed in this Action)
            Plaintiff,       : Adversary Case No. 02-03496 PJW
        v.                   :
                             :
TECH DATA CORP.,             :
                             :
            Defendant.       :
_____  :

INACOM CORP., on behalf of   :
all affiliated Debtors,      :
                             :
            Plaintiff,       : Civil Action No. 04-582 GMS
                             :
        v.                   : Adversary Case No. 02-03499 PJW
                             :
DELL COMPUTER CORPORATION,   :
                             :
            Defendant.       :
_____  :

INACOM CORP., on behalf of   :
all affiliated Debtors,      :
                             :
            Plaintiff,       : Civil Action No. 04-583 GMS
                             :
        v.                   : Adversary Case No. 02-03500 PJW
                             :
LEXMARK INTERNATIONAL, INC., :
                             :
            Defendant.       :
_____  :


DEPOSITION OF RICHARD CHARLES OSHLO, JR.,
March 20, 2005


KATHRYN POWERS- CERTIFIED SHORTHAND REPORTER

2

INACOM CORP., on behalf of
all affiliated Debtors,

           Plaintiff,    : Civil Action No. 04-584 GMS

          v.        : Adversary Case No. 02-03501 PJW

RESILIEN, INC., et al.,

           Defendant.

INACOM CORP., on behalf of
all affiliated Debtors,

           Plaintiff,    : Civil Action No. 04-593-GMS

          v.        : Adversary Case No. 02-03960 PJW

INGRAM ENTERTAINMENT, INC.,
Successor in interest to
NASHVILLE COMPUTER
LIQUIDATORS,

           Defendant.

INACOM CORP., on behalf of
all affiliated Debtors,

           Plaintiff,    : Civil Action No. 04-601 GMS

          v.        : Adversary Case No. 02-04441 PJW

SIGMA DATA, INC,

           Defendant.

DEPOSITION OF RICHARD CHARLES OSHLO, JR.,

taken by the Defendants before Kathryn Powers, Certified
Shorthand Reporter of the State of Iowa, at the Renaissance
Savery Hotel, Room 210, Des Moines, Iowa, commencing at
9:45 a.m., Sunday, March 20, 2005.

```
                                                           3

 1    APPEARANCES:

 2    For InaCom Corp.:          JEFFREY P. NOLAN, ESQ.
                                 Pachulski, Stang, Ziehl,
 3                                Young, Jones & Weintraub, P.C.
                                 10100 Santa Monica Blvd.
 4                               Eleventh Floor
                                 Los Angeles, California 90067-4100
 5
      For Executive Sounding     EARL M. FORTE, ESQ.
 6    Board Associates, Inc.,    Blank & Rome, LLP
      Liquidating Agent of       One Logan Square
 7    InaCom Corp.:              18th and Cherry Streets
                                 Philadelphia, Pennsylvania 19103-6998
 8
      For Defendant Dell:        SABRINA L. STREUSAND, ESQ.
 9                               G. JAMES LANDON, ESQ.
                                 Hughes & Luce, LLP
10                               111 Congress Avenue, Suite 900
                                 Austin, Texas  78701
11
      For Defendant Tech         STEPHEN C. HUNT, ESQ.
12    Data:                      Adorno & Yoss
      (by telephone)             350 East Las Olas Blvd.
13                               Seventh Floor
                                 Fort Lauderdale, Florida  23301
14
      For Defendant Lexmark:     CULVER V. HALLIDAY, ESQ.
15                               Stoll, Keenon & Park, LLP
                                 2650 Aegon Center
16                               400 West Market St.
                                 Louisville, Kentucky 40202-3377
17
      For Defendant Ingram:      JONATHAN P. HERSEY, ESQ.
18    (by telephone)             Bingham McCutchen, LLP
                                 600 Anton Road, 18th Floor
19                               Costa Mesa, California  92626

20    For Third-Party            GAIL S. GREENWOOD, ESQ.
      Defendant Hewlett          Friedman, Dumas & Springwater, LLP
21    Packard, Successor in      One Maritime Plaza
      Interest to Compaq         Suite 2475
22    Computer:                  San Francisco, California  94111

23
      Also Present:              Jason Fensterstock
24    (by telephone)             Duff & Phelps

25
```

4

1                    I N D E X

2   WITNESS                                    PAGE

3   Richard Charles Oshlo, Jr.

4           Examination  By Ms. Streusand         6

5           Examination by Mr. Halliday          132

6           Examination by Mr. Hunt              168

7           Examination By Mr. Nolan             173

8           Examination by Ms. Greenwood         210

9           Examination by Mr. Nolan             211

10          Examination by Mr. Forte             231

11          Examination by Ms. Streusand         237

12          Examination by Mr. Halliday          242

13          Examination by Mr. Hunt              249

14

15

16

17

18

19

20

21

22

23

24

25

PETERSEN COURT REPORTERS
317 Sixth Avenue, Suite 606
Des Moines, IA 50309-4155
515/243-6596

5

1

E X H I B I T S

2    EXHIBITS                                                    MARKED

3     1 - InaCom Corp. Officer's Certificate          37
      2 - Third Amendment and Waiver                  41
4     3 - 8-K March 2000                              44
      4 - Borrowing Base/Non-Default Certificate      51
5         February 26, 2000
      5 - Fourth Amendment and Waiver                 56
6     6 - 2/16/00 Memo from Davis Polk                65
      7 - Borrowing Base/Non-Default Certificate      68
7         March 25, 2000
      8 - Borrowing Base Certificate 4/22/00          70
8     9 - Summary of Impact of disposed Assets        72
          and Operations
9    10 - Treasury Released Checks by Date            78
     11 - Attachment E, Collateral Mang. Report       80
10   12 - (This number was skipped in marking)
     13 - 3/29/00 Ltr. to Bachner                     90
11   14 - 4/4/00 Memo to Tom from Dick                93
     15 - 3/24/00 Memo to Tom rom Dick               102
12   16 - Board of Directors Minutes                 104
     17 - Intercreditor Agreement                    104
13   18 - Separation and Sharing Agreement           108
     19 - Fifth Amendment and Waiver                 110
14   20 - Sixth Amendment and Waiver                 112
     21 - Form Notice of Borrowing                   115
15   22 - March 2000 - Wires                         127
     23 - 2/15/00 Ltr. to Oslo from Schuette         161
16

17

18

19

20

21

22

23

24

25

6

P R O C E E D I N G S

1    MS. STREUSAND: Would you please swear
2
3    the witness.
4            ROBERT CHARLES OSHLO, JR.,
5    called as a witness by the Defendants, being first
6    duly sworn by the Certified Shorthand Reporter,
7    was examined and testified as follows:
8            EXAMINATION
9    BY MS. STREUSAND:
10        Q.   Good morning, Mr. Oshlo. We met just
11   briefly a moment ago. Let me reintroduce myself.
12   I'm Sabrina Streusand. Along with James Landon,
13   we represent Dell, Inc., in an adversary
14   proceeding brought by InaCom.
15            Can you please state your full name for
16   the record.
17        A.   Richard Charles Oshlo, Jr.
18        Q.   And your address, sir, please?
19        A.   3818 Lincoln Place Drive, Des Moines,
20   Iowa, 50312.
21        Q.   And have you had your deposition taken
22   before, sir?
23        A.   Yes.
24        Q.   How many times?
25        A.   Probably about five times.

130

1    A.    No.

2    Q.    Did you work on a proposed purchase of
3  business units with CompuCom and InaCom?

4    A.    The only thing I know about CompuCom is a
5  conversation I had with Tom Fitzpatrick, probably
6  the Wednesday, middle of the week, before we laid
7  off that Friday numerous employees.

8    Q.    That would have been June of 2000, sir?

9    A.    I forget when, but he told me that--and I
10  think a couple other individuals in the Omaha
11  finance office, that they had been trying to sell
12  something to CompuCom, and that it failed, and
13  that as of that Friday they were going to lay off
14  most of the employees of InaCom and an X number of
15  us would, you know, stay around until God knows
16  what.

17    Q.    And did you know any details with respect
18  to the transaction of CompuCom?

19    A.    No.    I just knew--that was the first I
20  heard of it, and that it had failed.

21    Q.    And I'm sorry, I know you've told me
22  this, but when did you leave InaCom?

23    A.    September 2000.

24    Q.    2000.    Several months after the
25  bankruptcy proceeding?

# **EXHIBIT F**

GERALD A. GAGLIARDI



Page 1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF DELAWARE
 2
                        -  -  -
 3

 4   In re:                    : CHAPTER 11
     INACOM CORP., et al.,     : BANKRUPTCY CASE
          Debtors             : NO. 00-2426(PJW)
 5
     ─────────────────────────────────────────────
 6   INACOM CORP., et al.      : CIVIL ACTION
          -vs-                 :
     TECH DATA CORPORATION     : NO. 04-CV-148(GMS)
 7
     ─────────────────────────────────────────────
 8   INACOM CORP., et al.      : CIVIL ACTION
          -vs-                 :
     DELL COMPUTER CORP.       : NO. 04-CV-582(GMS)
 9
     ─────────────────────────────────────────────
10   INACOM CORP., et al.      : CIVIL ACTION
          -vs-                 :
     LEXMARK INTERNATIONAL, INC. : NO. 04-CV-583(GMS)
11
     ─────────────────────────────────────────────
12   INACOM CORP., et al.      : CIVIL ACTION
          -vs-                 :
     RESILIEN, INC.            : NO. 04-CV-584(GMS)
13
     ─────────────────────────────────────────────
14   INACOM CORP., et al.      : CIVIL ACTION
          -vs-                 :
     INGRAM ENTERTAINMENT, INC. : NO. 04-CV-593(GMS)
15
                        -  -  -
16
              Oral deposition of GERALD A. GAGLIARDI,
17   was taken pursuant to notice, held at BLANK ROME,
     LLP, One Logan Square, 18th & Cherry Streets,
18   Philadelphia, Pennsylvania, commencing at 9:33 a.m.
     on April 6, 2005, before April J. Foga, Certified
19   Shorthand Reporter and Notary Public, there being
     present:
20
                        -  -  -
21
              ZANARAS REPORTING AND VIDEO
22        REGISTERED PROFESSIONAL REPORTERS
       1616 Walnut St., Ste. 300      2112 Bay Avenue
23     Philadelphia, PA 19103      Ocean City, NJ 08226
            (215) 790-7857    1-877-GO-DEPOS
24
```

DISK
ENCLOSED

GERALD A. GAGLIARDI

Page 2

```
 1    A P P E A R A N C E S:

 2

 3         PACHULSKI, STANG, ZIEHL, YOUNG,
           JONES & WEINTRAUB
 4         BY:  ANDREW W. CAINE, ESQUIRE
           10100 Santa Monica Boulevard, 11th Floor
 5         Los Angeles, California 900067
           (310) 277-6910
 6         Counsel for Plaintiff, Inacom, Corp.

 7

           BLANK ROME, LLP
 8         BY:  EARL M. FORTE, ESQUIRE
           One Logan Square
 9         18th & Cherry Street
           Philadelphia, PA 19103
10         (215) 569-5618
           Counsel for Executive Sounding Board Associates,
11         Inc., liquidating agent for Inacom Corp. and
           affiliated debtors
12

13         ADORNO & YOSS, LLP
           BY:  STEPHEN C. HUNT, ESQUIRE
14         350 East Las Olas Boulevard, Suite 1700
           Fort Lauderdale, FL 33301
15         (954) 763-1200
           Counsel for Defendant Tech Data Corporation
16

17         HUGHES, LUCE, LLP
           BY:  SABRINA L. STREUSAND, ESQUIRE
18         111 Congress Avenue, Suite 900
           Austin, Texas 78701
19         (512) 482-6842
           Counsel for Defendant, Dell, Inc.
20

21
      (Appearance Page continued on Page 3.)
22

23

24
```

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 3

```
 1   A P P E A R A N C E S:

 2

 3        ZUCKERMAN, SPAEDER, LLP
          BY:  THOMAS G. MACAULEY, ESQUIRE
 4        919 Market Street, Suite 990
          Wilmington, DE 19899
 5        (302) 427-0400
          Counsel for Defendant, Ingram Entertainment,
 6        Inc.

 7

          MORRIS, NICHOLS, ARSHT & TUNNELL
 8        BY:  DEREK C. ABBOTT, ESQUIRE
          1201 North Market Street
 9        Wilmington, DE 19899
          (302) 575-7357
10        Counsel for Defendant, Hewlett-Packard Company

11

12

13

14

15                      -  -  -

16

17

18

19

20

21

22

23

24
```

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 95

1     damaging.  The fact that at the 99th hour when

2     we were trying to sell the assets to Compucom

3     and had a deal and Safeguard Scientific said

4     they couldn't allow the transaction to happen

5     because it was going to affect their tax

6     position.  Compucom was happy with the

7     transaction and the fact that there were no

8     financials.  Safeguard Scientific wouldn't let

9     us honor the contract or wouldn't let them do

10    the contract.  Otherwise, we could have

11    packaged the thing and we could have saved the

12    5,000 jobs that got taken and none of us would

13    have ever met each other.

14          So I can give you a whole host -- I

15    called it a cesspool a while ago.  It was the

16    worst situation I have ever seen in my 30 some

17    odd years of corporate experience.  I've

18    worked in an environment at Unysis where we

19    actually had prepared for bankruptcy some

20    years ago.  This was a completely different

21    situation.  This was misinformation,

22    misrepresentation, people not carrying out

23    things they said they were going to do for us.

24    It was nothing -- the worst mess I've seen in

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

Page 106

1   certain law facilities were actually paid off and

2   closed as a result of monies received from the Compaq

3   closing?

4        A.    I believe so.

5        Q.    Do you recall sitting here today which

6   ones would have been satisfied?

7        A.    I recall that there was one with IBM

8   and I don't recall the others.  I know that bank one

9   was redone.  Those are the ones -- I can remember the

10  IBM one because it was a sticky thing at the very end

11  of it.  We couldn't find the person to sign the

12  document, so they had to agree before we could close

13  and then they would then get their money shot off to

14  them, so --

15       Q.    It sounds to me, Mr. Gagliardi, from

16  the way you described it that the Compucom sale had

17  proceeded fairly well along; is that correct?

18       A.    Yes.

19       Q.    Do you know what remained to be done in

20  order to close that?

21       A.    There was a list of -- as we went down

22  through the period, there was a list of things that

23  had to get done in terms of which employees, which

24  services, which this, which -- you know, commitments

GERALD A. GAGLIARDI

Page 107

1    amongst everyone, the banks, Compucom, ourselves.

2    And we had pretty much ticked our way through all of

3    them. I can't recall which ones in particular needed

4    to be finished, but we were on a path to close the

5    deal and were actively working to get it done by a

6    certain day in that week, the week that we ended up

7    closing the doors. And there had been an open issue

8    about this getting financial statements which we did

9    not believe -- it was listed, but it wasn't listed on

10   the critical path and all of a sudden it appeared out

11   of nowhere to be on the critical past. Safeguard

12   Scientific raised their head and then Tom -- the two

13   Toms dove into that one and we were unable to resolve

14   it.

15            Q.    Actually, I should jump in,

16   Mr. Gagliardi, because on a couple of occasions, you

17   referred to two Toms and I just want to make sure --

18            A.    Tom Molchen and Tom Fitzpatrick.

19            Q.    Thank you, sir. And your reference to

20   two Toms in the deposition would always be to those

21   gentlemen?

22            A.    Yes. That's what they were constantly

23   referred to.

24            Q.    Thank you. Mr. Gagliardi, do you

9286d6ed-1a2f-41dc-8221-e231420ced71

GERALD A. GAGLIARDI

1    recall Mr. Fitzpatrick reporting to the board at the

2    May 1, 2000 meeting that the company was still

3    showing positive EBITDA?

4         A.   No.   I don't recall that.

5         Q.   Did you have an expectation for the

6    revenue projections that would have been derived from

7    the cash generated through the Compucom closing if it

8    had actually taken place?

9              MR. CAINE:   Can you read that back?

10             (The court reporter read back the

11        pertinent testimony.)

12             MR. CAINE:   Two objections as to form

13        and no foundation.

14             THE WITNESS:   I don't understand the

15        question.

16   BY MR. HUNT:

17        Q.   Mr. Gagliardi, I previously shared with

18   you a letter from the Houlihan, Lokey firm that was

19   marked as an exhibit.   That was exhibit GAG-3.   Do

20   you have any additional recollection regarding the

21   substance of this solvency opinion letter?

22        A.   No.

23        Q.   Do you believe that Inacom, at the time

24   of the actual closing with Compaq, had identified to

GERALD A. GAGLIARDI

1    BY MS. STREUSAND:

2         Q.    Do you know what financial information

3    was provided to Compucom?

4         A.    I know financial data was provided to

5    Compucom by Mr. Fitzpatrick --

6         Q.    And --

7         A.    -- and Laz.

8         Q.    And do you know what type?  Was it --

9         A.    No.  I didn't participate in those

10   meetings.  They had -- there were meetings I went to

11   and there were a set of meetings between just the

12   financial folks, Tom and a woman who was the CFO at

13   that time of Compucom.

14        Q.    Would balance sheets have been provided

15   to Compucom?

16        A.    I don't know.

17        Q.    Did you review the Houlihan, Lokey

18   solvency opinion of February 16, 2000 before the

19   close of the transaction with Compaq?

20             MR. CAINE:  Objection.  Asked and

21        answered.

22             THE WITNESS:  I did not.

23   BY MS. STREUSAND:

24        Q.    And did you work with anyone at

GERALD A. GAGLIARDI

1        A.      In the spring.  Before that, I thought

2    we -- maybe we could get this thing -- maybe they

3    were actually going to do it, but when they began

4    bouncing us from Kansas City to the partners in New

5    York and we couldn't get straight answers, and we

6    actually had one come to the board meeting to tell us

7    what was going to happen and he wouldn't give the

8    board straight answers, I began to believe that there

9    was just no end to this thing.

10        Q.      Do you recall when you first started

11    talking to anyone about a potential sale of the

12    service business?

13        A.      Yes.

14        Q.      When was that?

15        A.      Right after the close -- right after

16    the transaction with Compaq was announced, a guy

17    named Pete Musser, who was with a company named

18    Safeguard Scientific called me.  He was an

19    acquaintance I had had before and he -- Safeguard

20    Scientific was a principal owner in a thing call

21    Compucom and so he called me and said, Gerry, how

22    come you didn't give me a heads up you were thinking

23    about selling anything.  If you guys are thinking of

24    divesting yourself of any more of those assets, we

Page 188

```
1    month and week after week.  And the way we kept it
2    going week after week was the seriousness of the
3    negotiations with Compucom.
4         Q.    At some point, was a deal in principal
5    reach with Compucom?
6         A.    Yes.
7         Q.    What was the purpose for Inacom's
8    perspective of entering into that deal?
9         A.    Really to save the jobs of the 5,000
10   people that were going to get terminated.  There was
11   nothing in it for us.
12        Q.    When you say there was nothing in it
13   for Inacom, what do you mean?
14        A.    Well, Inacom would be in a position to
15   satisfy -- take care of its employees.  Clearly the
16   stockholders were going to be left high and dry and
17   there would have been more cash to pay creditors, so
18   from a fiduciary position, we thought that it was
19   best serving our constituency than just folding the
20   place up.
21        Q.    Was there cash coming to Inacom from
22   Compucom?
23        A.    Yes.  Yeah.  There was some cash.  I
24   don't recall the amount, but again, that would have
```

# EXHIBIT G



1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                        Plaintiff,          Civ Act No.
            -against-                       04-148 GMS
TECH DATA CORP.,                            Adversary No.
                        Defendant.          02-03496 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                        Plaintiff,          Civ Act No.
            -against-                       04-582 GMS
DELL COMPUTER CORPORATION,                  Adversary No.
                        Defendant.          02-03499 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                        Plaintiff,          Civ Act No.
            -against-                       04-583 GMS
LEXMARK INTERNATIONAL, INC.,                Adversary No.
                        Defendant.          02-03500 PJW
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                        Plaintiff,          Civ Act No.
            -against-                       04-593 GMS
INGRAM ENTERTAINMENT, INC.,                 Adversary No.
successor in interest to                    02-03960 PJW
NASHVILLE COMPUTER LIQUIDATORS,
                        Defendant.
------------------------------------x

July 28, 2005

5:19 p.m.

Deposition of RICHARD A. WHALEN

**Computer Reporting Incorporated**    

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

44

**R. Whalen**

1

2   get information that was reasonable knowledge by a

3   willing buyer as of the valuation date, and you

4   should endeavor to get as much information as they

18:09:53  5   can, but things that are put out there, published,

6   become public or become available after the

7   valuation date, you can't use, you can't consider

8   them, unless you pick a new valuation date.

9       Q.    Let's say hypothetically you have a

18:10:25 10  valuation date of June 30?

11      A.    Okay.

12      Q.    And the most recent projection you

13  have in order to perform your analysis, have been

14  completed on January 1st, and those projections

18:10:40 15  relied on actual data prior to January 1st?

16      A.    And the thinking on January 1st.

17      Q.    Right.

18          MR. POWELL:   Which January 1st?

19          MR. CAINE:   Of the same year.

18:10:52 20          THE WITNESS:   Before.

21      Q.    You would use those January 1st

22  projections in preparing your valuation as of June

23  30?

24      A.    Yes, or what I would try and do is

18:11:03 25  update those projections, make sure they are

43

R. Whalen

1

2       Blackstone report.  Would it be appropriate to

3       consider the information in the Blackstone report?

4            A.    You don't need it, you already have

18:08:42  5     it.  You mean that particular balance sheet and

6       those balances, current assets, $10, fixed assets,

7       $12.

8            Q.    There may be additional data

9       underlying the balance sheet that's contained in

18:08:53 10     the Blackstone report that you don't see in the

11      balance?

12           A.    I suppose if it is factual data that

13      was around on the valuation date, then I'm

14      thinking no matter where it comes from, you should

18:09:06 15     consider it.  There is a difference between

16      creating a report with all the judgment that goes

17      into it, and the thinking cap on in May of 2000,

18      which is different than perhaps a thinking cap in

19      April, or March, or February.  The difference

18:09:26 20     between assertions made in a report and financial

21      statement data on a page.  Maybe that's where we

22      are diverging here.

23           Q.    We are not, I'm just trying to

24      understand your opinion.

18:09:42 25          A.    I think in general wherever you can