# EXHIBIT E

# ORIGINAL

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

In re:  INACOM CORP., et al.,
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                          Plaintiff,          Civ Act No.
                                              04-148 GMS
              -against-                       Adversary No.
TECH DATA CORP.,                              02-03496 PJW
                          Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                          Plaintiff,          Civ Act No.
                                              04-582 GMS
              -against-                       Adversary No.
DELL COMPUTER CORPORATION,                    02-03499 PJW
                          Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                          Plaintiff,          Civ Act No.
                                              04-583 GMS
              -against-                       Adversary No.
LEXMARK INTERNATIONAL, INC.,                  02-03500 PJW
                          Defendant.
------------------------------------x
INACOM CORP., on behalf of all
affiliated Debtors,
                          Plaintiff,          Civ Act No.
                                              04-593 GMS
              -against-                       Adversary No.
INGRAM ENTERTAINMENT, INC.,                   02-03960 PJW
successor in interest to
NASHVILLE COMPUTER LIQUIDATORS,
                          Defendant.
------------------------------------x


                  July 28, 2005

                  9:11 a.m.


        Deposition of JASON FENSTERSTOCK

**Computer Reporting Incorporated** 

501 Fifth Avenue  New York, NY 10017
(212) 986-1344  Fax (212) 983-9149  www.crinyc.com

July 28, 2005

9:11 a.m.


Deposition of JASON FENSTERSTOCK,
held at the offices of Pachulski Stang Ziehl
Young Jones & Weintraub, 780 Third Avenue,
New York, New York, pursuant to Agreement,
before John Ianno, Jr., a Notary Public of
the State of New York.

A P P E A R A N C E S:


PACHULSKI STANG ZIEHL YOUNG

JONES & WEINTRAUB

Attorneys for Plaintiff

      10100 Santa Monica Blvd.

      Los Angeles, California 90067-4100

BY:   ANDREW W. CAINE, ESQ.,

         of Counsel


ADORNO & YOSS, LLP

Attorneys for Tech Data Corp.

      350 East Las Olas Boulevard

      Ft. Lauderdale, Florida 33301

BY:   STEPHEN HUNT, ESQ.,   (By Telephone)

         of Counsel

A P P E A R A N C E S: (Cont'd):

HUGHES LUCE LLP

Attorneys for Dell Computer Corp.

    111 Congress Avenue  Suite 900

    Austin, Texas 78701

BY:  H. ROBERT POWELL, ESQ.,

    SABRINA L. STRUESAND, ESQ.,

        of Counsel


STOLL KEENON & PARK LLP

Attorneys for Lexmark International

    400 West Market Street

    Louisvile, Kentucky 40202-3377

BY:  CULVER V. HALLIDAY, ESQ.,

        of Counsel

A P P E A R A N C E S: (Cont'd):


SHEPPARD MULLIN RICHTER & HAMPTON LLP

Attorneys for Ingram Entertainment

  650 Town Center Drive  4th Floor

  Costa Mesa, California 92626-1993

BY:  JONATHAN P. HERSEY, ESQ.,

   of Counsel


BLANK ROME LLP

Attorneys for Executive Sounding Board

  One Logan Square

  Philadelphia, Pennsylvania 19103-6998

BY:  EARL M. FORTE, ESQ.,

   of Counsel


ALSO PRESENT:

  DEAN VOMERO

  RICHARD A. WHALEN

1

2    **J A S O N    F E N S T E R S T O C K,**

3         called as a witness, having been first duly

4         sworn by the Notary Public (John Ianno, Jr.),

5         was examined and testified as follows:

6              **(Plaintiff's Exhibits 1 through 8,**

7    expert reports and related documents, marked

8         for identification, as of this date.)

9    **EXAMINATION BY**

09:11:30 10    **MR. CAINE:**

11         Q.    Good morning.  Could you please state

12    your name for the record.

13         A.    Jason Forbes Fensterstock.

14         Q.    Could you spell your name for the

09:11:44 15    record.

16         A.    J A S O N,  F O R B E S,  F E N S T E R

17    S T O C K.

18         Q.    Are you currently employed?

19         A.    Yes.

09:11:54 20    Q.    By whom, or what entity?

21         A.    Alix Partners.

22         Q.    What is your current business address,

23    please?

24         A.    9 West 57th Street, New York, New

09:12:07 25    York.

35

1                           *J. Fensterstock*

2                    See that?

3           A.    Yes.

4           Q.    What circumstances were you referring

10:07:42  5   to?

6           A.    All of the company circumstances, as

7    of April 17.

8           Q.    Why was April 17 chosen?

9           A.    That was the date that counsel asked

10:07:58 10   us to make our assessment as of.

11          Q.    Why was not April 22nd chosen?

12          A.    I believe April 17 was the date after

13   which all of the clients that have retained us, by

14   that date all of the payments that are subject to

10:08:33 15   attack in this action had been received, and there

16   was no need to go beyond that date.

17          Q.    In the course of preparing your

18   report, did you use any information of which

19   Inacom became aware after April 17th?

10:09:01 20          A.    Could you just please repeat that

21   question.

22          Q.    Sure.  In the course of preparing your

23   report, Exhibit 1, did you use any information of

24   which Inacom became aware after April 17th?

10:09:29 25          A.    In the course -- no.

1          *J. Fensterstock*

2          Q.    So if something happened on April 18th

3     and Inacom became aware of, you didn't use it in

4     your report?

10:09:44 5          A.    Except as set forth in this paragraph,

6     we used the income statements and balance sheet as

7     of the end of the April fiscal month for Inacom,

8     and if there were liabilities that were not on

9     that April 22nd balance sheet, but because of

10:10:40 10     information that became available to the company

11     between the 17th and the 22nd, we wanted to adjust

12     the liabilities to include those, so that the

13     liabilities would not be understated.

14          Q.    So do I understand you to say that any

10:11:15 15     liabilities that may have been discovered between

16     April 17 and April 22nd were included in your

17     report?

18          A.    Yes.

19          Q.    Was there any other information of

10:11:35 20     which the company may have become aware after

21     April 17th, that you included in your report?

22          A.    No, other than that which was

23     reasonably foreseeable on April 17th.  If it was

24     not reasonably foreseeable at April 17th it would

10:12:06 25     not be included in our report.

1              **J. Fensterstock**

2         Q.    As you sit here today, can you

3    identify any developments that were reasonably

4    foreseeable at April 17th that you included or

10:12:16  5    incorporated into your analysis?

6         A.    Only those related to the balance

7    sheet adjustment to liabilities, that we

8    previously discussed.

9         Q.    What were those balance sheet

10:12:31 10   adjustments to liabilities?  I don't mean the

11   numbers, I mean what were the liabilities related

12   to?

13        A.    We reviewed the convertible debt

14   associated with the missed preferred stock of

10:13:04 15   Vanstar.  We reviewed the -- something called

16   misdirected payments.  We reviewed something known

17   as the overpayment made by Compac in connection

18   with its purchase of the distribution and

19   configuration business from Inacom in February of

10:13:25 20   2000.  I believe that encompasses all, if --

21   substantially all, if not all, of what I was

22   referring to.

23        Q.    In the course of preparing your

24   report, or thereafter, did you become aware of any

10:13:55 25   information not known or reasonably foreseeable to

1          ***J. Fensterstock***

2     Inacom at April 17, that would have implication

3     for its financial condition as of April 22nd?

4          A.    No.

10:14:14  5          Q.    Had you become aware of any such

6     event, or information, would it have been

7     appropriate to include it in your analysis?

8          A.    Would you kindly repeat the question.

9          Q.    Sure.  Read it back.

10:15:38 10          (Record read.)

11          A.    If I understand the question

12    correctly, any information which was not known or

13    reasonably foreseeable as of April 17th, that

14    became available after April 17th, would not be

10:15:58 15    included in our analysis as of April 17th.  If it

16    was not known or reasonably foreseeable as of

17    April 17th.  I hope that is responsive.

18          Q.    I understand that that is the manner

19    in which you prepared this report.  My question

10:16:19 20    is:  If you became aware, during the course of

21    preparing this report, of information that had

22    material implication for Inacom's financial

23    condition as of April 22nd, even though that

24    information wasn't known or reasonably foreseeable

10:16:39 25    as of April 17th, would it have been appropriate

1              **J. Fensterstock**

2      for you to incorporate into your analysis?

3            A.    I don't believe so.

4            Q.    Why not?

10:16:48 5     A.    Because we were asked to value Inacom

6      at a certain -- at a given date, and in any

7      valuation process, there is a time frame beyond

8      which no more data is available.  There is a

9      curtain that's drawn, you can't see beyond that

10:17:26 10    curtain, it becomes guesses.  So you don't go

11     beyond that curtain in your analysis.

12            I think someone asked a question about

13     valuation of airplanes.  I think that's a good

14     analogy.  If you are going to value a 747 on June

10:17:59 15    30th of 2001, and the valuation is being asked

16     for, relative to June 30th, and your work is to be

17     done as of June 30th, only based upon information

18     that was known at June 30th, or could have been

19     known at June 30th, one would not forecast,

10:18:32 20    project, guess, that on September 11th of 2001,

21     some crazies were going to crash into the World

22     Trade Center and do other terrible damage.  So one

23     would value those, that 747, without giving effect

24     to what occurred on September 11th.

10:19:01 25           Q.    Have you finished your answer?

*J. Fensterstock*

1

2          A.      Yes.

3          Q.      Is there any particular place in

4    Exhibit 1, your May 2 report, to which you can

10:50:34  5    point, that shows the analysis that went into that

6    conclusion?

7          A.      Which conclusion?

8          Q.      That Inacom was able to pay its debts

9    as it became due on April 22, 2000, without having

10:50:50  10    to restructure its debt or sell any of its assets

11    outside the ordinary course of business.

12          A.      That was a background conclusion we

13    did not provide the bases for in this report.

14          Q.      What sorts of information did you use

10:51:26  15    to come to that background conclusion?

16          A.      All of the discovery documents that I

17    reviewed, which included thousands of pages, among

18    other items that I would highlight, which is a

19    very short portion of the total list, would

10:51:48  20    include the income statements for the four weeks

21    ending April 22nd, which had the company at a $63

22    million revenue run rate for four weeks, which

23    implies a $820 million annual revenue run rate,

24    with historical gross margins between 30 and 40

10:52:12  25    percent, with projected gross margins of 34 to 35

1                    **J. Fensterstock**

2    percent, which gross margins had plenty of

3    historical bases for in the calendars years '96,

4    '7, '8, '9, all of which data had been reviewed

10:52:32  5    for over a year and a half by Goldman Sachs, a

6    world class investment banking firm, Houlahan

7    Lokey, in its solvency opinion, Compac, in its

8    determination that it was entering into a $55

9    million subordinated loan agreement, a three year,

10:52:46  10   $420 million services and supply agreement, which

11   was expected to produce 10 percent EBITDA margins

12   on that 420 million, a distribution agreement

13   which was 3 and a half percent sales, and a

14   cooperation agreement which -- between Compac and

10:53:06  15   Inacom, which provided for a transition of -- a

16   transition period to work together, all of which

17   intended long-term -- and excluding -- including

18   the third and fourth bank amendments, pursuant to

19   which Deutsche Bank was the agent bank, various

10:53:32  20   borrowing base certificates, which showed

21   availability, and the list is very lengthy, but

22   that's a small portion of it.

23              Q.   Can you recall any other documents?

24              A.   I think those are the highlighted

10:53:50  25   ones.  I could go on and on and on, but I think

### J. Fensterstock

1  those are the ones that would be primary in my

2  thinking, but all of the others are included in my

3  thinking because I personally viewed all of those

10:54:02  5  documents.

6           Q.    Can you recall any others?

7           A.    Not at this time.

8           Q.    Can you identify for me, again, the

9  April, 2000 document that you referred to in that

10:54:21  10  last answer?

11          A.    There was an income statement for the

12  four week period ending April 22nd, which

13  provided -- there were several forms of that same

14  income statement in the documents.

10:54:36  15           There was $63 million of revenue for

16  the four weeks ending April 22nd.  If I'm not --

17  if my memory is correct, the gross margin at that

18  time for that four week period was 28 percent or

19  so, and this was in a time frame in which almost

10:54:55  20  all, in fact every one of the participants that I

21  had mentioned, including Houlahan, Goldman,

22  Greenhill, Deutsche Bank, Compac, and all the

23  syndicate banks, in the agent facility, had

24  understood that the March, April, May time frame

10:55:17  25  for Inacom would be suboptimal, and that after

1                      *J. Fensterstock*

2    that period both revenues and margins would

3    improve as the company was able to further

4    downsize its operating costs, and the cash savings

10:55:33  5    and resultant increase in EBITDA would kick in

6    subsequently.

7        Q.    Do you know if the April income

8    statement, to which you just referred,

9    incorporated any misdirected payment?

10:56:05 10        A.    Misdirected payments would not be

11    included in an income statement item, they would

12    be balance sheet items.

13            Perhaps it would enter into some

14    interest adjustment on the income statement, but

10:56:21 15    that would be the -- and that interest adjustment

16    would clearly not factor into either gross margin

17    or EBITDA document calculations, since interest is

18    an item below those calculations on an income

19    statement.

10:56:39 20        Q.    There was no balance sheet connected

21    to the document to which you have been referring,

22    the April income statement?

23        A.    There was a consolidated balance sheet

24    as of April 22nd.

10:56:52 25        Q.    Did that balance sheet include --

*J. Fensterstock*

1

2      A.    That I saw.

3      Q.    Did that balance sheet include any

4    misdirected payments?

10:57:00   5      A.    We believe that it did.

6      Q.    Did it include any liability for the

7    $42 million overpayment by Compac?

8      A.    May I take a moment to refresh my

9    recollection?

10:57:31  10      Q.    Sure.

11      A.    We believe it did.

12      Q.    You don't have the document in front

13    of you today to check?

14      A.    Correct, I don't have the document in

10:59:06  15    front of me to check.

16      Q.    Still on page 16, if you could look at

17    the last bullet point.  I'd like you to hold that

18    page and at the same time turn to page 46 of your

19    report.  I direct your attention to the line item

10:59:47  20    that says intangible assets and deferred income

21    tax.  See that?

22      A.    Yes.

23      Q.    On page 16 you indicate that you

24    attribute no value to the company's significant

11:00:05  25    tax attributes; correct?

1           *J. Fensterstock*

2                **MR. POWELL:**  How does he do that?

3           Q.      Tell me what they were.   What

4    documents did you use?

11:11:06 5           A.      Among others, I refer you to pages 50

6    and -- among others I refer you to page 50 of our

7    report.

8           Q.      Did you use all of the documents

9    referenced on page 50 in coming to your review of

11:11:45 10   the company's historical performance and revenue

11   projections for 2000 through 2002?

12          A.      Those on page 50 that were pertinent

13   to that, we used.

14          Q.      Did you use documents from the

11:12:05 15   Blackstone Group referenced in the top right-hand

16   corner of page 50?

17          A.      No.

18          Q.      In any part of your analysis contained

19   in any of your reports, did you use projections

11:12:53 20   prepared by the Blackstone Group?

21          A.      No.

22          Q.      Why not?

23          A.      I referred back to our earlier

24   questions and answers concerning what data was

11:13:10 25   used in connection with our analysis as of the

1                    *J. Fensterstock*

2    valuation date, and Blackstone Group data was not,

3    to my best knowledge, contemplated, or in

4    existence, until sometime after the valuation

11:13:36  5    date.

6          Q.    Do you recall when those Blackstone

7    projections were performed?

8          A.    To my best recollection, sometime in

9    May.

11:13:50 10          Q.    Do you recall for what time period the

11    projections applied?

12          A.    Which projections?

13          Q.    The Blackstone projections.

14          A.    Not offhand at this time.

11:14:02 15          Q.    Did it overlap any of the time periods

16    for which you were considering projections, that

17    is, 2000 through 2003?

18          A.    I don't recall.

19          Q.    In the course of reviewing the

11:14:36 20    company's historical performance, did you use any

21    actual performance data for the year 2000?

22          A.    Could you please repeat the question.

23          Q.    Sure.  The first bullet point, you

24    indicate you conducted a ten year DCF analysis

11:14:59 25    based on the company's historical performance, and

**J. Fensterstock**

1

2    revenue projections for 2000 through 2002;

3    correct?

4        A.    Yes.

11:15:07  5        Q.    Did you review the company's actual

6    performance for any of the time periods during the

7    year 2000?

8        A.    Yes.

9        Q.    What time period?

11:15:20  10        A.    The whole time period of 2000, prior

11    to our valuation date.

12        Q.    Did you use that actual data, for

13    January 1 through April 22, 2000, in preparing

14    your discounted cash flow analysis?

11:15:50  15        A.    Did we use the actual data?

16        Q.    Yes.

17        A.    In preparing our discounted cash flow

18    analysis?

19        Q.    Yes.

11:17:01  20        A.    In part, yes.

21        Q.    How can I tell that from your report?

22        A.    If you go to Exhibit B, and

23    specifically if you go to B-3, that is where you

24    will find the historical -- the only -- that is

11:17:32  25    where you will find, when you say use, there are

### J. Fensterstock

1    two different ways to use data, among others.  One

2    is to incorporate specific numbers into an Excel

3    spreadsheet, and the other one is to observe the

4    data and have it factor into judgments made with

11:17:49  5    respect to analyses.

6

7         In Exhibit B you will see some of the

8    specific numbers we used in our Excel

9    spreadsheets, what you cannot see is how the data

11:18:07  10   we observed for calendar 2000 leading up to April

11   22, factored into our judgments concerning our DCF

12   analysis.

13        Q.    Let's talk about each of the ways in

14   which you can use data.  Are the actual

11:18:26  15   performance numbers for Inacom, for the service

16   business from January 1, through April 22, 2000,

17   in your data?

18        A.    Balance sheet numbers, as of April

19   22nd, are in our Excel spreadsheets that were used

11:18:53  20   in the discounted cash flow analysis.

21        Q.    What about revenue?

22        A.    Revenue leading up to the date April

23   22nd, was reviewed by all of us, but is not set

24   forth for the stub period, because of two factors.

11:19:26  25   One factor is that the DCF analysis is for the

1    **J. Fensterstock**

2    future cash flows.  You are discounting back

3    future cash flows.  You look at historical income

4    statement and balance sheets to put the future

11:19:47  5    into some type of a context.

6               In the context of this analysis, much

7    of the financial data that we had for the period

8    January 1 through April 22nd of 2000, included pre

9    and post sale to Compac, data, did not include the

11:20:24  10    expense reduction program that was thought through

11    and contemplated by Inacom.  Did not include, for

12    example, the large services and supply arrangement

13    between Compac and Inacom for $420 million of

14    revenues, with $85 million obligated in calendar

11:20:52  15    2000 and 125 in 2001, and 145 in 2002, with the

16    associated 10 percent EBITDA margins that were

17    expected as presented to the board by Goldman

18    Sachs in January of 2000, and so we had some

19    degree of difficulty basing the future on -- let's

11:21:22  20    just say 60 days from February 15th to April 22nd,

21    where the data was not parsed out adequately.

22               So although we reviewed it, our

23    footnotes would have been extensive if we had just

24    copied that data and put it into historical

11:21:42  25    context in Exhibit B, and we simply did not do

1                    *J. Fensterstock*

2          that, but we went through all of the exercise that

3          I have been trying to summarize for you.

4                 Q.    Did you, in that same exercise, use

11:22:15  5    historical performance data for prior years?

6                 A.    Yes, for the service business.

7                 Q.    Correct.  Do I understand you

8          correctly you did use service business performance

9          data from prior years as a source for looking

11:22:41  10   forward, but you did not use the January 21, to

11         April 22, 2000 service data as a source for

12         looking forward?

13                A.    We did not have -- the answer to that

14         is yes, because we had four -- among others, four

11:23:02  15   pieces of paper produced in the discovery, which

16         were for calendar years and quarters in those

17         calendars years in '99, '98, '97, and '96, which

18         gave us 16 quarterly data points on the revenues

19         and gross margins associated with the historical

11:23:26  20   service business.  When it came to January through

21         February 15th, and February 15th through April

22         22nd, we did not have a clear picture of the gross

23         margin for the service business loan except, to my

24         best recollection, as we saw the first full month

11:24:05  25   that was broken out, March may have been as well,

**J. Fensterstock**

1
2    but the first full month that we focused on, with

3    great weight, not because of anything other than

4    we thought it was the business data point, and the

11:24:21   5    last good data points was the four weeks ending

6    April 22nd, which was Inacom, and clearly Inacom,

7    post the sale of the distribution business, and

8    even reflected a 28 percent gross margin and a

9    $820 million annual revenue run rate without the

11:24:47  10    benefit of any noticeable portion, or any portion

11    of the $85 million of revenue that was to come to

12    Inacom from Compac, pursuant to the

13    distribution -- sales and service agreement that

14    also had an expected 10 percent EBITDA margin

11:25:08  15    attached to it, as set forth in the January

16    Goldman board presentation.

17         Q.    Okay, back to page 21.  In the second

18    bullet point -- why don't I give you a moment to

19    read that to yourself.  Have you had a chance to

11:26:30  20    do so?

21         A.    Yes.

22         Q.    In the second sentence you say, "as a

23    result, Inacom's financial statements do not

24    provide a clear basis for projecting long-term

11:26:38  25    EBITDA margins for its service business."