LEXSEE 1997 US DIST LEXIS 20197

**WILLIAM STOKES, Plaintiff,-v-WILLIAM J. PERRY, SECRETARY, UNITED STATES DEPARTMENT OF DEFENSE, Defendant.**

**94 Civ. 0573 (RO)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 20197; 72 Empl. Prac. Dec. (CCH) P45,217*

**December 17, 1997, Decided**
**December 19, 1997, Filed**

**DISPOSITION:** [*1] Government's motion for judgment on partial findings granted, and action dismissed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employee filed a complaint against defendant, the Secretary of the Department of Defense (government), which alleged racial discrimination, disparate treatment, retaliation, and the absence of any equal opportunity scheme in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq. At the close of plaintiff's case, the government moved for judgment on partial findings under Fed. R. Civ. P. 52(c).

**OVERVIEW:** After the employee filed his claims the court set the matter for a trial so as to clarify the factual basis and legal theories on which the employee's pro se claims were based. The employee claimed that he, a black male, was not chosen on several occasions for a promotion that he claimed he was qualified for, that he was given lower evaluations because he was black, and that he was retaliated against when he filed Equal Employment Opportunity claims against his supervisor based on the evaluations and a written counseling he received. At the close of his case the government filed a motion for a judgment pursuant to Fed. R. Civ. P. 52(c). The court granted the government's motion because it found that the employee had not made out a prima facie case of discrimination in promotion, or of retaliatory acts. After the evaluations he did not apply for a promotion, and there was no connection apparent between the EEO claims and the alleged retaliation.

**OUTCOME:** The court granted the government's motion for partial judgment on the employee's Title VII action at the end of the employee's case.

**LexisNexis(R) Headnotes**

*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN1] Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., in part provides that it shall be an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race. *42 U.S.C.S. § 2000e-2(a).*

*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN2] The adjudication of a disparate treatment claim has three stages. First, the plaintiff must make out a prima facie case, giving rise to the inference of discriminatory treatment. Once the plaintiff has made out a prima facie case, the burden then shifts to the defendant to show a legitimate, non-discriminatory reason for the employment decision; if the defendant does so, then the plaintiff must show that the defendant's reason was pretextual. The basic contours of a prima facie case of disparate treatment were established in McDonnell Douglas, which held that a plaintiff must show (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. Different factual situations may require different kinds of proof. Generally speaking, the plaintiff must prove by a preponderance of the evidence that he was denied an employment opportunity under circumstances which give rise to an inference of

1997 U.S. Dist. LEXIS 20197, *1; 72 Empl. Prac. Dec. (CCH) P45,217

unlawful discrimination.

*Labor & Employment Law > Discrimination > Racial Discrimination > Coverage & Definitions*
[HN3] Where the fourth prong of McDonnell Douglas is literally inapplicable because plaintiff failed to be promoted in a pool hiring situation, the plaintiff, in order to make out a prima facie case of disparate treatment, must show that the employment decision was made under some circumstances which indicate that race was a factor.

*Labor & Employment Law > Discrimination > Retaliation*
[HN4] Retaliation is prohibited by Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., which provides that it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter. *42 U.S.C.S. § 2000e-3*(a). Like a disparate treatment case, there are three stages to a retaliation case: once plaintiff makes out his prima facie case, defendant must show a legitimate, non-retaliatory reason for the employment decision, which plaintiff must then show is pretextual. To make out a prima facie case of retaliation, plaintiff must show (1) that he was engaged in an activity protected by Title VII, (2) that his employer was aware of that activity, (3) that the employee suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action.

*Labor & Employment Law > Discrimination > Title VII*
[HN5] To prevail in a pattern-or-practice action, the plaintiff must establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure — the regular rather than the usual practice. Thus, plaintiff must show that the discrimination was systematic. Ordinarily, this showing is made by statistical proof.

*Civil Procedure > Trials > Bench Trials*
[HN6] Judgment for the defendant under Fed. R. Civ. P. 52(c) is appropriate where the plaintiff has failed to make out a prima facie case or where the plaintiff has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim.

**COUNSEL:** WILLIAM STOKES, plaintiff, Pro se, Staten Island, NY.

For WILLIAM J. PERRY, defendant: Sheila M. Gowan, U.S. Attorney's Office, SDNY, New York, NY.

**JUDGES:** Richard Owen, U.S.D.J.

**OPINIONBY:** Richard Owen

**OPINION:**

OPINION, FINDINGS AND CONCLUSIONS, AND ORDER

OWEN, District Judge

This action is before me as a bench trial. At the close of plaintiff's case, the government has moved for judgment on partial findings under *Rule 52(c) of the Federal Rules of Civil Procedure.*

William Stokes's complaint alleges racial discrimination — disparate treatment, retaliation, and the absence of any equal opportunity scheme for the advancement of black males — in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e* et seq. Because of Stokes's inability along the way to get specific as to his claim and because discovery was far from enlightening (Stokes is proceeding pro se), the trial was set up so as to clarify the factual basis and legal theories underlying Stokes's complaint by hearing his — the plaintiff's — case and then having a recess so that the government would have fixed by the [*2] transcript what it had to meet.

Stokes, a black male, has been and continues to be employed by Defense Logistics Agency ("DLA"), an agency of the Department of Defense, as a financial analyst from 1978 to the present, first in its main office at 201 Varick Street and later at a branch office. He holds an A.B. in mathematics and an M.B.A. in corporate finance and banking. In addition to his own duties as an analyst, Stokes trained other analysts when they first arrived at DLA. Stokes's current employment level under the government system is GS-12.

When Stokes began his employment at DLA in 1978, his supervisor — the Branch Chief — was Julius Wrubel. Stokes and Wrubel enjoyed a good working relationship, and at first Wrubel rated Stokes as "exceptional" or "highly successful" on his evaluations, n1 although Stokes's ratings started to drop sometime before 1988, when Wrubel died. Stokes was among those who applied to replace Wrubel as Branch Chief, a GS-13 position, but he was not selected. Instead, Wrubel was replaced by Morton Rolf. Rolf died about six months later. Rolf's successor was not chosen for a year a half. During the interim other DLA GS-12 employees, including Stokes, [*3] took turns as Acting Chief. Stokes again applied for the position of Branch Chief on a permanent basis, but in July of 1989, the position was filled by Larry Baum, who came in from private industry. n2

n1 Employee performance at DLA was rated

1997 U.S. Dist. LEXIS 20197, *3; 72 Empl. Prac. Dec. (CCH) P45,217

on a scale of 1 to 5, which translated as "unacceptable", "minimally acceptable", "fully successful", "highly successful", and "exceptional".

n2 When Stokes was not selected to replace Wrubel as Branch Chief, he filed an EEO complaint. He filed another EEO complaint when he was not chosen to replace Rolf. Neither complaint is a subject of this suit.

Baum and Stokes did not enjoy a good working relationship. Stokes complained about Baum being made his boss even before Baum started to work at DLA, and in a pretrial deposition, Stokes said. "I just let him know in no uncertain terms, 'I don't like you. I don't respect you.'" Thereafter, the two had strong words for each other on more than one occasion; Baum, in particular, was observed yelling at Stokes. Moreover, Baum [*4] was unimpressed with Stokes's work. Baum thought that Stokes took too long to perform financial reviews and close cases. Baum also expressed dissatisfaction with Stokes's writing skills, and on one occasion, he asked another analyst to rewrite a report. On more than one occasion, Baum reversed Stokes's decision on awarding contracts.

Baum did not give Stokes the high evaluations that he had received at earlier times in the past. In the performance rating for the period from July 31, 1989 to March 31, 1990, Baum gave Stokes a mid-range rating of "fully successful". In addition, in April of 1990, Baum wrote Stokes a "letter of counselling", a kind of negative evaluation, short of a reprimand, which details problems that a supervisor has noted with an employee's performance. In response to the letter of counselling, Stokes filed a complaint with the EEO. n3 In his 1990-1991 and 1991-1992 performance evaluations, Stokes again received a "fully successful" rating from Baum. With regard to each evaluation, Stokes filed another EEO complaint.

n3 Stokes never exhausted his administrative remedies with respect to that EEO complaint, and it does not form a part of this suit.

[*5]

In the early part of 1993, Stokes was assigned to a field office, Edwin Dodge Organization ("EDO"). When he first arrived at EDO, Stokes claimed, he did not have the basic equipment he needed for his work — a computer, etc. — and had to scrounge to get the office properly equipped. This claim was contradicted, however, by one of Stokes's own witnesses, who testified that he set Stokes's computer up for him some two weeks after Stokes got to EDO. Once he was at EDO. Stokes reported to Michael Carbone instead of to Baum. In the perfor-

mance evaluation for January through March of 1993, n4 Carbone also rated Stokes mid-range as "fully successful".

n4 Stokes first claimed the dates of this evaluation were altered, which turned out to be no more than an error, and then claimed "[I have] never seen it before in my life." However, when it was shown to him, he acknowledged his signature on the exhibit.

The period at issue in this action runs from April of 1990, the beginning of the time period covered by the 1990-1991 [*6] performance evaluation, through November of 1993, when the EEOC issued Stokes a right-to-sue letter.

Stokes's first claim in this suit is that the performance ratings which he received from Baum and Carbone, which he says affected his ability to be promoted, were an instance of disparate treatment. Disparate treatment is prohibited under [HN1] Title VII, which provides:

It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual or employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race . . . .

42 U.S.C. § 2000e-2(a). [HN2] The adjudication of a disparate treatment claim has three stages. First, the plaintiff must make out a prima facie case, giving rise to the inference of discriminatory treatment. Once the plaintiff has made out a prima facie case, the burden then shifts to the defendant to show a legitimate, [*7] non-discriminatory reason for the employment decision; if the defendant does so, then the plaintiff must show that the defendant's reason was pretextual. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).* At all times, the burden of persuasion remains on the plaintiff. See *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981).*

The basic contours of a prima facie case of disparate treatment were established in McDonnell Douglas, which held that a plaintiff must show

Case 1:04-cv-00148-GMS    Document 109-2    Filed 10/19/2005    Page 4 of 24

Page 4

1997 U.S. Dist. LEXIS 20197, *7; 72 Empl. Prac. Dec. (CCH) P45,217

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*411 U.S. at 802.* The McDonnell Douglas court also noted that different factual situations may require different kinds of proof. See id. n. 13; see also *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 [*8] *(1978).* Generally speaking, the plaintiff must prove by a preponderance of the evidence that he was denied an employment opportunity "under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253.

The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.

*International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977).

Stokes meets the first and third prongs of the McDonnell Douglas test: he is black, and he was not given the job of supervisor. Whether he meets the second prong is an arguable point. On one hand, he held an M.B.A. and had several years' experience at DLA and an M.B.A., and several of his current and former co-workers testified to their high opinion of Stokes's abilities. On the other hand, Stokes's own testimony and that of his witnesses also [*9] called into question his qualifications. Although Stokes received "exceptional" ratings in his early years at DLA, his ratings began to drop as early as 1987–88, when Wrubel was still his supervisor. While Stokes insisted that his written work was good, the witness Stokes called to support that assertion, a former co-worker, industrial specialist Stanley Sokoloff, acknowledged under cross–examination that the reports he saw had been cleared through Stokes's supervisor and might have been altered at that phase. Another former co-worker, Kenneth Blauer, testified that while he appreciated the extensive coverage that Stokes would give a to a subject, Stokes's work also included errors, including

conflicts in numbers. The very last witness Stokes called in three days of testimony stated that at the time Baum became Stokes's boss, Stokes was having marital problems which distressed him and caused him on occasion to come in late and take time off during the day. Thus, there is much evidence in the record that would support a finding that Baum's ratings were warranted and Stokes was not qualified for the position of supervisor. However, for purposes of the Government's motion, while I will [*10] assume that Stokes was qualified for the position, the outcome of the motion is unaffected because Stokes cannot and does not meet the fourth McDonnell Douglas prong.

Of all the prongs of the McDonnell Douglas test, the fourth is the one which would most clearly support the presumption of discrimination, for under that prong, it is the fact that a position remained unfilled even though the employer had considered a qualified candidate that has the appearance of invidiousness. See *Holmes v. Bevilacqua,* 794 F.2d 142, 146 (4th Cir. 1986) (en banc). However, where the plaintiff was among a pool of applicants for the same position from which one applicant was hired, it is impossible to make a showing under the fourth prong because, in that case, the position is filled simultaneously with the rejection. See 1 Lex K. Larson, *Employment Discrimination* § 8.03[3] (1997).

In dealing with this, different circuits have developed different requirements to take the place of the fourth McDonnell Douglas prong in a pool-hiring situation. The Fourth Circuit requires, in lieu of a showing that the position remained open, plaintiff "must present some other evidence that his [*11] race was a factor considered by his employer in not granting him the promotion." *Holmes,* 794 F.2d at 147. In the Third Circuit, the prima facie case is satisfied by "the presence of abundant circumstantial evidence from which the inference of discriminatory treatment can be drawn". *Green v. USX Corp.,* 843 F.2d 1511, 1526–27 (3d Cir. 1988). The Ninth and Tenth Circuits have adopted rules in which a showing of only the first three McDonnell Douglas prongs is sufficient to establish a prima facie case of disparate treatment in a pool-hiring/simultaneous hiring situation. See *Mohammed v. Callaway,* 698 F.2d 395, 398 (10th Cir. 1983), *Williams v. Edward Apffels Coffee Co.,* 792 F.2d 1482, 1485 (9th Cir. 1986).

The Second Circuit has not specifically addressed the pool-hiring/simultaneous hiring situation. However, other holdings in this Circuit are instructive. In the context of age discrimination suits, the Second Circuit has repeatedly described the plaintiff's burden to include a showing that the employment decision took place under "circumstances giving rise to an inference of age discrim-

1997 U.S. Dist. LEXIS 20197, *11; 72 Empl. Prac. Dec. (CCH) P45,217

ination". *Montana v. First Fed. Sav. and Loan Ass'n, 869 F.2d 100, 105 (2d [*12] Cir. 1989); accord Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994), Gallo v. Prudential Residential Serv., 22 F.3d 1219, 1224 (2d Cir. 1994), Pena v. Brattleboro Retreat, 702 F.2d 322, 324 (2d Cir. 1983).* The Montana court also held that a plaintiff who sought to make out a prima facie case of gender discrimination under Title VII was "required to show that she was treated less favorably than comparable male employees in circumstances from which a gender-based motive could be inferred." Montana at 106. The Circuit also approved the alternate fourth-prong showing in a Title VII pregnancy discrimination case, *Quaratino v. Tiffany & Co., 71 F.3d 58, 64 (1995)* ("circumstances giving rise to an inference of unlawful discrimination").

I note that in *Aguirre-Molina v. New York State Div. of Alcoholism and Alcohol Abuse, 675 F. Supp. 53, 58 (N.D.N.Y. 1987),* the district court adopted the approach taken by the Fourth Circuit in Holmes, holding that the plaintiff in a Title VII case must show some indicia of discrimination in order to make out a prima facie case. This approach commends itself to me.

> Without the fourth prong of the McDonnell Douglas [*13] proof scheme, any qualified minority applicant who is denied promotion could make out a prima facie case by merely proving his race, his qualifications, and his failure to be promoted. The proof of the first three prongs only set the stage for the fourth, which tips the scale in favor of a prima facie case, because the fourth prong requires proof that points toward illegal discrimination.

*Holmes, 794 F.2d at 147.* I therefore conclude that, in a case such as this, [HN3] where the fourth prong of McDonnell Douglas is literally inapplicable because plaintiff failed to be promoted in a pool hiring situation, the plaintiff, in order to make out a prima facie case of disparate treatment, must show that the employment decision was made under some circumstances which indicate that race was a factor.

Thus defined, plaintiff's showing fails. Plaintiff has produced no evidence that Baum's or Carbone's conduct toward Stokes was racially motivated.

Stokes attempted, without success, to show that Baum exhibited racist behavior generally. He called a co-worker, Larry Reynolds, who testified that his impression was that Baum disliked African-American males; however, Reynolds did not give [*14] any specific instances of Baum's conduct in support of that impression, aside

from the fact that he, like Stokes, received low ratings from Baum. In addition, Reynolds testified that he only worked in the main office at 201 Varick Street for thirty days. Stokes called another co-worker, Marie Pizarro-Ferrante, who testified that Larry Baum "had a comment for every group of people under the sun", but she did not recall hearing him use any racial epithets. Pizarro-Ferrante, who had a bias against Baum, also testified that Baum would say that government employees are stupid and ignorant. This observation was echoed in the testimony of Stokes's witness Salvatore Vasile, a co-worker, who heard Baum complain that government employees were basically incompetent. This, even if credited, is not evidence of racial bias.

Stokes testified that Baum made "a lot of little derogatory statements about every group" in a joking manner and that he, Stokes, would laugh along with Baum; however, Stokes did not testify that Baum ever used racial slurs or any language showing racial bias. Indeed, Stokes's only evidence of the use of a racial epithet was as recited in Baum's letter of counselling to Stokes, [*15] dated April 25, 1990, a portion of which reads as follows.

> After I [Baum] returned from lunch I called you [Stokes] into my office to explain why the four (4) past due reports were just sitting on your desk. You then started accusing Mr. Cheesman [sic] of disrupting your desk. When I pointed out to you the fact that Mr. Cheeseman had not been involved with a financial review in over a month, you switched to accusing Mr. Kalmanowitz of disrupting the material on your desk. At this point you started to get very loud, blaming Mr. Kalmanowitz for all yours problems. When I tried getting back to the subject matter as to why the reports were late, you stated that you had gotten an extension on one case, and you posed the question, "since when was a case one (1) or two (2) days past due considered late?". You then started shouting again, so loudly that all in the area could hear you. You claimed that you were being picked on for racial reasons. As a matter of fact you shouted several times that you were being picked on because you were a "nigger" (your word). You continued to blame Mr. Kalmanowitz for your problems and again stated that your being questioned as to why the [*16] reports were late was racially motivated. You left my office having given me the impression that you would complete the third late report before the start of the meet-

ing on Friday. You never explained why the reports were being held in your office past the due date. (Emphasis supplied.)

Upon questioning of Stokes on this subject by the Court, the following occurred:

> THE COURT: Did Baum ever use language to you indicating a racial slur or racial animus or racial bias? Did he ever say anything to you?
>
> MR. STOKES: Yes. He wrote it in a letter.
>
> THE COURT: Where is the letter?
>
> MR. STOKES: In that letter of counseling, I think.
>
> * * *
>
> THE COURT: What did he say in the letter of counselling as to racial slurs?
>
> MR. STOKES: He used the "N" word. I think it is in there. . . .
>
> * * *
>
> MR. STOKES: It is . . . about the middle of the page down at "As a matter of fact, you shouted several times that you were being picked on because you were" — then he said I said that.
>
> THE COURT: He said that you say that?
>
> MR. STOKES: Sir, he shouldn't have even mentioned that because he wrote it. He wrote it.
>
> THE COURT: Mr. Stokes, if it were the fact that you had said what he says you said, [*17] is there any reason he does not have a right to put in there what he says you said to him?
>
> MR. STOKES: Sir, I would never go up to a white person and say that and then expect some respect from them. No, sir.
>
> THE COURT: I asked you whether he made a racial slur, and you said he did and it was in [the letter of counseling].
>
> MR. STOKES: And he wrote it.
>
> THE COURT: I know. When we looked at [the letter of counseling], he is relating what he says you said to him, not him making a slur against you. Do you recognize that

fact?

> MR. STOKES: Sir, I know what the man said to me. He was always gonna change it.
>
> THE COURT: It is not there. It is not in [the letter of counselling].
>
> We are going to break for lunch until 2:00.
>
> * * *
>
> THE COURT: Mr. Stokes, when we broke for lunch, in an effort to sort of keep things on a relevant track, I had asked you if Baum had ever used language indicating to you a racial slur or racial bias or racial animus and you pointed me to [the letter of counselling]. Do you have any other instances that you can point the Court to where he did this?
>
> MR. STOKES: No.

Plaintiff also failed to show that Baum's behavior toward him in particular was motivated [*18] by racial animus. Whether or not Baum may have violated the union agreement when he wrote Stokes a letter of counselling at the same time that he gave Stokes a "fully successful" rating, Baum's failure to follow the alleged procedure bears no indicia of racism. While it appears that Baum on occasion treated Stokes with open dislike, Stokes reciprocated. In addition to Stokes telling Baum, as quoted above, "I don't like you, I don't respect you", Stokes testified that on another occasion, "after that first case, [Baum] came and said 'I just don't like you.' My thing was, is it because I know this job better than you, or what?" (Emphasis supplied.) Whatever their feelings toward each other, nothing in their interaction showed that Baum was influenced by the fact that Stokes is black. Nor did Baum single out Stokes as the recipient of less–than–desirable performance evaluations; he also gave a "fully successful" rating to at least two other GS–12s, Marcia Garwin and Daniel Gottbetter, neither of whom was black.

With respect to Carbone, plaintiff has produced almost no evidence at all.

In *Stanojev v. Ebasco Services, 643 F.2d 914, 920–21 (2d Cir. 1981),* the court held that [*19] a plaintiff might make a prima facie showing of age discrimination without using the McDonnell Douglas prongs, by means of direct proof, statistical evidence, or circumstantial evidence. Plaintiff presented no statistical evidence at all. He did attempt to show, through anecdotal evidence, that blacks and whites were treated differently at DLA. Plaintiff did not succeed.

1997 U.S. Dist. LEXIS 20197, *19; 72 Empl. Prac. Dec. (CCH) P45,217

Stokes testified that DLA employees used to say, jokingly, that no black employee was able to get ahead at DLA; according to Reynolds's testimony on cross-examination, however, members of both races received promotions through desk audits. Although Nathaniel Goods, a union official, testified to his impression that no African-American had ever attained the rank of GS-13, he admitted on cross-examination that a black woman, Beverly Sella, had indeed been promoted to GS-13. Stokes acknowledged that George T. Brown, a black computer specialist at DLA, was also a GS-13. There was other evidence that a Larry Booth, a black male, was also a GS-13.

Because plaintiff has made no showing under the fourth prong of the McDonnell Douglas test, he has failed to make out a prima facie case of disparate treatment under [*20] Title VII. Thus, plaintiff's disparate treatment claim must fail.

Stokes also claims that he was retaliated against for filing a prior complaint with the EEO. [HN4] Retaliation is prohibited by Title VII, which provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3*(a). Like a disparate treatment case, there are three stages to a retaliation case: once plaintiff makes out his prima facie case, defendant must show a legitimate, non-retaliatory reason for the employment decision, which plaintiff must then show is pretextual. See *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)*. To make out a prima facie case of retaliation, plaintiff must show (1) that he was engaged in an activity protected by Title VII, (2) that his employer was aware of that activity, (3) that the employee suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse action. See *Cosgrove v.* [*21] *Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993), Van Zant, 80 F.3d at 714*.

Stokes claims that he was retaliated against for filing claims with the EEO and that the retaliation took the form of performance evaluations in which Stokes continued to receive undeservedly low ratings. There is no dispute that an EEO complaint is a protected activity or that officials at DLA, such as Baum, were aware that Stokes had filed complaints; thus, the first two prongs of the prima facie case for retaliation are met. As for the third prong, however, plaintiff has failed to show that the "fully successful" ratings affected him adversely. Stokes admitted under cross-examination that he neither lost his job nor suffered a loss in pay as a result of those evaluations.

Although he asserts that the ratings kept him from being able to advance, he admits that he did not apply for a promotion during the relevant time period.

Even if plaintiff could show that the performance evaluations were adverse actions, he cannot show a causal connection between those ratings and his EEO complaint. The causal connection prong may be established "indirectly by showing that the protected activity was followed [*22] by discriminatory treatment or directly through evidence of retaliatory animus." *Cosgrove, 9 F.3d at 1039*. Plaintiff cannot establish discriminatory treatment for the same reasons that he failed to do so in his disparate treatment claim. Plaintiff attempts to show retaliatory animus by pointing to a statement made by Baum in April of 1991. According to Stokes, when Baum gave Stokes the performance evaluation for 1990-1991, Baum told him "if you win the first one, here is another one for you," by which Stokes understood Baum to mean that this evaluation, like the one from the previous year, could form the basis of an EEO complaint. While personal irritation is evidenced, that does not make it evidence of racial animus in Baum's statement; rather, I interpret Baum's remark as his acknowledgment that the ratings which Baum believed were fairly warranted were perceived by Stokes as racially motivated.

Because plaintiff has made no showing either that he suffered adversely from the performance ratings her received or that there was a causal connection between those ratings and his EEO complaints, he has failed to make out a prima facie case of retaliation under Title VII. Thus, [*23] plaintiff's retaliation claim must fail.

In addition, Stokes has attempted to show that DLA engaged in a pattern or practice of racial discrimination. n5 [HN5] To prevail in a pattern-or-practice action, the plaintiff must "establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure — the regular rather than the usual practice." *Teamsters, supra, 431 U.S. at 336*. See also *Coser v. Moore, 739 F.2d 746, 749 (2d Cir. 1984)*. Thus, plaintiff must show that the discrimination was systematic. See *Lopez v. Metropolitan Life Ins. Co., 930 F.2d 157, 160 (2d Cir. 1991)*. Ordinarily, this showing is made by statistical proof. See, e.g., *Teamsters, supra, Coser, supra*.

> n5 Although plaintiff did not allege that a pattern or practice of discrimination in his EEO complaint, the government stipulated at trial that it would allow the court to consider that the complaint had been amended to that effect.

Here, plaintiff has presented no statistical evidence

1997 U.S. Dist. LEXIS 20197, *24; 72 Empl. Prac. Dec. (CCH) P45,217

[*24] whatsoever. He has failed even to make the lesser showing of disparate treatment. In fact, plaintiff has not even proved "the mere occurrence of isolated or accidental or sporadic discriminatory acts" which are insufficient in a pattern-or-practice case. *Teamsters, 431 U.S. at 336.* The utterly conclusory testimony of Stokes's former co-worker, Madeline DiBugno, called by Stokes, does not avail. She had recently retired after 50 years of service and testified to such generalizations as "there has been discrimination in that office through the years with any black man who ever attempted." DiBugno went on to do litle more than name some names and other generalities. This sworn testimony was contradicted, however, by other testimony, including that of Stokes himself (see p. 11, supra), and by agency records, one of which Stokes stubbornly resisted recognizing. Her testimony was then nullified for purposes of this case by an affidavit she had given to an EEO investigation in which she testified as follows:

> Q: Did you not state in an affidavit, ma'am, "I have no firsthand knowledge of the performance appraisal issues which prompted Bill to file a discrimination complaint"? [*25]

> A: I just said that, yes. I was not in his group.

> Q: Did you not state in that affidavit, "I was not in that section, and I have no personal knowledge of what the basis for the problems were", referring to the problems between Bill Stokes and Larry Baum?

> A: True.

> Q: Isn't it true that you don't know of anything specific that would support Bill Stokes's claim that he has been discriminated against by Larry Baum?

> A: Yes. Personally, if I see him training an upward mobility person also, and the branch chief, Larry Baum — this was knowledge in the office. That is discrimination if he was not considered for the position.

> Q: Ms. DiBugno, did you not state in your affidavit, under penalty of perjury, "I don't know of anything specific that I could point to which would indicate that Larry Baum has discriminated against Bill Stokes"? Is that not what you stated in your affidavit?

> A: That I said . . . .

Because Stokes has presented no evidence sufficient to establish a pattern or practice of discrimination, this claim too must fail.

[HN6] Judgment for the defendant under Rule 52(c) is appropriate where the plaintiff has failed to make out a prima facie case or where the plaintiff [*26] has made out a prima facie case but the court determines that a preponderance of the evidence goes against the plaintiff's claim. See 9A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2573.1 (2d ed. 1994). On the basis of the foregoing, which constitutes my findings of fact and conclusions of law, I conclude that plaintiff has failed to establish a prima facie case with regard to his claims of disparate treatment, retaliation, and pattern or practice of discrimination. n6 The government's motion for judgment on partial findings is therefore granted, and the action is dismissed. Submit judgment accordingly.

> n6 Even if some of the generalities in the record could be considered to raise the suggestion of a prima facie case, the overwhelming preponderance of the evidence goes against the plaintiff's claims.

Dated: December 17, 1997

New York, N. Y.

Richard Owen

U.S.D.J.

LEXSEE 1998 DEL SUPER LEXIS 725

**HUGH A. MACNEIL, and JEANNE B. MACNEIL, his wife, Plaintiffs, v. JOHN A. CUSATO and BARBARA A. CUSATO, his wife, ANTHONY J. CUSATO, and CUSATO BROTHERS CONSTRUCTION COMPANY, INC., Defendants.**

**C.A. No. 96L-10-001**

**SUPERIOR COURT OF DELAWARE, SUSSEX**

*1998 Del. Super. LEXIS 725*

**August 31, 1998, Date Submitted**
**November 30, 1998, Date Decided**

**DISPOSITION:** [*1] On Plaintiffs' Motion for Summary Judgment GRANTED. On Defendant's Motion for Summary Judgment DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In the action that began as a mortgage foreclosure action, plaintiff mortgagees and defendants, mortgagor and guarantors, filed cross-motions for summary judgment in respect to defendants' counterclaim that the mortgage note's interest rate was usurious.

**OVERVIEW:** The mortgagors executed a note with the corporate mortgagor that was signed by a guarantor in his capacity as an officer of the corporation. The parties also executed a waiver whereby the guarantors relinquished any federal or state law claim that the interest charged was usurious. The debt was later refinanced with the same signatories and guarantors, but the waiver was not resigned. The notes were extended although the mortgagor ceased to exist. The mortgagees instituted a foreclosure action, but the sale of the property was set aside. Then defendants filed the instant counterclaim that the contract rate was usurious. The court granted the mortgagees' motion for summary judgment on the counterclaim. The court concluded that: (1) the original note was between the mortgagees and the mortgagor, who was a corporation that under *Del. Code Ann. tit. 6, § 2306* could not assert the defense of usury; (2) as guarantors the individuals were linked to the corporation and the corporate debt; and (3) the guarantors were not entitled to assert the defense of usury because it was not an available defense for the mortgagor.

**OUTCOME:** The court granted the mortgagees' motion for summary judgment and denied the defendants' motion of the issue of whether the mortgage note's interest rate was usurious.

**LexisNexis(R) Headnotes**

*Banking Law > National Banks > Interest & Usury*
[HN1] In all cases where any borrower or debtor has paid the whole debt or sum loaned, together with interest exceeding the lawful rate, the borrower or debtor, or his personal representative, may recover in an action against the person who has taken or received the debt and interest, or his personal representative, the sum of 3 times the amount of interest collected on any loan in excess of that permitted by law or the sum of $500, whichever is greater, if such action is brought within one year after the time of such payment. *Del. Code Ann. tit. 6, § 2304(b).*

*Contracts Law > Defenses > Usury*
[HN2] Under *Del. Code Ann. tit. 6, § 2306*, no corporation shall interpose the defense of usury in any action.

*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN3] A motion for summary judgment under Del. Super. Ct. R. Civ. P. 56 may be granted when there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. Alternatively, summary judgment is improper whenever genuine issues of material fact exist, or when a more thorough inquiry into the facts appears desirable to clarify how the law should apply to the circumstances of a particular case.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary Judgment Standard*
[HN4] The moving party bears the burden of showing that there are no material issues of fact present, and the record must be read in a light most favorable to the non-moving party. When the court is presented with cross-motions for summary judgment, neither party's motion will be granted

1998 Del. Super. LEXIS 725, *1

unless no genuine issue of material fact exists, so that one of the parties is entitled to judgment as a matter of law. In addition, summary judgment must be denied if there is a dispute regarding the inferences which might be drawn from the facts.

*Contracts Law > Defenses > Usury*
[HN5] Usury is defined in *Del. Code Ann. tit. 6, § 2304* as the charge to a borrower by a lender, directly or indirectly, of a higher rate of interest than that permitted by law. However, the defense of usury is not available to corporations. *Del. Code Ann. tit. 6, § 2306.*

*Contracts Law > Defenses > Usury*
[HN6] Individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes.

**COUNSEL:** Richard E. Berl, Jr., Esquire, Georgetown, Delaware, Attorney for Plaintiffs.

Lisa A. Yindra, Esquire, Georgetown, Delaware, Attorney for Defendant.

**JUDGES:** Graves, J.

**OPINIONBY:** Graves

**OPINION:** Graves, J.

Hugh MacNeil and Jeanne MacNeil ("Plaintiffs") originally commenced this case as a mortgage foreclosure action against John A. Cusato, Barbara A. Cusato, and Anthony J. Cusato (collectively referred to as "Defendants") and Cusato Brothers Construction Company, Inc. (the "Corporation"). The Plaintiffs purchased the mortgaged property at a public sale following entry of a default judgment. Prior to confirmation, this Court vacated the default judgment as to Anthony Cusato ("Defendant"), and Defendant paid sale costs. Thereafter, Defendant paid Plaintiffs the entire amount due on the original note between the parties. In a supplemental pleading, Defendant counterclaimed that the note's interest rate was usurious and sought damages. The parties have filed cross-motions for summary judgment, and they have submitted briefs in support of their respective motions. For the reasons stated [*2] below, I grant Plaintiffs' Motion for Summary Judgment and deny Defendant's Motion for Summary Judgment.

**FACTS**

The following chronology, which the parties do not dispute, outlines the parties' contractual relationship. On November 18, 1988, Plaintiffs loaned $30,000 to the Corporation. Anthony Cusato, as president and secretary of the Corporation, signed a Note evidencing the loan. The Note was guaranteed by the Defendants, as individuals, and secured by a mortgage on lands owned by the same. Notably, the parties executed a waiver whereby Guarantors relinquished any federal or state law claim that the interest charged—twenty-four percent (24%)—was usurious.

Because the parties partially have based their respective claims and counterclaims on the waiver agreement, the pertinent portions of the agreement are set forth below.

> We, the undersigned corporation and individuals, makers, and guarantors of payment, respectively, of a certain Note bearing even date herewith to Hugh A. MacNeil and Jeanne B. MacNeil, his wife, in the amount of Thirty Thousand [Dollars], payable with interest at the rate of twenty-four (24%) percent per annum, in twenty (20) equal payments of principal [*3] and interest . . . do hereby waive our rights under Delaware law, Federal law, or any other law or statute, to claim that the interest being charged under said Note is usurious under *23 Del. C. § 2301* [sic] . . . . We further swear that this loan is being entered into and obtained for business and commercial purposes and that the repayment thereof while secured by a mortgage is not secured by a mortgage against the principal residence of the maker or any of the guarantors. The undersigned further swear that this loan is to the corporation and they are acting as guarantors of payment only.

On April 19, 1990, Defendants refinanced the 1988 debt as evidenced by a Note for $35,000. Again, Anthony Cusato signed in his capacity as president and secretary of the Corporation, and Defendants, as individuals, guaranteed the Note. However, the parties this time did not resign a separate waiver regarding a usurious interest rate.

On February 16, 1993, Plaintiffs released two of the four lots covered under the 1990 Mortgage Defendants had executed. Finally, on March 31, 1993, the parties executed a Note and Mortgage Extension Agreement. Importantly, this agreement was between Plaintiffs [*4] as mortgagees and Defendants as mortgagors for $21,500 with interest to be paid at 24% per annum and secured by the remaining two lots from the 1990 Mortgage. Notably, on October 5, 1992, the Corporation ceased to exist and was not mentioned in the March 31, 1993 Agreement.

On October 3, 1996, Plaintiffs filed a mortgage foreclosure action on the remaining two lots. Subsequent to

1998 Del. Super. LEXIS 725, *4

an entry of default judgment, the property was auctioned at a public sale, and Plaintiffs purchased the same. Prior to confirmation, however, Defendant filed a motion to set aside the sale. On July 1, 1998, this Court issued an Order setting aside the judgment and vacating the sale.

On March 31, 1998, Defendant paid Plaintiffs $51,572.45, a sum equaling the principal, penalties, and interest at the aforementioned 24%. Thereafter, pursuant to *6 Del. C. 2304 (b)*, Defendant filed a supplemental pleading claiming that the contract rate was usurious and seeking damages. n1 Section 2304 (b) provides, in pertinent part:

> [HN1] In all cases where any borrower or debtor has paid the whole debt or sum loaned, together with interest exceeding the lawful rate, the borrower or debtor, or his personal representative, [*5] may recover in an action against the person who has taken or received the debt and interest, or his personal representative, the sum of 3 times the amount of interest collected on any loan in excess of that permitted by law or the sum of $500, whichever is greater, if such action is brought within one year after the time of such payment."

*6 Del. C. § 2304 (b).*

> n1 The Court notes that the defense of usury normally is not permitted in mortgage foreclosure actions. *Gordy v. Preform Building Components, Inc., Del. Super., 310 A.2d 893, 895-96 (1973).* See also, *First Federal Savings & Loan Association of Norwalk v. Christiana Falls, Del. Super., 1986 Del. Super. LEXIS 1324*, C.A. Nos. 84L-FE-11 through 84L-FE-39 and 84L-MR-1 & 84L-MR-2, O'Hara, J (Sept. 9, 1986) (Letter Op.) (holding that defendant's assertion of defense of usury to validity of mortgage was not within the scope of permitted defenses). However, this Court is proceeding on this ground as the parties have based their respective arguments thereon without contesting its applicability.

[*6]

On June 4, 1998, Plaintiffs filed their Motion for Summary Judgment arguing that Defendant has no entitlement to damages. On August 11, 1998, Defendant filed his Cross-motion for Summary Judgment. Plaintiffs contend that Plaintiffs effectively relinquished his right to assert a usury defense in the waiver agreement or, alternatively, that Defendant, as guarantor, is estopped from

seeking the protections of *6 Del. C. § 2304 (b)* because the underlying borrower was a corporation. [HN2] Under *6 Del. C. § 2306*, "no corporation shall interpose the defense of usury in any action." I find that the following issue alone resolves the parties' motions: Notwithstanding a corporation's preclusion from asserting the defense of usury, may the corporate borrower's guarantor assert such defense when, at the time the guarantor repays the loan, the corporation no longer exists?

**STANDARD OF REVIEW**

[HN3] A motion for summary judgment under Superior Court Civil Rule 56 may be granted when there is no genuine issue as to any material fact, so that the moving party is entitled to judgment as a matter of law. *Moore v. Sizemore, Del. Super., 405 A.2d 679, 680 (1979).* Alternatively, summary judgment [*7] is improper whenever genuine issues of material fact exist, or when a more thorough inquiry into the facts appears desirable to clarify how the law should apply to the circumstances of a particular case. *Ebersole v. Lowengrub, Del. Supr., 54 Del. 463, 180 A.2d 467 (1962).*

[HN4] The moving party bears the burden of showing that there are no material issues of fact present, and the record must be read in a light most favorable to the non-moving party. *Alabi v. DHL Airways, Inc., Del. Super., 583 A.2d 1358 (1990).* When the Court is presented with cross-motions for summary judgment, as here, neither party's motion will be granted unless no genuine issue of material fact exists, so that one of the parties is entitled to judgment as a matter of law. *Empire of America v. Commercial Credit, Del. Supr., 551 A.2d 433 (1988).* In addition, summary judgment must be denied if there is a dispute regarding the inferences which might be drawn from the facts. *Id. at 435.*

**DISCUSSION**

The parties' respective arguments focus on several issues. The first is whether Defendant effectively relinquished his right to assert the defense of usury by signing the aforementioned waiver. The second is whether [*8] the parties negotiated a usurious contract rate of interest. The last issue is whether Defendant should be prevented from raising a claim of usury by virtue of being a guarantor of the underlying corporate obligation. For the reasons below, I find that the final issue, which centers on the Corporation as debtor, unilaterally resolves this case.

Defendant's argument focuses on the fact that the Corporation was no longer in existence at the time of the 1993 extension agreements and, therefore, was not a party to that transaction. On that basis, Defendant maintains that the Defendant was acting in an individual capacity and without the disabilities of corporate status in

1998 Del. Super. LEXIS 725, *8

usurious transactions. n2

> n2 "No corporation shall interpose the defense of usury in any action." 6 Del. C. § 2306.

Conversely, Plaintiffs contend that Defendant was and continued to be a guarantor of the corporate debt with those subsequent agreements merely reinitiating that status and its obligations. Case law and supports Plaintiffs' contention. [*9] [HN5]

Usury is defined in 6 Del. C. § 2304 as "the charge to a borrower by a lender, directly or indirectly, of a higher rate of interest than that permitted by law." However, the defense of usury is not available to corporations. 6 Del. C. § 2306. The parties' initial loan clearly was between an individual lender, a corporate borrower, and individual guarantors. The subsequent agreements did not, and could not without a novation or an expressly and wholly superseding agreement, alter that relationship. n3 Specifically, the Defendant's status as a guarantor remained intact. As a guarantor, the Defendant was linked not solely to the Corporation, but more to the Corporation's debt—a debt for which the Guarantors remained secondarily liable and, ultimately, became primarily liable.

> n3 "A novation requires four elements: (1) a valid pre-existing obligation; (2) a valid new contract; (3) extinction of the old contract; and (4) the consent of all parties to the novation transaction. Schwartz v. Centennial Insurance Co., Del. Ch., 1980 Del. Ch. LEXIS 501, C.A. No. 5350, Hartnett, V.C. (Jan. 16, 1980) (Letter Op.) (citing 58 Am. Jur. 2d Novation § 10.

[*10]

In Bank of Delaware v. NMD Realty Co., Del. Super., 325 A.2d 108, 111 (1974), this Court held that [HN6] "individual defendants as accommodation indorsers are not entitled to assert the defense of usury inasmuch as it was not an available defense for the corporate maker of the notes." This statement of fact and law mirrors Defendant's standing in the instant case. Moreover, the corporation's nonexistence and concomitant non-repayment is precisely the type of situation from which creditors protect themselves by using guarantors. The law of this State, set forth in Bank of Delaware v. NMD Realty Co., supra, accords with that of various jurisdictions in ruling that "the defense of usury is not available to the privies of a corporate debtor." 47 C.J.S. Interest and Usury § 242 (1982).

See, e.g., Selengut v. Ferrara, N.J. Super. App. Div., 203 N.J. Super. 249, 496 A.2d 725, 730, cert. denied, N.J. Supr., 102 N.J. 316, 508 A.2d 199 (1985) (holding "it is generally recognized that a statute withdrawing the defense of usury from a corporation applies also to individual guarantors, sureties, and endorsers on the corporate obligations, so that they, as well as the corporation, are precluded from interposing [*11] usury as a defense."); Associated East Mortgage Co. v. Highland Park, Inc., Conn. Supr., 172 Conn. 395, 374 A.2d 1070 (1977) (noting that guarantors on corporate note were precluded from asserting usury defense when that defense was not available to the corporate borrower); All Purpose Finance Corp. v. D'Andrea, Pa. Supr., 427 Pa. 341, 235 A.2d 808, 810-11 (1967) (holding that guarantors, like the corporate principal debtor, are precluded from interposing a usury defense upon default); Baronberg v. Humphreys, City Ct. of N.Y., 166 Misc. 100, 1 N.Y.S.2d 415, 417 (1937) (holding that defendants who executed mortgage to secure corporation's note could not plead that plaintiff-creditor had exacted usurious interest for loan of money evidenced by note because loan was not made to defendants, but to corporation).

Whether Defendant's position is termed privy, guarantor, or accommodation party, the result consistently is estoppel from asserting usury where such defense was not available to the original debtor. Moreover, there was no novation in either the subsequent 1990 agreement or the 1993 extension agreement which would cast doubt on Defendant's status as guarantor. Defendant, as guarantor, was no stranger to the corporation's [*12] preclusion from the defense of usury. Upon the Corporation's expiration, the Defendant-guarantor was not transformed into an individual-debtor who could then assert the defense of usury. Rather, that expiration triggered the maturity of the guarantor's secondary liability. It is noteworthy that whether or not the corporation remains in existence is up to the Defendant-guarantor, not the Plaintiff-creditor. Indeed, to reach a contrary result would create a windfall for the Defendant-guarantor, in contravention with his contractual obligations, and place an unjust and unforseen eradication of the Plaintiffs-creditors' contractual rights and provisions.

### CONCLUSION

For the above reasons, the entry of summary judgment in favor of Plaintiffs in **GRANTED** and Defendant's Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**

LEXSEE 1995 US DIST LEXIS 13715

**MARYLAND CASUALTY COMPANY, Plaintiff, - against - W.R. GRACE & COMPANY, CONTINENTAL CASUALTY COMPANY, ROYAL INDEMNITY COMPANY, AETNA CASUALTY AND SURETY COMPANY, and GENERAL INSURANCE COMPANY OF AMERICA, Defendants.**

**83 Civ. 7451 (JSM) (LB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1995 U.S. Dist. LEXIS 13715*

**September 20, 1995, Decided**
**September 20, 1995, FILED**

**SUBSEQUENT HISTORY:** As Amended October 6, 1995.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff insured requested an entry of partial judgment pursuant to Fed. R. Civ. P. 52(c) against defendant insurer in an action regarding the existence of lost insurance policies.

**OVERVIEW:** Insured brought a suit in an attempt to establish the existence of lost insurance policies allegedly issued by the insurer. The court held that the insured established the existence of the 1961 and 1967 policies, but had failed to do so with respect to the pre-1961 policies. The court held that to recover under a lost insurance policy, the insured had to prove its former existence, delivery and contents by clear, satisfactory and convincing evidence. The court held that as to the 1961 and 1967 policies, the insured's evidence not only supported the existence of the policy and the limits, it supplied sufficient proof of premium payment and all the relevant evidence supported the existence of the policies. The court found that the insured failed to establish the material terms and conditions of the pre-1961 policies and the evidence did not satisfy the clear and convincing standard.

**OUTCOME:** The insured's request was granted. The court found the insured had established the existence of the 1961 and 1967 policies, but had failed to do so with respect to the pre-1961 policies.

**LexisNexis(R) Headnotes**

*Insurance Law > Claims & Contracts > Contract Formation*

*Evidence > Procedural Considerations > Inferences & Presumptions*
[HN1] A party seeking to recover under a lost insurance policy must prove its former existence, execution, delivery and contents by clear, satisfactory and convincing evidence.

*Civil Procedure > Appeals > Standards of Review > Standards Generally*
[HN2] A party who has the burden of proof by clear and convincing evidence must persuade the trier of fact that his or her claim is highly probable. This standard is more exacting than the standard of preponderance of the evidence, but less exacting than the standard of proof beyond a reasonable doubt.

*Civil Procedure > Trials > Judgment as Matter of Law*
*Civil Procedure > Trials > Bench Trials*
[HN3] Pursuant to Fed. R. Civ. P. 52(c), if during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgement until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).

**COUNSEL:** [*1] Laura A. Foggan, Esq., Keith S. Watson, Esq., Wiley, Rein & Fielding, Washington, D.C., Attorneys for Maryland Casualty Company.

Kurtis B. Reeg, Esq., Cawood K. Bebout, Esq., Gallop, Johnson & Neuman, L.C., St. Louis, Missouri, Attorneys for General Insurance Company.

1995 U.S. Dist. LEXIS 13715, *1

Michael L. Anania, Esq., Ford Marrin Esposito Witmeyer & Gleser, New York, New York, Attorneys for Continental Casualty Company.

**JUDGES:** LEONARD BERNIKOW, United States Magistrate Judge

**OPINIONBY:** LEONARD BERNIKOW

**OPINION:**

OPINION AND ORDER

**Bernikow, U.S. Magistrate Judge:**

The present dispute in this diversity case, between Maryland Casualty Company ("Maryland") and Continental Casualty Company ("CNA") on one side and General Insurance Company of America ("General") on the other, involves the issue of lost insurance policies. The facts of this case have been set forth many times, see, e.g., *Maryland Cas. Co. v. W. R. Grace and Co.,* 23 F.3d 617 (2d Cir. 1993), cert. denied, 130 L. Ed. 2d 559, 115 S. Ct. 655 (1994), and need not be repeated. n1 In brief, this case, a declaratory judgment action, concerns the coverage obligation of the insurer parties to defend and indemnify defendant W.R. Grace & Co.–Conn. [*2] ("Grace") under comprehensive general liability ("CGL") policies. Maryland Casualty Co. ("Maryland"), which issued such policies to Grace from 1955 to 1973, brought this action against Grace and CNA, Grace's current insurer, for a declaration of its obligations. In 1985, Maryland added three other insurers including General Insurance Co. ("General"). Grace seeks coverage because it has been sued in thousands of underlying lawsuits for bodily injury and property damage in connection with its manufacture and distribution of asbestos-containing products.

> n1 This case was referred to the undersigned for all purposes including trial with the consent of the parties, pursuant to 28 U.S.C. 636(c)

The insurer parties, including General, at various times issued CGL policies to Grace or its predecessors. Grace, as well as the insurers, have been unable to locate many of the policies. Grace is not involved in the present dispute because it has settled its claims against General. See Stipulation For Dismissal dated March 15, 1994. Nevertheless, [*3] Maryland and CNA ("plaintiffs") seek to establish the existence of General policies in the hopes of compelling General to share in Grace's defense costs in the underlying actions. The court conducted a trial without a jury on the lost policies. This opinion constitutes the court's findings of fact and conclusions of law.

*Fed. R. Civ. P. 52(a).*

The court found at the start of the trial that Maryland had made a diligent search for the policies so as to enable it to rely on secondary evidence, pursuant to *Fed. R. Ev. 1004.* Transcript of trial ("Tr.") 73–74. General makes no claim that the policies were lost or destroyed due to the fraud or bad faith of Grace, Maryland or CNA. See *Fed. R. Ev. 1004(1).* General unsuccessfully searched its own files for evidence of the lost policies that were the subject of the trial. Grace, which of course, had a strong incentive to locate any polices providing coverage, searched its own files. Grace retained Alison Watts, a consultant specializing in locating lost policies. Ms. Watts and her associates conducted an exhaustive search, interviewing numerous Grace employees, employees of acquired companies, relevant insurance brokers and others and examining [*4] hundreds of thousands of documents. Watts dep. 140–1, 258–60, 262, 274.

Background

Plaintiffs seek to show that from 1953 through 1967, General issued blanket liability policies with products coverage to Vermiculite Northwest, Inc. ("VNW"), a Washington corporation acquired by Grace in late 1966. VNW manufactured and distributed asbestos-containing products, including various asbestos-containing insulation products used in the construction business. General concedes that it issued four one-year policies to VNW providing products coverage from June 1, 1963, to June 1, 1966, based on copies of policies found by Grace in the course of its search for evidence of coverage. See Pl. ex. 1 (Stipulation dated March 4, 1994). Those policies, General admits, provide coverage to VNW for bodily injury and property damage caused by products distributed, handled, manufactured or sold by VNW, subject only to the terms, conditions and exclusions set forth in the acknowledged policies.

General denies, however, that it issued any other policy to VNW, based upon its own search, and review of the secondary evidence presented by Grace, Maryland and CNA. It does admit, though, that if it had [*5] issued a blanket liability policy to VNW in 1961 and in 1966, those two policies would have provided coverage to VNW for bodily injury and property damage caused by the products distributed, handled, manufactured or sold by the insured, subject only to the terms, conditions and exclusions set forth in certain General blanket liability policies ("BLP"). Pl. ex. 1 (Stipulation dated March 4, 1994). General also admits that any products coverage afforded to VNW under those two policies would not have been excluded by endorsement or otherwise. Id. Nonetheless, General argues that Maryland and CNA have not proven the existence,

execution, delivery, and particular terms and conditions of any alleged policy for those years.

At trial, plaintiffs presented evidence concerning the 1961 and 1967 policies. They also presented evidence with respect to the 1953 to 1961 policies as a group.

Discussion

[HN1] A party seeking to recover under a lost insurance policy "must prove its former existence, execution, delivery and contents by clear, satisfactory and convincing evidence." *Boyce Thompson Institute v. Insurance Company of North America, 751 F. Supp. 1137, 1140 (S.D.N.Y. 1990).* Although [*6] this standard has not met with universally acceptance, see, e.g., *Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F. Supp. 1420, 1425 (D. Del. 1992),* the State of Washington follows it in considering lost instruments such as deeds. n2 See *Keierleber v. Botting, 77 Wash. 2d 711, 466 P.2d 141, 144 (1970); Deglow v. Smith, 77 Wash. 2d 128, 459 P.2d 786, 786 (1969); Johnson v. Wheeler, 41 Wash. 2d 246, 248 P.2d 558, 560 (1952)* (evidence at trial, the court found that the clear and convincing standard applies. See order, dated April 6, 1994.

n2 The parties agreed that the State of Washington law would govern the proof-of-policies issues as to any General policies. Order dated March 7, 1994.

The clear and convincing does not call for the highest levels of proof. *United States v. Owens, 854 F.2d 432, 436 (11th Cir. 1988).* [HN2] "'A party who has the burden of proof by clear and convincing evidence must persuade [the trier of fact] that his or her [*7] claim is highly probable. This standard is more exacting than the standard of preponderance of the evidence, but less exacting than the standard of proof beyond a reasonable doubt.'" *Id. at 436 n. 8* (quoting *State v. Renforth, 155 Ariz. 385, 746 P.2d 1315, 1318 (Ct.App 1987)).*

The alleged 1967 policy (June 1, 1966 to June 1, 1967)

In regard to the 1967 policy, General argues that the record contains no evidence of a premium payment and notes that no witness has direct recollection of seeing a completed declarations page with limits or a policy. General Post Trial Brief at 21. Plaintiffs counter that the other evidence they present is sufficient. On the issue of the existence of the policy and its limits, plaintiffs submit a copy of a letter, dated June 3, 1966, from Parker, Smith & Feek, Inc., VNW's insurance agent, n3 to VNW's president, Bill Culver, which enclosed a

General comprehensive liability policy, BLP 270815, for another year from June 1, 1966. The letter indicated that the contract provided completed operations coverage n4 and set forth the limits of the policy: "The contract provides $300,000/1,000,000 Automobile and Miscellaneous Bodily Injury Liability, [*8] $100,000 Automobile Property Damage Liability, and $250,000 Miscellaneous Property Damage Liability with an aggregated limit of $250,000." Pl. ex. 18. Plaintiffs submit another letter, dated June 2, 1966, from the same insurance agent concerning the same policy; this one is directed to Mr. J.B. Lyall, VNW's lessor, and names Mr. Lyall and his wife as additional insureds. Pl. ex. 19.

n3 Prior to 1963, VNW purchased its insurance from an insurance agency called Clise and Cumins. Ex. 1. Charles Clise, the president of Clise and Cumins, was the brother of J.W. Clise, who controlled a group of companies including VNW. Jt. ex. 5 (Potter 3-7-94 dep) at 22; jt. ex. 4 (Culver dep) at 17, 27, 32, 133. Business Consultants, Inc., a management company, was another Clise-owned company. J.W. Clise was the principal owner of VNW, Business Consultants, Inc., Vermiculite Manufacturing Co., and Mount Pleasant Cemetery. Ex. 101 to pl. ex. 217 at P4. In 1963, Parker, Smith and Feek replaced Clise and Cumins as VNW's insurance agent.

n4 Plaintiff's expert testified that completed operations coverage and products coverage are sold together or not at all. Tr. 257.

[*9]

As noted, Grace acquired VNW in 1966. The 1966 purchase and sale agreement between VNW and Grace, dated August 5, 1966, stated that the sellers delivered to Grace "a true and complete schedule (certified by the Treasurer of [VNW]) setting forth all insurance policies." Pl. ex. 120, or Def. ex. 1, P 7(o) at 10. The schedule lists BLP 270815 for the term "6-1-66 to 6-1-67." Pl. ex. 22. The listing concurs with the coverages and limits set forth in the Feek letters of June 2 and 3, 1966. Pl. exs. 18 and 19. The purchase and sale agreement also states that VNW "is not in default or alleged to be in default on any agreement or contract..." *Pl. ex. 120 or def. ex. 1 P 7(t)* at 10. Plaintiffs' expert testified that in the ordinary course the premium would have been due at the inception of the policy or 30 days thereafter. Tr. 302. The disputed policy incepted on June 1, 1966, and the purchase and sale agreement is dated August 5, 1966. The foregoing evidence not only supports the existence of the policy and the limits, it supplies sufficient proof of premium payment.

General argues that the schedule of insurance, Pl. ex. 22, is undated and unverified, and fails to state when it was prepared, [*10] who prepared it or where the information in it was obtained. Citing John W. Wallace & Co. v. Continental Ins. Co., No. A–35555–89T5 (N.J. Super. Ct. App.Div. Nov. 8, 1990), reprinted in 5 Mealey's, No. 6 at C-1, p. 4 (Dec. 11, 1990), n5 General argues that references in a document to a policy number are insufficient to prove the existence, terms and conditions of that policy. John Wallace, however, is inapposite. In that case, the plaintiff relied on a certificate of insurance issued by the insurer's agent to establish the existence of a comprehensive business policy described in the certificate. Id. at 3–4. The certificate indicated the amount of the policy and its term. The president of the agent testified, though, that the agent never had the authority to issue a policy, which could only be issued by the underwriter for the insurer itself. Id. at 4, 6. The court, noting that the burden was on the plaintiff to establish the existence of the insurance policy and its terms and conditions, found that a certificate of insurance is not a policy or a contract of insurance. Id. at 7.

n5 This opinion is marked not for publication without the approval of the committee on opinions.

[*11]

In the present case, plaintiffs have submitted more than a certificate of insurance. Indeed, all the relevant documents support the existence of the policy. And unlike the defendant in John Wallace, General has presented no evidence to contradict or undermine the convincing evidence offered by plaintiffs.

It is true, as General points out, that Mr. Culver could not recall receiving the letter from Parker, Smith & Feek, or whether it came with a contract. Culver Dep. at 195. But the letter was part of a pattern of renewing VNW's general liability coverage. Plaintiffs have submitted copies of similar letters from the same broker, to VNW and Mr. Lyall, for earlier years for which General acknowledges coverage. See pl. exs. 10, 11, 12, 14, 15, 16 and 17. These letters begin in 1963, when Parker Smith & Feek replaced Clise & Cumins as VNW's broker. For example, plaintiffs submit a letter, dated June 22, 1964, from Parker Smith & Feek to Mr. Culver of VNW, which enclosed an admitted comprehensive liability policy providing one year coverage from June 1, 1964. Pl. ex. 14. The letter shows that the 1964 policy includes the same limits and essentially the same conditions as those [*12] contained in the alleged policy covering June 1, 1966 to June 1, 1967. Id. If, after years of similar coverage, the coverage changed, according to plaintiff's expert, the broker would have made it "absolutely clear" in any letter delivering a renewal policy.

Tr. 179.

This evidence, along with General's stipulation, appears clear and convincing and, thus, meets the standard to establish the existence of the policy and its terms and conditions.

The alleged 1961 policy

Plaintiffs present an even more compelling case with respect to the 1961 policy. Plaintiffs submit two binders, the first dated June 29, 1962, pl. ex. 23, and the second, August 3 1962, pl. ex. 24, that bind the admitted 1962 policy, but refer to the alleged 1961 policy, numbered BLP 186027. General argues that plaintiffs' own expert conceded that the two binders purporting to renew coverage of the 1961 policy do not contain the insured, limits, policy period, endorsements and exclusions upon which to make a coverage decision. A review of the transcript, however, reveals that the expert said the opposite. He testified that he would grant coverage for the 1961 policy based on the binder. Tr. 273–74. Of course, [*13] the binder listed the insureds on the 1962 policy. But, according to the expert, the binder had much information on it: the limits of liability, the effective date, the insureds. n6 Tr. 275. The binder had enough information on it, the expert continued, to indicate the basic coverage under the 1961 policy. Id. He conceded that he did not know whether endorsements were attached to the basic coverage. Id. In that regard, General's counsel asked the expert on cross-examination, whether there were any self–insured retentions under the policy. Id. Based on his review of a large loss report, pl. ex. 28, discussed below, the expert opined that there was no self–insured retention. Tr. 307–09.

n6 The expert did say that he could not tell from the looking at the binder who the "et al." insureds were under the 1961 policy. Tr. 268. He could obtain that information, the expert noted, from the successor policy. Id.

The first binder in the line entitled "Endorsements applying," says "Same as BLP 186027." [*14] n7 For the 1962 policy, it identifies the insureds as Business Consultants, Inc. and VNW, et al. It also states "Same as BLP 186027" in the line entitled "Description and location of risk." The second binder, pl. ex. 24, cancels and replaces the June 29, 1962 binder. Again binding the 1962 policy, it states on the Endorsements applying line "Same as BLP 186027 with the attached exclusion" and has the same notation as the first binder on the description line.

n7 BLP 186027 refers to the alleged 1961 policy.

1995 U.S. Dist. LEXIS 13715, *14

General argues that the binders fall into the same category as the cover sheet on a policy described in *Boyce Thompson, 751 F. Supp. at 1140, n.2*. In that case, the cover sheet of an admitted policy contained a notation stating "renew or in lieu of OBP 4585." Id. In fact, the binders provide more information than the cover sheet supplied by the plaintiffs in Boyce Thompson. And even apart from the binders, plaintiffs have produced considerably more evidence than Boyce Thompson did.

To begin with, [*15] Blake Potter, who worked for General from 1947 to 1953, jt. ex. 5 (Potter dep) at 9–10, and for Clise & Cumins from 1953 to 1961. Id. at 9, 13–14, testified that he recalled that General provided blanket liability insurance coverage for VNW from at least June 1961 through June 1962. Id. at 26. Nevertheless, he admitted that the basis for this testimony was the documents sent him by the attorneys for plaintiffs. Id. at 68–69.

Additional evidence consists of a premium rating and calculation sheet, pl. ex. 25 or 25a (a more legible copy of ex. 25), which lists the present policy and the previous policy by number, term and limits. General's 30(b)(6) witness on the codes contained on the premium audit sheets testified that the information on this kind of document would have been obtained from the policy. Jt. ex. 8 (Parker dep) at 52–54. n8 The previous policy or old policy is the disputed policy, i.e., BLP 186027, for the term June 1, 1961 to June 1, 1962. The present policy or new policy is BLP 205359 for the term June 1, 1962 to June 1, 1963. Plaintiff's expert explained that the exhibit lists the various descriptions and classifications that apply to the account and the [*16] limit of liabilities. Tr. 206. n9 The exhibit has a column entitled "Earned Premium Adjusted For," which applies to the 1961 policy and another column entitled "Estimated Advance Premium For," pertaining to the new policy. It also shows an additional premium due on the disputed policy, after an audit, in the amount of $88.20. Tr. 206, 209–10. If an additional premium was due, the expert added, a deposit premium was paid at the beginning of the term. Tr. 206. The premium rating sheet further lists the names of the insureds including VNW.

n8 General's objection to this testimony is overruled. Although the witness did not prepare the audit sheet at issue, she had personal knowledge concerning the preparation of such documents. Moreover, a premium audit sheet issued to VNW, shown to the witness, had a format similar to the sheets she prepared. Id. at 22.

n9 General's motion to preclude the expert's testimony is denied. The testimony has been helpful to the court. And to the extent, if any, the expert might have opined on matters of law, the court will make its own legal findings.

[*17]

The next piece of evidence, a handwritten audit sheet concerns the 1961 and the 1962 policies, BLP 186027 and BLP 205359, respectively. Pl. ex. 26. The first line of this document reads "General Insurance Co. of America." With respect to the 1961 policy, this document states that an audit was conducted on March 31, 1961, though plaintiff's expert testified that the document should have read March 31, 1962. Tr. 211. This document indicates, like ex. 25, that an additional premium of $88.20 was due. It also means, according to the expert, that the policy lasted for a full policy term. Tr. 210. Additionally, the document appears to list the insureds, including VNW.

Plaintiffs also submit a large loss report, n10 dated November 28, 1961, prepared by an underwriter and underwriter supervisor, both employed by General, which concerns the 1961 policy, BLP 186027. Pl. ex. 27. The report appears to relate to a products loss concerning Vermiculite Manufacturing Co. Tr. 1025. Nevertheless, the report lists the insureds as J.W. Clise & Co. and VNW, the agent as Clise & Cumins and the policy limits as $250/250M. General's Rule 30(b)(6) witness on large loss reports, Earl Wallis, testified, [*18] at deposition, that his practice with regard to listing the name of the insureds on the "name of the insured" line of the report was to use only the first name on the policy when the policy had numerous insureds. Jt. ex. 6 at 64. Although he did not prepare the report, he explained this practice as the result of the lack of room on the report for a lot of names. Id. n11 Thus, General's complaint about the failure to prove the identity of the insureds is not consistent with the evidence. With respect to the limits, they agree with those on the premium rating and calculation sheet, ex. 25, that is, $250,000 per accident and $250,000 aggregate property damage claims. See tr. 225–226, 298. n12

n10 A General expert defined a large loss report as a document "designed to notify the peers, or the superiors, of the underwriter who handle the risk that a certain loss has occurred over a certain amount." Tr. 825. The insurer, he added, considers the report in determining whether to maintain, cancel or non-renew the insurance. Id.

n11 General objected to similar testimony from this, its own, witness because he was not the author of the document and on relevance grounds. The lack of personal knowledge of a witness does not bar his Rule 30(b)(6) designation. *S.E.C. v. Morelli,*

*143 F.R.D. 42, 45 (S.D.N.Y. 1992)*. In addition, the testimony appears relevant. Accordingly, General's objection is overruled.

[*19]

   n12 It appears plaintiffs' expert inadvertently erred when he said, at tr. 289, that limits of 250/250 mean 250,000 per occurrence or aggregate on the first side. The remainder of his testimony coincides with his corrected testimony that the first side concerns per accident or occurrence and the second the aggregate. Tr. 298

The report, says plaintiffs' expert, indicates that a claim was made under the policy. Tr. 225. The date of loss on the report is August 1961. General's expert acknowledged that such a report would not have been prepared if General was not on the risk at that time. Tr. 842. Mr. Wallis testified to the same effect, see Jt. ex. 6 at 27, as did a General employee. Jt. ex. 7 at 61.

General notes that plaintiffs' expert found no proof of payment for the 1961 policy or, for that matter, for the 1966 policy. While acknowledging that he had seen no canceled check for the 1961 policy or any document reflecting payment, the expert testified that a review of exs. 25 and 27 shows that a premium was paid. Tr. 297-98. The premium rating sheet, ex. 25, in the expert's opinion, indicated [*20] that all but the audit premium had been paid. Tr. 297. The large loss report, dated November 1961, ex. 27, as noted, shows a loss incurred in August 1961. Tr. 298. The expert reasoned that if the premium on the 1961 policy had not been paid by November 1961, the date of the report, the policy would have been cancelled for non-payment. Id.

General complains that the large loss report concerns Vermiculite Manufacturing Co., and does not set forth the nature of the limits or effective dates of the policy. But General ignores the fact that the report lists the insured as J.N. Clise & Co. and VNW. It also overlooks the fact that the date of the policy is set forth in the first binder and in the premium rating and calculation sheet as well. In addition, the report lists the limits, which also appear in the premium rating and calculation sheet.

While none of the documents referred to above, standing alone, may have established the existence of the 1961 policy, taken together, these documents, the expert testimony and the stipulation show the existence, including the material terms, of that policy.

The alleged 1953 to 1961 policies

The 1953 to 1961 policies present a more difficult

[*21] question. Plaintiffs do not provide the same quality of evidence submitted in connection with the 1961 and 1967 policies.

General argues that plaintiffs have not only failed to prove the existence of the policies, they have not established the policies' material terms and conditions. Plaintiffs have not proven, for example, any limits for any policy issued to VNW before 1961, says General. General adds that plaintiffs have failed to prove the policy term, number, identity of insureds, risk and loss insured, extent of coverage available, payment of any premiums, or any other specifics of any pre-1961 policy.

In regard to the existence of the policies, William Culver, mentioned earlier, a "manager" at VNW in 1955, jt. ex. 4 (Culver dep) at 22, who became VNW's president in 1963, id. at 30, testified, at deposition, that between 1955 and 1966, VNW used two insurance brokers: Clise and Cumins, and Parker, Smith & Feek. Id. at 133. As a manager he had no role in obtaining general liability insurance, id. at 136-38, but he believed that product liability coverage was part of VNW's insurance package. Id. at 143-44. He could not recall, though, which company provided that [*22] coverage. Id.

Blake Potter, also mentioned earlier, testified, at deposition, that he was involved with the VNW account at Clise & Cumins from 1953 to 1961. Jt. ex. 5 at 38. He also noted that VNW's liability insurance was placed with General. Id. at 39. In a rebuttal deposition taken during trial, based on an affidavit he prepared a few days before the deposition, Potter essentially repeated this testimony. n13 In the affidavit (at P 11), he said: "It is my best recollection that VNW's CGL insurance carrier throughout my employment at Clise & Cumins was General Insurance Company." Ex. 101 annexed to pl. ex. 217. On cross-examination, Mr. Potter agreed that his best recollection does not mean that he is 100 per cent certain. Pl. ex. 217 at 48, 56. Potter also testified that he recalled seeing experience risk documents for VNW for policies issued by General on the anniversary dates of the policies. Id. at 56-57.

   n13 General objected to the admissibility of the deposition and affidavit. In view of the court's finding on the pre-1961 policies, the objection need not be resolved.

[*23]

In *Boyce Thompson, 751 F. Supp. 1137*, which, like the case at bar, involved lost and admitted CGL policies, Boyce Thompson offered ledger sheets indicating periodic payments to its insurance broker for the lost policy years echoing the three-year period of the acknowledged

1995 U.S. Dist. LEXIS 13715, *23

policies, as well as an affidavit of an employee of the broker stating that Boyce Thompson had employed the broker for CGL coverage by the defendant insurer. *751 F. Supp. at 1140–41.* The court found this evidence did not satisfy the clear and convincing standard. *Id. at 1141.*

Similarly, the testimony of Culver and Potter does not rise to that level. Culver had no role in obtaining liability insurance and could not remember which company provided that coverage. Potter, for his part, could not say with certainty that General provided coverage to VNW. He used terms like "as far as I know," jt. ex. 5 at 39, and "to the best of my recollection." Aff. at P11. Given the passage of time between his employment at Clise & Cumins, Potter's uncertainty is understandable. The passage of time, however, does not lessen plaintiffs' burden. Moreover, Potter did not know when for the first time General provided coverage [*24] for VNW. Jt. ex. 5 at 71.

The question arises whether the documentary evidence, added to the testimony of Culver and Potter, satisfies plaintiffs' burden. They again cite the November 28, 1961 large loss report concerning Vermiculite Manufacturing Co. See supra, pp. 14–16. Aside from the information cited above, a handwritten notation on the report says "risk earned 44.1% experience debit."

At deposition, Mr. Wallis, General's Rule 30(b)(6) witness on large loss reports, explained the 44.1% experience debit. Jt. ex. 6 (Wallis dep) at 42–44. He indicated that the experience rating is based on the premiums for the previous three years: "you look back three years and you look at the premium and you look at the losses and you do a ratio." Id. at 44. This testimony suggests that the experience rating on the large loss report was based on the premiums paid for General policies for the previous three years, namely, 1958, 1959 and 1960. General's expert agreed that the large loss report seeks loss ratio data for three years. Tr. 897. Another large loss report form, pl. ex. 28, has a blank line for "Lost ratio past three years." But, he noted, the report could contain experience data [*25] for a shorter period. Tr. 897.

The ratio is computed on policies providing the same kind of coverage noted in the large loss report, see id. at 43–44, apparently general liability. Mr. Wallis testified that the "experience rating is done on a particular line of business." Id. Further, the coverage included products liability because the report, as noted, see supra. at 14–16, appears to concern such a claim. Nevertheless, the parties dispute whether the report is based on one line of coverage. Jesse Starnes, a General underwriter, who prepared another large loss report, discussed below, testified that he would look at all losses and all premiums under any policy in preparing the report, not just products loss. Jt.

ex. 15 at 28; see also id. at 13–14. All the witnesses who considered the issue, other than Mr. Starnes, however, supported Mr. Wallis's testimony. Tr. 230–31; tr. 858.

Plaintiffs also rely on a large loss report, dated February 18, 1963, pl. ex. 28, which, they say, shows that General insured VNW for products coverage beginning as early as 1951, and at least by 1958. General unsuccessfully moved in limine to exclude this document as irrelevant. It argued [*26] that the report named Business Consultants, Inc., but nowhere mentioned VNW. The report, however, concerned a claim made on admitted policy BLP 205359 for 1962–1963, which insured Business Consultants, Inc., VNW, Vermiculite Manufacturing Co., Mount Pleasant Cemetery, Concrete Thermal Casing, Inc. and Vermiculite–Puerto Rico, et al. And by naming Business Consultants, Inc., the report confirmed the practice, noted by Mr. Wallis, of listing the first named insured on the report.

The report, a General document, had a pre-printed question, which asked "How long have we had risk?" The response, handwritten by General's underwriter, Jesse Starnes, is subject to dispute. It reads either "11 1/2 years" or "4 1/2 years." Starnes at his deposition could not read his handwriting, jt. ex. 15 at 18, so as to tell whether he meant four or eleven, nor could he remember preparing this report. Id. at 10. He testified, though, that the risk refers to "the account with the name listed on the top." Id. at 16: see also 25. As the trier of fact, the court finds the entry is 11 1/2 years. The numeral looks more like an eleven than a four. In all other places on the form where Mr. Starnes wrote [*27] the numeral four, there could be no dispute. He clearly wrote a four. On the disputed line the first numeral one is higher than the second numeral one. That fact creates the debate, but it is insufficient to find that the writer intended a four.

The finding that Mr. Starnes intended an eleven does not carry the day for plaintiffs. For one thing, he had no recollection of preparing the report. He could not even decipher his own handwriting. Furthermore, the entry merely responded to one of a number of questions that provided background information; it was not the main focus of the report. In addition, General's expert, Mr. Malecki, testified that neither large loss report showed that General provided products liability coverage to VNW prior to 1961. Tr. 831. He noted that the two large loss reports provided no information concerning the identity of the named insured on any prior policy. Tr. 833–34. He explained that because a named insured is listed on a report "doesn't necessarily mean it's been a named insured under a previous policy." Id. at 831. Id. To him, "there is no way to reconstruct the prior coverage, based upon this large loss report [pl. ex. 27]." Tr. 833. [*28]

1995 U.S. Dist. LEXIS 13715, *28

Indeed, General notes that the declarations pages on the four acknowledged policies show different insureds for each policy. On these policies, not all of the "Clise" companies were carried on the same policy from year to year. In 1963, for example, the named insureds were Business Consultants, Inc., VNW and Concrete Thermal Casing, Inc. Yet in the following year, only VNW was a named insured. Thus, General submits that the "Clise" group of companies did not maintain continuous coverage with General from 1962 through 1966. Post trial brief at 12.

In attempting to explain the different insureds, plaintiffs point out that J.W. Clise's died in 1962, prior to the issuance of the 1962 policy. They submit that it is not surprising that the insurance for these companies would be handled differently after his death. Thus, after the death, plaintiffs note, the Clise companies changed insurance brokers. Plaintiffs' explanation, however, is not based on any evidence and amounts to no more than speculation.

Plaintiffs also argue that both Mr. Potter and Mr. Culver testified that all of J.W. Clise's companies were insured together under the same insurance policies. Mr. Culver believed that between [*29] 1955 and 1966 members of the Vermiculite family of companies, including VNW, were named insureds on the general liability policies Jt. ex. 4 at 149-50. As noted, though, Culver could not recall the insurance company that provided coverage. Potter testified that the Clise companies were not insured separately. Jt. ex. 5 at 72. All the companies J.W. Clise owned, according to Potter, were insured together on a given policy. Pl. ex. 217 at 9, 47, referring to Potter ex. 101. He admitted, however, that he did not know when for the first time General provided coverage for VNW. Id. at 71.

To support Mr. Potter's and Mr. Culver's testimony that the Clise companies were insured under the same blanket liability policies, plaintiffs cite the premium rating sheet, pl. ex. 25, issued in 1961, which lists the named insureds as Business Consultants, Inc., VNW, Vermiculite Manufacturing Co., Mount Pleasant Cemetery, Concrete Therman Casing, Inc., and Vermiculite Puerto Rico. This document, though not very legible, appears to have referred to the 1961 and 1962 policies, not to any earlier policies.

Plaintiffs have also introduced specimen General policy forms in existence before 1961. These [*30] forms contained products coverage and a defense obligation. They may have proven helpful, see, e.g., *Rogers v. Prudential Ins. Co., 218 Cal. App. 3d 1132, 1137, 267 Cal. Rptr. 499 (1990)* (contents of a lost policy may be proven by copies of other policies sold at the same time that used similar provisions), had plaintiffs provided ad-

ditional probative evidence. But given the nature of the evidence, the forms do little to satisfy plaintiffs' burden.

Thus, the documentary materials even when combined with the testimony of Culver and Potter do not reach the level of clear and convincing evidence to show the existence of the policies or their terms. To find for plaintiffs on the pre–1961 policies requires the court to draw all inferences and resolve all doubts in their favor. The court cannot do so given plaintiffs' burden. Plaintiffs' evidence with respect to the pre–1961 policies pales by comparison to their evidence in connection with the 1961 and 1967 policies. On the later policies, plaintiffs submitted documentary evidence supporting their existence and establishing their terms. The evidence included contemporaneous documentation and correspondence consistent with the previous [*31] practice of the parties. In certain instances, one piece of evidence corroborated another. Also, plaintiffs presented evidence of the policy number and the policy term, information completely lacking for the pre–1961 years.

Even plaintiffs' evidence concerning premiums is lacking. True, Potter could not recall that VNW ever defaulted on a premium payment. Pl. ex. 217 at 63. But that testimony does not amount to clear and convincing evidence of premium payments going back to 1953. And, as stated, Potter could not recall when General first insured VNW. Plaintiffs also argue that it is unlikely General would have continued to issue policies to VNW in the 1960s had it defaulted in its premium obligations in earlier years. This argument appears reasonable, but does not amount to clear evidence of premium payments.

Another issue raised by the parties concerns policy limits. General maintains that plaintiffs have the burden of proving the monetary value of coverage, *City of Tacoma v. Great American Insurance Companies*, No. C93–5729B (W.D. Wash. June 16, 1995), reprinted in 5 Mealey's, No. 36 at G–2 (July 25, 1995), and have not satisfied their burden. The court agrees with General [*32] with respect to the pre–1961 policies. Plaintiffs have provided little or no evidence of policy limits for those policies. They rely on the evidence submitted for the post–1961 policies to support the contention that the pre–1961 policies had the same limits. Given their burden, plaintiffs have failed to prove the limits of the pre–1961 policies. Nevertheless, they argue they do not have to prove limits because General's duty to defend can be found without such proof. *Burroughs Wellcome Co. v. Commercial Union Ins. Co., 632 F. Supp. 1213, 1223 (S.D.N.Y. 1986)* (policy limits immaterial to the duty to defend). As indicated, plaintiffs seek to compel General to share in Grace's defense costs in the underlying action.

General argues that the limits will be important in

1995 U.S. Dist. LEXIS 13715, *32

the allocation phase of this case. Washington law, like New York law, says General, provides for pro rata allocation of defense costs by limits. *Avondale Indus., Inc. v. Travelers Indemn. Co., 774 F. Supp. 1416, 1436–38 (S.D.N.Y. 1991).* General has cited no Washington case for its position. And in *Perez Trucking, Inc. v. Ryder Truck Rental, Inc., 76 Wash. App. 223, 886 P.2d 196, 201 (1994),* a Washington court [*33] allocated defense costs equally between concurrent primary insurers until judgment or settlement. That court did not say, however, whether the "other insurance" clauses of the relevant policies provided for equal contribution or pro rata contribution. In any event, in view of the court's finding regarding the existence and terms of the pre-1961 policies, the question of whether plaintiffs' claim for defense costs eliminates the obligation to prove the amount of coverage need not be resolved.

Conclusion

For the foregoing reasons, the court finds that plaintiffs have established the 1961 and 1967 policies, but have failed to do so with respect to the pre-1961 policies.

Rule 52(c) judgment

Plaintiffs request the entry of a partial judgment with respect to the 1961-1967 policies, pursuant to *Fed. R. Civ. P. 52(c).* n14 General resists, arguing that a finding in favor of plaintiffs on whether General issued the subject policies is not dispositive of any claim upon which Rule 52(c) authorizes judgment. Rule 52(c) judgment, according to General, is only contemplated when the finding would be dispositive of a claim or defense.

A motion under the rule is usually made at [*34] the close of the plaintiff's case where the plaintiff has failed to carry its burden of proof. 1991 Advisory Committee Note to Rule 52(c). Rule 41(b) had authorized that procedure. In 1991, Rule 52(c) replaced the part of Rule 41(b) that authorized dismissal of the plaintiff's case for a failure of proof. Id. The present motion clearly would not fit under the old rule. But the new rule not only retains the Rule 41(b) dismissal, it authorizes the entry of judgment at any time the court "can appropriately make a dispositive finding of fact on the evidence." Id. Moreover, the rule was

amended in 1993 to make clear that judgments may be entered against any party "and with respect to issues or defenses that may not be wholly dispositive of a claim or defense." 1993 Advisory Committee Note to Rule 52(c). Hence, the present motion appears to fall within the new rule.

> n14 [HN3] Rule 52(c) provides:
>
> > If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgement until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

[*35]

General also argues that the express language of the rule permits the court to decline to enter a judgment until the close of all of the evidence in the case. True, the entire case is not over, but all the evidence is in on the lost policies. The court conducted a full trial on that issue. Thus, General has not presented any argument requiring the court to reject plaintiffs' request for entry of a partial judgment on the lost policies. Accordingly, plaintiffs' request is granted.

Settle judgment on five days' notice.

So ordered.

Dated: New York, New York

September 20, 1995

LEONARD BERNIKOW

United States Magistrate Judge

LEXSEE 2004 BANKR LEXIS 315

**In re: EXDS, INC. (f/k/a EXODUS COMMUNICATIONS, INC.), et al., Debtors. EXDS, INC. (f/k/a EXODUS COMMUNICATIONS, INC.), Plaintiff, v. FINISAR CORPORATION, Defendant.**

**Chapter 11, Case No. 01–10539 (PJW) Jointly Administered, Adv. Proc. No. 02–05935 (PJW)**

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

*2004 Bankr. LEXIS 315; 42 Bankr. Ct. Dec. 215*

**March 19, 2004, Decided**

**DISPOSITION:** [*1] Defendant's motion for summary judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant creditor filed a motion for summary judgment in connection with plaintiff debtor's claim seeking to avoid and recover a prepetition payment made to the creditor.

**OVERVIEW:** The debtor alleged that a payment made to the creditor was a preference. The creditor argued that there was no antecedent debt because there was no debtor–creditor relationship. In the purchase order in question, a non–debtor subsidiary of the debtor ordered from the creditor certain fiber optic equipment. The invoice was paid in Canadian dollars, which the creditor rejected. The debtor then tendered a check to the creditor in United States dollars. The creditor argued that the debtor simply paid the obligation of its affiliate and that the payment was not for an obligation of the debtor to the creditor. The court found that further discovery pursuant to *Fed. R. Civ. P. 56(f)*, made applicable to the proceeding by *Fed. R. Bankr. P. 7056*, might have shown that the creditor had an expectation from the purchase order that there was a purchase agreement with the debtor and that the debtor was going to make the payment. Because there were material issues of fact as to the existence of a debtor–creditor relationship between the parties, the matter was not ripe for summary judgment.

**OUTCOME:** The court denied the motion.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof*
*Civil Procedure > Summary Judgment > Summary*

*Judgment Standard*
[HN1] Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. The moving party bears the burden of demonstrating that there are no issues of fact and all inferences must be drawn in a light most favorable to the non–moving party.

*Bankruptcy Law > Examiners & Trustees > Preferences*
*Bankruptcy Law > Preferential Transfers*
[HN2] *11 U.S.C.S. § 547*(b)(2) provides that a trustee may avoid any transfer of an interest of the debtor in property for or on account of an antecedent debt owed by the debtor before such transfer was made. *11 U.S.C.S. § 547*(b)(2). Debt is defined as a liability on a claim. *11 U.S.C.S. § 101* (12). A claim is defined broadly to include a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. *11 U.S.C.S. 101*(5). A common sense approach for determining whether a loan repayment is for an antecedent debt owed by the debtor is to consider whether the creditor would be able to assert a claim against the estate, absent the repayment. *11 U.S.C.S. § 547*(b)(2).

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*
[HN3] *Fed. R. Civ. P. 56(f)*, made applicable to a bankruptcy proceeding by *Fed. R. Bankr. P. 7056*, states that the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had where the party opposing the summary judgment application cannot present by affidavit facts essential to justify the party's opposition. *Fed. R. Civ. P. 56(f)*.

**COUNSEL:** For Exds, Inc., Exds Plan Administrator: Mark Minuti, Jeremy W. Ryan, Saul Ewing LLP,

2004 Bankr. LEXIS 315, *1; 42 Bankr. Ct. Dec. 215

Wilmington, DE.

For Exds, Inc., Exds Plan Administrator: Richard Levy, Jeffrey A. Koppy, Daniel S. Dooley, Jenner & Block, LLC, Chicago, IL.

For Finisar Corporation: Michael G. Busenkell, Jason W. Harbour, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

**JUDGES:** Peter J. Walsh, United States Bankruptcy Judge.

**OPINIONBY:** Peter J. Walsh

**OPINION:**

### MEMORANDUM OPINION

Dated: March 19, 2004

**WALSH, J.**

Pending before the Court is the Motion for Summary Judgment (Doc. # 14) filed by defendant Finisar Corporation ("Finisar"). For the reasons set forth below, the Motion will be denied.

### BACKGROUND

On September 26, 2001, EXDS, Inc. (f/k/a Exodus Communications, Inc.) ("the Debtor") and certain affiliated entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On June 5, 2002, the Court entered an order confirming a reorganization plan.

On October 15, 2002, pursuant to §§ 547 and 550 of the Bankruptcy Code, the Debtor commenced this adversary proceeding against Finisar seeking [*2] to avoid and recover a pre-petition payment of $42,998.79 made to Finisar. Finisar filed an answer to the complaint and on June 13, 2003, Finisar filed the Motion, arguing that there was no antecedent debt because there was no creditor-debtor relationship between the Debtor and Finisar.

In a purchase order ("the Purchase Order") dated October 18, 2000, Exodus Internet (Canada) Inc. ("Canada"), a non-debtor subsidiary of the Debtor, ordered from Finisar certain fiber optic equipment. The Purchase Order directed Finisar to ship the product to "Sanrise C/O Hitachi" ("Sanrise") at Sanrise's business location. On October 25, 2000, Finisar sent an invoice to the Debtor's address and on October 26, 2000, Finisar performed by shipping the goods ordered by Canada to Sanrise. On April 20, 2001, Canada paid the invoice in Canadian dollars. That payment was rejected by Finisar and thereafter the Debtor tendered a check for $42,998.79

in United States dollars.

The Debtor had created Canada to expand into the Canadian marketplace. Pursuant to two agreements between the Debtor and Canada, the Debtor agreed to pay mostly all of Canada's costs and debts. When the Debtor did not directly pay Canada's [*3] invoices, it transferred funds into Canada's bank account to cover the amounts of the invoices.

### DISCUSSION

[HN1] "Summary judgment may only be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. . . .'" *Carter v. Exxon Co. USA, 177 F.3d 197, 202 (3d Cir. 1999).* The moving party bears the burden of demonstrating that there are no issues of fact and all inferences must be drawn in a light most favorable to the non-moving party. *Id.*

Finisar argues that the Debtor simply paid the obligation of its affiliate, and that payment was not for an obligation of the Debtor to Finisar, and therefore, it was not a payment of an antecedent debt. The Debtor argues that summary judgment is premature because a material issue of fact exists as to which party – the Debtor or Canada – was obligated to pay for the purchase of Finisar's products.

[HN2] *Section 547(b)(2) of the Bankruptcy Code* provides that a trustee may "avoid any transfer of an interest of the debtor in property . . . for or on account of an antecedent debt owed by the debtor before such [*4] transfer was made. . . ." *11 U.S.C. § 547(b)(2).* Debt is defined as a "liability on a claim." *11 U.S.C. § 101 (12).* A claim is defined broadly to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *11 U.S.C. 101(5).* "A common sense approach for determining whether a loan repayment is 'for . . . [an antecedent] debt owed by the debtor' is to consider whether the creditor would be able to assert a claim against the estate, absent the repayment." *Smith v. Creative Fin. Mgmt. Inc. (In re Virginia–Carolina Financial Corp.), 954 F.2d 193, 197 (4th Cir. 1992)(citing 11 U.S.C. § 547(b)(2)).*

[HN3] *Federal Rule of Civil Procedure 56(f)*, made applicable to this proceeding by *Federal Rule of Bankruptcy Procedure 7056*, states that the court "may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken [*5] or discovery to be had" where the party opposing the summary judgment application "cannot . . . present by affidavit facts essential to justify the party's

2004 Bankr. LEXIS 315, *5; 42 Bankr. Ct. Dec. 215

opposition." *Fed. R. Civ. P. 56(f)*. The Debtor asserts its entitlement to conduct such discovery.

Clearly the Purchase Order contains language which suggests that the Debtor may have been liable for payment of the Purchase Order. First, the Purchase Order states: "ATTN: FOR PROMPT PAYMENT, SEND ALL INVOICES TO: Exodus Communications," stating a Santa Clara, California address. Second, the Purchase Order refers to the "agreement of Exodus Communications, Inc. . . . to purchase the goods." Third, the facsimile stamp on the Purchase Order states: "From–Exodus Purchasing". The Purchase Order names Canada, stating its address in Brampton, Ontario. However, that reference does not establish that Canada is solely responsible for payment to Finisar. Significant to this issue is the invoice which Finisar sent to the Debtor. It is not addressed to "Exodus Communications," nor is it addressed to "Canada" c/o Exodus Communications; it is addressed to "Exodus Communications, Inc. . . . Attn: A/P Dept. [*6] " The Canada name appears nowhere on the invoice.

Given the language used in the Purchase Order and the invoice, it can reasonably be inferred that Finisar had a basis for asserting a claim against the Debtor. Indeed, further discovery may show that Finisar had an expectation from the Purchase Order that there was a purchase agreement with the Debtor and that the Debtor would make the payment.

Presumably, Finisar had knowledge of the parent/subsidiary relationship between the Debtor and Canada. Thus, Finisar may have relied upon the creditworthiness of the Debtor and believed that the Debtor would be liable for the payment on the Purchase Order.

## CONCLUSION

For the reasons set forth above, it is clear that there are material issues of fact as to existence of a creditor-debtor relationship between Finisar and the Debtor. Given the evidence supporting a finding of such a relationship, this matter is decidedly not ripe for summary judgment. Consequently, I deny Finisar's Motion.

## ORDER

For the reasons set forth in the Court's Memorandum Opinion of this date, Defendant Finisar Corporation's Motion for Summary Judgment (Doc. # 14) is DENIED.

Peter J. Walsh

United States [*7] Bankruptcy Judge

Dated: March 19, 2004